CENTER FOR CONSTITUTIONAL RIGHTS
Barbara Olshansky
Michael Ratner
Jules Lobel
Robert Perry
Jeffrey Fogel
David Cole
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6439

**CV 04     0249**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

JAN 2 2 2004

★BROOKLYN OFFICE ★ NSL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

MAHER ARAR,

                          Plaintiff,

      – against –

JOHN ASHCROFT, Attorney General of the
United States; LARRY D. THOMPSON, formerly
Acting Deputy Attorney General;
TOM RIDGE, Secretary of State for Homeland
Security; JAMES W. ZIGLAR, formerly
Commissioner for Immigration and Naturalization
Services; J. SCOTT BLACKMAN, formerly
Regional Director of the Eastern Regional Office of
the Immigration and Naturalization Services;
PAULA CORRIGAN, Regional Director of
Immigration and Customs Enforcement;
EDWARD J. McELROY, formerly District
Director of Immigration and Naturalization Services
for New York District, and now District Director of
Immigration and Customs Enforcement;
ROBERT MUELLER, Director of the Federal
Bureau of Investigation; and JOHN DOES 1-10,
Federal Bureau of Investigation and/or
Immigration and Naturalization Service Agents,

                      Defendants.

-----------------------------------------------------------x

**TRAGER, J.**

**POHORELSKY, M.J.**
_____ - CV - _____

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

Plaintiff MAHER ARAR, by and through his attorneys allege the following:

## NATURE OF ACTION

1.      This is a constitutional, civil, and human rights case challenging the decision by United States government ("Federal") officials to send Maher Arar, a Canadian citizen seized while he was transiting through JFK Airport to a connecting flight home, to Syria for interrogation under torture. After holding Mr. Arar in harsh and punitive conditions, coercively interrogating him for hours on end, and depriving him of contact with his family, his consulate, and his lawyer, federal officials rushed Mr. Arar off in a private jet to Jordan and then Syria. Federal officials removed Mr. Arar to Syria with the full knowledge of the existence of state-sponsored torture in that country, and in direct contravention of the United Nations Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment (CAT), a treaty ratified by the United States in 1994. Upon information and belief, federal officials removed Mr. Arar to Syria under the Government's "extraordinary renditions" program precisely because Syria could use methods of interrogation to obtain information from Mr. Arar that would not be legally or morally acceptable in this country or in other democracies.

2.      On information and belief, the decision to remove Mr. Arar to Syria for interrogation under torture was based solely on Mr. Arar's casual acquaintance with individuals thought possibly to be involved in terrorist activity. On information and belief, there was never, and is not now, any reasonable suspicion to believe that Mr. Arar was involved in such activity.

3.      Plaintiff Maher Arar brings this action against Defendants John Ashcroft, Larry D. Thompson, J. Scott Blackman, Edward J. McElroy, Robert Mueller, and others, for their role in the violation of his constitutional, civil and international human rights. Defendants conspired

2

with officials in the Syrian government and/or aided and abetted Syrian government officials in their plan to arbitrarily detain, interrogate and torture Mr. Arar. Defendants intentionally detained Mr. Arar and then removed him to Syria so that Syrian authorities could interrogate him under torture. Further or in the alternative, Defendants knew or ought reasonably to have known that by removing Mr. Arar to Syria there was a substantial likelihood that he would be subjected to torture. Defendants' conduct violates the Torture Victim Protection Act, the Fifth Amendment to the United States Constitution, and treaty law.

4.     Prior to his removal, Defendants John Ashcroft, Larry D. Thompson, J. Scott Blackman, Edward J. McElroy, Robert Mueller, and others, unlawfully detained and interrogated Mr. Arar for thirteen days. During this time, Defendants denied Mr. Arar effective access to consular assistance, the courts, his lawyer, and family members. While confined, Defendants also subjected Mr. Arar to coercive and involuntary interrogation designed to overcome his will and compel incriminating statements from him. These interrogations were conducted for excessively long periods of time and at odd hours of the day and night. While in detention, Mr. Arar was subjected to unreasonable and excessively harsh conditions. He was held in solitary confinement, chained and shackled, subjected to invasive strip-searches, and deprived of sleep and food for extended periods of time. By their actions Defendants Ashcroft, Thompson, Blackman, McElroy, Mueller, and others, violated rights guaranteed to Mr. Arar under the Fifth Amendment to the United States Constitution and treaty law.

5.     Mr. Arar seeks a judgment declaring that Defendants' actions, and those of all persons acting on their behalf including their agents and/or employees are illegal and violate Mr. Arar's constitutional, civil, and human rights. Mr. Arar also seeks a declaration that his

3

detention in the United States and the decision to remove him to Jordan and Syria were unjustified, unconstitutional, unlawful and without probable cause to believe that he was a member of or had any involvement with Al Qaeda or any other terrorist organization.

6.      Mr. Arar also seeks compensatory and punitive damages for violations of his constitutionally and internationally protected rights.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1350, note (the Torture Victim Protection Act), 5 U.S.C. §§ 551, 559 (Administrative Procedure Act), and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act).

8.      This action is brought pursuant to the Torture Victim Protection Act. It is also an action brought directly under the Fifth Amendment to the United States Constitution and treaty law.

9.      Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to Mr. Arar's claims occurred in this District.

## JURY DEMAND

10.     Mr. Arar demands trial by jury in this action on each and every one of his claims.

## PARTIES

11.     Plaintiff MAHER ARAR is a 33 year old citizen of Canada. He currently resides in Ottawa, Canada. He and his parents came to Canada from Syria when he was seventeen years old. Mr. Arar obtained his Bachelors degree from McGill University, Montreal and his Masters

4

degree in telecommunications from INRS-Telecommunications. Mr. Arar met his wife, Monia Mazigh, a Canadian citizen born in Tunisia, at McGill University, and they were married in 1994. They have two young children.

12.     Since 1999, Mr. Arar has been employed by or worked on a consultancy basis with MathWorks, a high-tech firm based in Massachusetts with clients all over the world, including the United States. Mr. Arar has substantial connections with the United States. At all material times, he had federal authorization to work in the United States. Mr. Arar lived in Boston when he was an employee of Mathworks. Mr. Arar has relatives and friends who live in the United States. Mr. Arar wishes to return to the United States for work and to visit relatives and friends but is prevented from doing so by the immigration order prohibiting his return.

13.     Prior to the incidents complained of herein, Mr. Arar had never experienced any difficulties with either United States or Canadian authorities and had never been arrested. Mr. Arar is neither a member of nor involved with Al Qaeda or any other terrorist organization. Mr. Arar has never knowingly associated himself with terrorists, terrorist organizations or terrorist activity.

14.     Defendant JOHN ASHCROFT is the Attorney General of the United States. In this capacity, Defendant Ashcroft, at the time of the actions complained of herein, had ultimate responsibility for the implementation and enforcement of United States immigration laws. Defendant Ashcroft was responsible for making the decision to remove Mr. Arar to Jordan and Syria. Conspiring with and/or aiding and abetting Defendants Thompson, Blackman, McElroy, Mueller, and others, as well as with Syrian government officials, Defendant Ashcroft removed Mr. Arar to Syria so that Syrian authorities would interrogate him in ways that they believed

themselves unable to do directly, including the use of torture. Further, or in the alternative, Defendant Ashcroft removed Mr. Arar to Syria knowing that Mr. Arar would be in danger of being subjected to torture there. Defendant Ashcroft is sued in his official and individual capacities.

15.     Defendant LARRY D. THOMPSON was Acting Attorney General when the unlawful actions complained of herein took place. In this capacity, Defendant Thompson signed the order removing Mr. Arar to Syria. Conspiring with and/or aiding and abetting Defendants Ashcroft, Blackman, McElroy, Mueller, and others, as well as Syrian government officials, Defendant Thompson removed Mr. Arar to Syria so that Syrian authorities would interrogate him in ways that they believed themselves unable to do directly, including the use of torture. Further, or in the alternative, Defendant Thompson removed Mr. Arar to Syria knowing that Mr. Arar would be in danger of being subjected to torture there. Defendant Thompson is sued in his individual capacity.

16.     Defendant TOM RIDGE is the Secretary of State for Homeland Security. In this capacity, Defendant Ridge is currently responsible for the implementation and enforcement of United States immigration laws. Defendant Ridge is sued in his official capacity.

17.     Defendant JAMES W. ZIGLAR was the Commissioner of the Immigration and Naturalization Services at the time the unlawful actions complained of herein took place. At all material times, Defendant Ziglar had responsibility for the implementation and enforcement of United States immigration laws. He was the INS's chief executive officer. Conspiring with and/or aiding and abetting Defendants Ashcroft, Thompson, Blackman, McElroy, Mueller, and others, as well as Syrian government officials, Defendant Ziglar removed Mr. Arar to Syria so

6

that Syrian authorities would interrogate him in ways that they believed themselves unable to do directly, including the use of torture. Further, or in the alternative, Defendant Ziglar removed Mr. Arar to Syria knowing that Mr. Arar would be in danger of being subjected to torture there. Defendant Ziglar failed to consider the provisions of Article 3 of CAT, as required by 8 C.R.F. §235.8(b)(4), in making the decision to remove Mr. Arar to Syria. Defendant Ziglar is sued in his individual capacity.

18.    Defendant J. SCOTT BLACKMAN was Regional Director of the Immigration and Naturalization Services for the Eastern District when the unlawful actions complained of herein took place.   In this capacity, Defendant was responsible for ensuring that proper consideration was given to Article 3 of CAT as required by 8 C.R.F. §235.8(b)(4).  Conspiring with and/or aiding and abetting Defendants Ashcroft, Thompson, McElroy, Mueller, and others, as well as Syrian government officials, Defendant Blackman removed Mr. Arar to Syria so that Syrian authorities would interrogate him in ways that they believed themselves unable to do directly, including the use of torture.  Further, or in the alternative, Defendant Blackman removed Mr. Arar to Syria knowing that Mr. Arar would be in danger of being subjected to torture there.  Defendant Blackman failed to properly consider the provisions of Article 3 of CAT as required by INA regulations in making the decision to remove Mr. Arar to Syria. Defendant Blackman is being sued in his individual capacity.

19.    Defendant PAULA CORRIGAN is currently Regional Director of U.S. Immigration and Customs Enforcement for the Eastern Region. In this capacity, Defendant Corrigan is responsible for ensuring that proper consideration is given to Article 3 of CAT as

7

required by 8 C.R.F. §235.8(b)(4) in deciding whether to remove persons from the United States. Defendant Corrigan is being sued in her official capacity.

20. Defendant EDWARD J. McELROY was formerly District Director for the Immigration and Naturalization Services for the New York City District and is presently District Director of U.S. Immigration and Customs Enforcement. In these capacities, Defendant McElroy was, and is responsible for the enforcement of customs and immigration laws in the New York City area. Conspiring with and/or aiding and abetting Defendants Ashcroft, Blackman, Mueller, and others, as well as Syrian government officials, Defendant McElroy removed Mr. Arar to Syria so that Syrian authorities would interrogate him in ways that they believed themselves unable to do directly, including the use of torture. Further, or in the alternative, Defendant McElroy removed Mr. Arar to Syria knowing that Mr. Arar would be in danger of being subjected to torture there. Defendant McElroy is sued in his individual capacity.

21. Defendant ROBERT MUELLER is the Director of the Federal Bureau of Investigation. In this capacity, Defendant Mueller is responsible for law enforcement operations in the United States, including counter-terrorism operations. Conspiring with and/or aiding and abetting Defendants Ashcroft, Thompson, Blackman, McElroy, and others, as well as Syrian government officials, Defendant Mueller removed Mr. Arar to Syria so that Syrian authorities would interrogate him in ways that they believed themselves unable to do directly, including the use of torture. Further, or in the alternative, Defendant Mueller removed Mr. Arar to Syria knowing that Mr. Arar would be in danger of being subjected to torture there. Defendant Mueller is sued in his individual and official capacities.

8

22.     Defendants JOHN DOE 1-10 are federal law enforcement agents who are employed by the FBI or the INS. Singly or collectively, the Doe Defendants have subjected Mr. Arar to coercive and involuntary custodial interrogation and unreasonably harsh and punitive conditions of detention. The Doe Defendants are being sued in their individual capacities.

## STATEMENT OF FACTS

### Background

23.     The United States Department of State ("State Department") has long regarded Syria as a systematic practitioner of torture. The State Department lists Syria as a state sponsor of terrorism, and, for at least the past ten years, State Department Human Rights Country Reports on Syria have documented that the Syrian government practices torture. The most recent State Department report on Syria issued in March 2003, found, for example, that:

> there was credible evidence that security forces continued to use torture, although to a lesser extent than in previous years. Former prisoners, detainees, and the London-based Syrian Human Rights Organization reported that torture methods included administering electrical shocks; pulling out fingernails; forcing objects into the rectum; beating, sometimes while the victim is suspended from the ceiling; hyperextending the spine; bending the detainees into the frame of a wheel and whipping exposed body parts; and using a chair that bends backwards to asphyxiate the victim or fracture the victim's spine. . . . Although it occurs in prison, torture was most likely to occur while detainees were being held at one of the many detention centers run by the various security services throughout the country, especially while the authorities were attempting to extract a confession or information.

U.S. Dept. of State, Bureau Of Democracy, Human Rights, and Labor, *Country Reports on Human Rights Practices – 2002: Syria* § 1c (Mar. 31, 2003) (Exhibit A attached to this complaint). More recently, President Bush publicly condemned Syria dictators for "a legacy of torture, oppression, misery and ruin." *Remarks by the President at the 20th Anniversary of the*

9

*National Endowment for Democracy*, United States Chamber of Commerce, Washington D.C., November 6, 2003 (Exhibit B attached to this complaint).

24.      On information and belief, since September 11, 2001, the United States has undertaken covert "extraordinary renditions," removing non-U.S. citizens detained in this country and elsewhere and suspected -- reasonably or unreasonably – of terrorist activity to countries, including Syria, where interrogations under torture are routine. The Federal officials who have adopted, ratified, and/or implemented the "extraordinary renditions" policy know full well that non-U.S. citizens removed under this policy will be interrogated under torture. On information and belief, U.S. officials remove these non-U.S. citizens to countries like Syria precisely because those countries can and do use methods of interrogation to obtain information from detainees that would not be morally acceptable or legal in the United States and other democracies. Indeed, these officials have facilitated such human rights abuses, exchanging dossiers with intelligence officials in the countries to which non-U.S. citizens are removed. *See e.g.*, Rajiv Chandrasekaran and Peter Finn, *U.S. Behind Secret Transfer of Terrorist Suspects*, WASH. POST, March 11, 2002 at A01; Dana Priest and Barton Gellman, *U.S Decries Abuse but Defends Interrogations*, WASH. POST, Dec. 26, 2002, at A01; Sebastian Rotella, *Key to U.S. Case Denies Iraq-Al Qaeda Link*, L.A. TIMES, Feb. 1, 2003, at A01; DeNeen Brown and Dana Priest, *Deported Syrian Suspect Details Torture in Syria*, WASH. POST, Nov. 5, 2003 at A01 (Exhibit C attached to this complaint).

## Facts Specific to Plaintiff

25.      While on a family vacation in Tunisia in late September 2002, Mr. Arar received an e-mail from his former employer, MathWorks, asking him to return to Ottawa to consult with

10

a prospective client. On September 25, 2002, Mr. Arar took a flight to Zurich, leaving his wife and two children behind to continue their vacation. After stopping overnight in Zurich, he boarded a flight to Montreal, with a transfer stop at John F. Kennedy Airport, New York ("JFK").

26.     At around noon, on September 26, 2002, Mr. Arar debarked at JFK in order to catch his connecting flight. He was not applying to enter the United States at this time. Mr. Arar presented his valid Canadian passport to the immigration inspector on duty. Upon entering Mr. Arar's name into a computer, the inspector instructed Mr. Arar to wait nearby.

27.     At about 2 p.m., an immigration officer fingerprinted and photographed Mr. Arar. Shortly thereafter, two uniformed men searched Mr. Arar's wallet, carry-on bags, and luggage, without his consent. Concerned that he would miss his connecting flight, Mr. Arar repeatedly asked to make a telephone call home. His requests were ignored.

28.     At around 4 p.m., three or four men arrived in the area where Mr. Arar was being detained. One told Mr. Arar that he wanted to ask him some questions. He assured Mr. Arar that he would be permitted to make his connecting flight after answering the questions. When Mr. Arar asked if he could call a lawyer, he was told that only U.S. citizens were entitled to lawyers.

29.     Mr. Arar was then interrogated for approximately five hours by an FBI agent. The agent constantly yelled and swore at Mr. Arar, calling him a "fucking smart guy" with a "fucking selective memory." When Mr. Arar took more than a few seconds to respond to the rapid-fire questions, the agent became angry.

30.     Referring to an undisclosed report, the FBI agent interrogating Mr. Arar questioned him about his work and travel in the United States and his relationships with certain

11

individuals including, in particular, Mr. Abdullah Almalki. Mr. Arar explained that Mr. Almalki was a casual acquaintance of his from Ottawa. In 1997, Mr. Almalki had witnessed an apartment rental agreement signed by Mr. Arar. Mr. Arar had last seen Mr. Almalki in October 2001 when they had lunch together.

31.     Following the five-hour interrogation, Mr. Arar was questioned for another three hours, this time by an immigration officer who asked Mr. Arar about his membership in or affiliation with various terrorist groups. Mr. Arar vehemently denied any such membership or affiliation. That interrogation ended at about midnight.

32.     Mr. Arar then was chained and shackled, put in a vehicle, and driven to another building at JFK, where he was placed in solitary confinement. There was no bed. The lights remained on all night. Mr. Arar did not sleep at all.

33.     The next morning, September 27, 2002, beginning at about 9 a.m., two FBI agents interrogated Mr. Arar for about five hours, asking him about Osama Bin Laden, Iraq, and Palestine, among other things. During the interrogation, the agents constantly yelled and swore at Mr. Arar. Mr. Arar vehemently denied any connection to terrorists or terrorist activity. He repeatedly asked to see a lawyer and to make a telephone call but these requests were ignored.

34.     At about 2 p.m., Mr. Arar was taken back to his cell and chained and shackled. He was given a cold McDonalds meal -- his first food in almost two days.

35.     Early that evening, an immigration officer came to Mr. Arar's cell. He asked that Mr. Arar "volunteer" to be sent to Syria. Mr. Arar refused, insisting that he be sent to Canada or Switzerland. Angered by this response, the officer stated that the United States government had a "special interest" in Mr. Arar. The officer instructed Mr. Arar to sign a form. Even though Mr.

12

Arar was not allowed to read the form, he signed it, fearing adverse consequences if he did not do so.

36.    Later that evening, Mr. Arar was taken from his cell in chains and shackles, put in a vehicle, and driven from JFK to the Metropolitan Detention Center, a federal detention facility located in Brooklyn, New York ("MDC"). There he was strip searched, given an orange jumpsuit to wear, and placed in solitary confinement in a small cell.

37.    Over the next three days, until October 1, 2002, Mr. Arar repeatedly asked to see a lawyer and make a telephone call but these requests were ignored.

38.    On October 1, 2002, an MDC official handed Mr. Arar a document stating that the INS had found him inadmissible in the United States because he belonged to an organization designated by the Secretary of State as a Foreign Terrorist Organization, namely, Al Qaeda. Mr. Arar was never given a meaningful opportunity to contest this finding.

39.    The same day, Mr. Arar finally was permitted to make a telephone call. He called his mother-in-law in Ottawa, Canada. Since September 26, 2002, Mr. Arar's family had been frantically searching for him. Upon learning that he was detained at MDC, they contacted the Office for Canadian Consular Affairs, which had not been informed by the United States of Mr. Arar's detention. They also retained Ms. Amal Oummih, a New York City immigration attorney.

40.    On October 3, 2002, Mr. Arar was visited by Maureen Girvan from the Canadian Consulate. Mr. Arar showed Ms. Girvan the document finding him inadmissible in the United States. He expressed concern that he might be removed to Syria. Ms. Girvan assured Mr. Arar that could not happen, noting that he was a Canadian citizen.

41.    The next day, October 4, 2002, two immigration officers visited Mr. Arar's cell.

They asked him to designate in writing the country to which he wished to be removed. Mr. Arar designated Canada.

42.     On the evening of Saturday, October 5, 2002, Mr. Arar was visited by Ms. Oummih, who had requested permission from the MDC Warden the day before to meet with Mr. Arar.

43.     Late the next evening, Sunday, October 6, 2002, Mr. Arar was taken in chains and shackles to a room where approximately seven INS officials questioned him about his opposition to removal to Syria. Mr. Arar had no prior notice of this interrogation. The only notice given Ms. Oummih was a message left by Defendant McElroy, District Director for Immigration and Naturalization Services for New York City, on her voice mail at work that same evening. Ms. Oummih did not retrieve the message until she arrived at work the next day, Monday morning, October 7, 2002 – long after Mr. Arar's interrogation had ended.

44.     Initially, Mr. Arar told his interrogators that he would not answer questions without Ms. Oummih. He reluctantly changed his mind only after being <u>falsely</u> told by his interrogators that Ms. Oummih chose not to attend the session. Mr. Arar told his interrogators that he feared that if he was removed to Syria, he would be tortured. Mr. Arar fully substantiated his claims about the likelihood of being tortured there.

45.     The interrogation lasted for six hours, until the very early morning of October 7, 2002. Throughout the interrogation, Mr. Arar was informed that his interrogators were discussing the issue with "Washington D.C." At the conclusion of the interrogation, although no decision was related to Mr. Arar, Mr. Arar was asked to sign what appeared to be a transcript. He declined to do so. Mr. Arar was taken back to his cell in chains and shackles.

14

46.     On the morning of October 7, 2002, Ms. Oummih received a call from an INS official <u>falsely</u> notifying her that Mr. Arar had been taken to the INS's Varick Street offices "for processing" en route to a detention facility in New Jersey. Later that day, she received another call from an INS official <u>falsely</u> notifying her that Mr. Arar had arrived at the New Jersey detention facility.   Ms. Oummih was told to call back the next day for the exact location.   In fact, Mr. Arar remained at MDC for this entire period.

47.     Early on October 8, 2002, at about 4 a.m., Mr. Arar was taken in chains and shackles to a room where two INS officials told him that, based on Mr. Arar's casual acquaintance with certain named individuals, including Mr. Almalki as well as classified information, Defendant Blackman, Regional Director for the Eastern Region of Immigration and Naturalization Services, had decided to remove Mr. Arar to Syria.   Without elaboration, Defendant Blackman also stipulated that Mr. Arar's removal to Syria would be consistent with Article 3 of CAT.   When Mr. Arar repeated his concerns about torture, the officials present simply stated that the INS is not governed by the "Geneva Convention."   They further told Mr. Arar that he was barred from re-entering the United States for five years.   (A copy of Defendant Blackman's decision is attached as Exhibit D.)

48.     On information and belief, Defendant Thompson, Deputy Attorney General, in his capacity as Acting Attorney General, signed an order on or about October 8, 2002, removing Mr. Arar to Syria.

49.     After the interrogation, Mr. Arar was taken from MDC in chains and shackles to a New Jersey airfield, placed on a small private jet, and flown to Washington, D.C. From there, Mr. Arar was flown to Amman, Jordan, where he was turned over to Jordanian authorities on October 9, 2002. On information and belief, Syrian officials refused to accept Mr. Arar directly

15

from the United States.

50.     After interrogating and beating him, on or about October 9, 2002, Jordanian authorities turned Mr. Arar over to Syrian authorities. For the next 10 months, until about August 19, 2003, Mr. Arar was detained in the Palestine Branch of Syrian Military Intelligence ("the Palestine Branch").

51.     For the first 12 days of his detention in Syria, Mr. Arar was interrogated for 18 hours per day. He was also subjected to physical and psychological torture. Syrian security officers regularly beat him on the palms, hips, and lower back, using a two-inch thick electric cable. They also regularly struck Mr. Arar in the stomach, face, and back of the neck with their fists. The pain was excruciating. Mr. Arar pleaded with them to stop, to no avail.

52.     Syrian security officers continued also subjected Mr. Arar to severe psychological torture.     They placed him in a room where he could hear the screams of other detainees being tortured.     They also repeatedly threatened to place him in the spine-breaking "chair," hang him upside down in a "tyre" and beat him, and give him electric shocks.

53.     To minimize the torture, Mr. Arar falsely confessed, among other things, to having trained with terrorists in Afghanistan. In fact, Mr. Arar has never been to Afghanistan and has never been involved in terrorist activity.

54.     The questions asked Mr. Arar by Syrian security officers in the Palestine Branch bore a striking similarity to those asked Mr. Arar by FBI agents at JFK in September, 2002. As with the FBI agents, Syrian security officers focused on Mr. Arar's relationship with certain individuals, including in particular, Abdullah Almalki.

55.     On information and belief, Defendants provided their Syrian counterparts with a

16

dossier on Mr. Arar, compiled in part from the interrogations at JFK. On information and belief, Defendants suggested matters to be covered by Syrian security officers during Mr. Arar's interrogation. On information and belief, Defendants handed over Mr. Arar to Syrian officials intending that they interrogate him under torture or knowing full well that Mr. Arar would be tortured during those interrogations.

56.     On information and belief, Syrian security officers turned over to the Defendants all information coerced from Mr. Arar during his interrogations under torture in Syria. A Syrian official familiar with Mr. Arar's case stated that during Mr. Arar's detention in Syria, the Syrian government shared information gleaned from its interrogation and investigation of Mr. Arar with the United States government. *See* 1/21/04 transcript of CBS's Sixty Minutes II: "His Year In Hell" (Exhibit E attached to this complaint).

57.     On information and belief, United States officials removed Mr. Arar to Syria so that Syrian security officers could interrogate him under torture and thereby obtain information for United States counter-terrorism operations. On information and belief, United States officials removed Mr. Arar to Syria under the above "extraordinary rendition" policy.

58.     When not being interrogated, Mr. Arar was placed in a tiny underground cell, measuring approximately six feet long, seven feet high, and three feet wide -- hardly enough room to even move. The cell was damp and cold, especially during the winter months. The only light came through a small aperture in the ceiling above -- an aperture which rats ran across and through which cats often urinated onto Mr. Arar.

59.     Sanitary conditions were almost non-existent. Mr. Arar was allowed to bathe -- in cold water -- only once a week. He was not permitted to exercise. The food was barely edible. While detained at the Palestine Branch, Mr. Arar lost approximately 40 pounds.

17

60.     The intensive interrogations and severe physical beatings of Mr. Arar ceased on or about October 20, 2002, the same day that the Canadian Embassy officials in Syria inquired about Mr. Arar. The next day, Syrian officials confirmed to Canadian Embassy officials that Mr. Arar was in their custody. United States officials had refused even to acknowledge to Ms. Oummih, Mr. Arar's immigration attorney, or to Ms. Girvan, the Canadian Consulate staff person who visited Mr. Arar at MDC, that Mr. Arar had been removed to Syria.

61.     Between October 23, 2002 and August 14, 2003, Syrian officials allowed Canadian Consular officials to visit Mr. Arar on seven occasions. Prior to each visit, Syrian security officers threatened Mr. Arar with additional torture if he complained about his mistreatment to his visitors. Mr. Arar complied until August 14, 2003. On that date, unable to bear the mistreatment any longer, Mr. Arar yelled out to a Canadian Consular official that he had been tortured and was being kept in a grave.

62.     Approximately five days later, Mr. Arar was briefly transferred to the Syrian Military Intelligence's Investigations Branch. Prior to the transfer, Mr. Arar was forced to sign a false confession that he had undertaken terrorist training in Afghanistan. From the Investigation Branch, Mr. Arar was transferred to Sednaya Prison, an overcrowded Syrian prison facility where Mr. Arar remained for about six weeks.

63.     On September 28, 2003, Mr. Arar was transferred back to the Palestine Branch. He was held in solitary confinement for a week. During this time, Mr. Arar was confined in a room where, day and night, he could hear detainees screaming from torture.

64.     On October 5, 2003, Mr. Arar was taken to the Syrian Supreme State Security Court. There, a prosecutor told him that he would be released without criminal charges. That

18

same day, Mr. Arar was released into the custody of Canadian Embassy officials in Damascus, Syria.

65.     According to Imad Moustapha, Syria's highest-ranking diplomat in Washington, Syrian officials investigated every link and relationship in order to unvocer a connection between Mr. Arar and Al Qaeda, but could find no such connection. Mr. Moustapha said that Syria eventually released Mr. Arar because Syria wanted to make "a gesture of goodwill to Canada," and because Syrian officials "could not substantiate any of the allegations against him." Syria now considers Mr. Arar completely innocent. (*See* Exhibit E).

66.     On October 6, 2003, Mr. Arar returned home to Ottawa to his family whom he had not seen in more than a year.

67.     Mr. Arar continues to suffer the effects of his ordeal. He still experiences difficulties relating to his wife and two young children. He frequently has nightmares about his treatment in the United States and Syria. People continue to call him a terrorist. The publicity surrounding his situation has made finding employment particularly difficult. His employment prospects have been further undermined by his inability to travel to the United States.

## GENERAL ALLEGATIONS

68.     Mr. Arar's treatment, including his torture in Jordan and Syria, was inflicted under color of law and under color of official authority, and/or in conspiracy with or on behalf of those acting under color of official authority.

69.     At all relevant times, the Defendants were part of a conspiracy to interrogate Mr. Arar under torture. Other conspirators, including unnamed Jordanian and Syrian officials, planned and effected the aforementioned torture, together with the Defendants named herein.

19

70.     At all relevant times, the Defendants acted in concert with unnamed Jordanian and Syrian officials so as to effect the torture described herein.

71.     Defendants are liable for the acts of described herein in that Defendants directed, ordered, confirmed, acquiesced or conspired and/or aided and abetted in bringing them about.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Torture Victim Protection Act: Prohibition Against Torture)

72.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

73.     The acts described herein constitute a violation of the right not to be tortured under color of foreign law.  Violation of this right is actionable under the Torture Victim Protection Act, 28 U.S.C. § 1350, note.

74.     Defendants Ashcroft, Thompson, Ziglar, Blackman, McElroy, Mueller, and others, are liable for said conduct in that acting in concert with unnamed Jordanian and Syrian officials they conspired in and/or aided and abetted in bringing about the violations of Plaintiff's right not to be tortured under color of Syrian law.

75.     As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional distress, and economic loss.

### SECOND CLAIM FOR RELIEF
(Fifth Amendment: Substantive Due Process - Torture)

76.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

77.     Defendants agreed amongst themselves and with unnamed Syrian officials to

20

deport Plaintiff to Syria for the purpose coercive interrogation and torture in that country. In furtherance of their agreements, Defendants detained Plaintiff, denied him access to counsel, the courts, and his consulate, and used government resources to transfer Plaintiff to Syrian custody. By conspiring to consign and transport Plaintiff to Syria for the purposes of interrogation and torture there, Defendants, acting under color of law and their authority as federal officers, intentionally subjected Plaintiff to torture and coercive interrogation, taking his liberty without due process of law in violation of the Fifth Amendment to the Constitution.

78.     At the time they seized Plaintiff and subsequently transported him to Syria, Defendants were fully aware of the policy of state-sponsored torture in that country and of Syria's plan to interrogate Plaintiff under torture, and knowingly gave substantial assistance to the Syrian government's plan by detaining Plaintiff, denying him access to counsel, the courts, and his consulate, and by using government resources to transfer him to Syria. By aiding and abetting Syria's plan to interrogate Plaintiff under torture, Defendants, acting under color of law and their authority as federal officers, knowingly or recklessly subjected Plaintiff to torture and coercive interrogation, taking his liberty without due process of law in violation of the Fifth Amendment to the Constitution.

79.     By arbitrarily detaining Plaintiff and transporting him to Syria for interrogation and torture there, Defendants entered into a special relationship with Plaintiff and then placed Plaintiff in a position more vulnerable to danger than he would have been had Defendants not acted as they did. By doing so, Defendants, acting under color of law and their authority as federal officers, intentionally or recklessly subjected Plaintiff to torture and coercive interrogation, taking his liberty without due process of law in violation of the Fifth Amendment to the Constitution.

80.    The harms that Plaintiff suffered were foreseeable to Defendants.

81.    Plaintiff has no effective means of enforcing his Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

82.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional distress, and economic loss.

## THIRD CLAIM FOR RELIEF
### (Fifth Amendment: Substantive Due Process - Detention)

83.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

84.    Defendants agreed amongst themselves and with Syrian officials to deport Plaintiff to Syria for the purpose arbitrary, indefinite detention in that country. In furtherance of their agreements, Defendants detained Plaintiff, denied him access to counsel, the courts, and his consulate, and used their own resources to transfer Plaintiff to Syrian custody. By conspiring to consign and transport Plaintiff to Syria for the purposes of arbitrary, indefinite detention there, Defendants, acting under color of law and their authority as federal officers, intentionally subjected Plaintiff to arbitrary, indefinite detention, taking his liberty without due process of law in violation of the Fifth Amendment to the Constitution.

85.    At the time they seized Plaintiff and subsequently transported him to Syria, Defendants were fully aware of Syria's practice of arbitrary and indefinite detention without trial and of Syria's plan to arbitrarily detain Plaintiff without trial there, and knowingly gave substantial assistance to the Syrian government's plan by detaining Plaintiff denying him access to counsel, the courts, and his consulate and by using government resources to transport him to Syria. By aiding and abetting Syria's plan to arbitrarily detain Plaintiff, Defendants, acting

under color of law and their authority as federal officers, knowingly or recklessly subjected Plaintiff to arbitrary detention without trial, taking his liberty without due process of law in violation of the Fifth Amendment to the Constitution.

86.     By arbitrarily detaining Plaintiff and rendering him to Syria for arbitrary and indefinite detention without trial there, Defendants entered into a special relationship with Plaintiff and placed him in a position more vulnerable to danger than he would have been had Defendants not acted as they did.  By doing so, Defendants, acting under color of law and their authority as federal officers, intentionally or recklessly subjected Plaintiff to arbitrary, indefinite detention without trial, taking his liberty without due process of law in violation of the Fifth Amendment to the Constitution.

87.     The harms that Plaintiff suffered was foreseeable to the Defendants.

88.     Plaintiff has no effective means of enforcing his Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

89.     As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional distress, and economic loss.

## FOURTH CLAIM FOR RELIEF
### (Fifth Amendment: Substantive Due Process – Domestic Detention)

90.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

91.     By subjecting Plaintiff to outrageous, excessive, cruel, inhuman, and degrading conditions of confinement, Defendants, acting under color of law and their authority as federal officers, intentionally or recklessly subjected Plaintiff to arbitrary detention, taking his liberty without due process of law in violation of the Fifth Amendment to the Constitution.

23

92.    By subjecting Plaintiff to coercive and involuntary custodial interrogation designed to overcome his will and compel incriminating statements from him, Defendants, acting under color of law and their authority as federal officers, intentionally or recklessly violated Plaintiff's right to due process under the Fifth Amendment to the Constitution.

93.    By subjecting Plaintiff to a "communications blackout" and other measures while in custody that interfered with his access to lawyers and the courts, Defendants, acting under color of law and their authority as federal officers, intentionally or recklessly violated Plaintiff's right to obtain access to legal counsel and to petition the courts for redress of his grievances, and his right to due process under the Fifth Amendment to the Constitution.

94.    Plaintiff has no effective means of enforcing his Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

95.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical harm, emotional distress, and economic loss.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Arar respectfully requests that the Court enter a judgment:

1.    Declaring that the actions of Defendants, their agents, and their employees, are illegal and violate Mr. Arar's constitutional, civil, and international human rights;

2.    Awarding compensatory and punitive damages to Mr. Arar in an amount that is fair, just, and reasonable;

3.    Awarding reasonable attorneys' fees and costs of suit, and

4.    Ordering such further relief as the Court considers just and proper.

Dated: New York, New York
   January 22, 2004

Respectfully submitted,

Center for Constitutional Rights

By: _Barbara J. Olshansky_
  Barbara Olshansky (BO 3635)

Michael Ratner
Jules Lobel
Robert Perry
Jeffrey Fogel
David Cole
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614 6430



U.S. DEPARTMENT of STATE

## Syria

Country Reports on Human Rights Practices - 2002
Released by the Bureau of Democracy, Human Rights, and Labor
March 31, 2003

Syria is a republic under a military regime with virtually absolute authority in the hands of the President. Despite the existence of some institutions of democratic government, the President, with counsel from his ministers, high-ranking members of the ruling Ba'th Party, and a relatively small circle of security advisers, makes key decisions regarding foreign policy, national security, internal politics, and the economy. All three branches of government are influenced to varying degrees by leaders of the Ba'th Party, whose primacy in state institutions and the Parliament is mandated by the Constitution. The Parliament may not initiate laws but only assesses and at times modifies those proposed by the executive branch. The Constitution provides for an independent judiciary, but security courts are subject to political influence. The regular courts generally display independence, although political connections and bribery may influence verdicts.

The powerful role of the security services in government, which extends beyond strictly security matters, stems in part from the state of emergency that has been in place almost continuously since 1963. The Government justifies martial law because of the state of war with Israel and past threats from terrorist groups. Syrian Military Intelligence and Air Force Intelligence are military agencies, while General Security, State Security, and Political Security come under the purview of the Ministry of Interior. The branches of the security services operated independently of each other and outside the legal system. The security forces were under effective government control. Their members committed serious human rights abuses.

The population of the country was approximately 17 million. The economy was based on commerce, agriculture, oil production, and government services. Economic growth was hampered by the still dominant state role in the economy, a complex bureaucracy, overarching security concerns, endemic corruption, currency restrictions, a lack of modern financial services and communications, and a weak legal system.

The Government's human rights record remained poor, and it continued to commit serious abuses. Citizens did not have the right to change their government. The Government used its vast powers to prevent any organized political opposition, and there have been very few antigovernment manifestations. Continuing serious abuses included the use of torture in detention; poor prison conditions; arbitrary arrest and detention; prolonged detention without trial; fundamentally unfair trials in the security courts; an inefficient judiciary that suffered from corruption and, at times, political influence; and infringement on privacy rights. The Government significantly restricted freedom of speech and of the press. Freedom of assembly does not exist under the law and the Government restricted freedom of association. The Government did not officially allow independent domestic human rights groups to exist; however, it permitted periodic meetings of unlicensed civil society forums throughout the year. The Government placed some limits on freedom of religion and freedom of movement. Proselytizing by groups it considered Zionist was not tolerated, and proselytizing in general was not encouraged. Violence and societal discrimination against women were problems. The Government discriminated against the stateless Kurdish minority, suppressed worker rights, and tolerated child labor in some instances.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were no reports of political killings or other killings committed by government forces during the year.

In November 2000, a number of armed clashes occurred between Bedouin shepherds and Druze residents of Suwayda Province that required government military intervention to stop. Local press reported that between 15 and 20 Druze, Bedouin, and security forces personnel were killed (see Section 5). Some members of the security forces committed a number of serious human rights abuses. In its Annual Report, the Syrian Human Rights Commission stated that in 2001 and during the year three individuals died in detention (see Section 1.c.). The Government has not investigated previous deaths in detention.

b. Disappearance

There were no new confirmed reports of politically motivated disappearances during the year. Because security forces often did not provide detainees' families with information regarding their welfare or location, many persons who disappeared in past years are believed to be in long-term detention or to have died in detention. The number of new disappearances has declined in recent years, although this may be due to the Government's success in deterring opposition political activity rather than a loosening of the criteria for detention (see Section 1.d.).

Despite inquiries by international human rights organizations and foreign governments, the Government offered little new information on the welfare and whereabouts of persons who have been held incommunicado for years or about whom little is known other than the approximate date of their detention. The Government claimed that it has released all Palestinians and Jordanian and Lebanese citizens who reportedly were abducted from Lebanon during and after Lebanon's civil war. However, the Government's claim was disputed by Lebanese nongovernmental organizations (NGOs), Amnesty International (AI), and other international NGOs, as well as some family members of those who allegedly remain in the country's prisons (see Section 1.d.).

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Despite the existence of constitutional provisions and several Penal Code penalties for abusers, there was credible evidence that security forces continued to use torture, although to a lesser extent than in previous years. Former prisoners, detainees, and the London-based Syrian Human Rights Organization reported that torture methods included administering electrical shocks; pulling out fingernails; forcing objects into the rectum; beating, sometimes while the victim is suspended from the ceiling; hyperextending the spine; bending the detainees into the frame of a wheel and whipping exposed body parts; and using a chair that bends backwards to asphyxiate the victim or fracture the victim's spine. In 2001 AI published a report claiming that authorities at Tadmur Prison regularly tortured prisoners, or forced prisoners to torture each other. Although it occurs in prisons, torture was most likely to occur while detainees were being held at one of the many detention centers run by the various security services throughout the country, especially while the authorities were attempting to extract a confession or information.

The Government has denied that it uses torture and claims that it would prosecute anyone believed guilty of using excessive force or physical abuse. Past victims of torture have identified the officials who tortured them, up to the level of brigadier general. If allegations of excessive force or physical abuse are to be made in court, the plaintiff is required to initiate his own civil suit against the alleged abuser. Courts did not order medical examinations for defendants who claimed that they were tortured (see Section 1.e.). There were no substantiated allegations of torture during the year.

In 2000 the Government apprehended Raed Hijazi, accused of a terrorist plot targeting American and Israeli tourists in Jordan during the millennium celebrations, and sent him to Jordan to stand trial. According to media accounts of the trial, doctors for both the defense and the prosecution testified that Hijazi's body showed signs of having been beaten, but witnesses, including Hijazi, made contradictory and inconclusive claims regarding whether the alleged abuse occurred while he was in Jordanian or Syrian custody. The Jordanian court has rejected the allegations that Hijazi's confession was coerced. In February the Jordanian authorities sentenced Hijazi to death. He has appealed the decision but remained in custody at year's end pending a decision.

Prison conditions generally were poor and did not meet international standards for health and sanitation. However, there were separate facilities for men, women, and children. Pre-trial detainees, particularly those held for political or security reasons, were usually held separately from convicted prisoners. Facilities for political or national security prisoners generally were worse than those for common criminals.

At some prisons, authorities allowed visitation, but in other prisons, security officials demanded bribes from family members who wished to visit incarcerated relatives. Overcrowding and the denial of food occurred at

several prisons. According to Human Rights Watch, prisoners and detainees were held without adequate medical care, and some prisoners with significant health problems reportedly were denied medical treatment. Some former detainees have reported that the Government prohibited reading materials, even the Koran, for political prisoners.

In 2001 the London-based Syrian Human Rights Commission reported that three detainees died in prison and that their remains bore evidence of torture and extreme medical neglect.

The Government did not permit independent monitoring of prison or detention center conditions, although diplomatic or consular officials were granted access in high profile cases.

d. Arbitrary Arrest, Detention, or Exile

Arbitrary arrest and detention were significant problems. The Emergency Law, which authorizes the Government to conduct preventive arrests, overrides Penal Code provisions against arbitrary arrest and detention, including the need to obtain warrants. Officials contend that the Emergency Law is applied only in narrowly defined cases, and in January 2001, the regional press reported that the Information Minister claimed that the authorities had frozen "martial law." Nonetheless, in cases involving political or national security offenses, arrests often were carried out in secret. Suspects may be detained incommunicado for prolonged periods without charge or trial and are denied the right to a judicial determination regarding the pretrial detention. Some of these practices were prohibited by the state of emergency, but the authorities were not held to these strictures. Additionally, those suspected of political or national security offenses may be arrested and prosecuted under ambiguous and broad articles of the Penal Code, and subsequently tried in either the criminal or security courts, as occurred with the 10 civil society activists arrested in August and September 2001. During the year, two were tried and sentenced in criminal court and eight were tried and sentenced in secrecy in the Supreme State Security Court under the Emergency Law's authority. All were initially held incommunicado and in solitary confinement, though the criminal court trials and initial sessions of one of the other trials were open to the press and diplomats.

The Government detained relatives of detainees or of fugitives in order to obtain confessions or the fugitive's surrender (see Section 1.f.). The Government also threatened families or friends of detainees, at times with the threat of expulsion, to ensure their silence, to force them to disavow publicly their relatives, or to force detainees into compliance.

Defendants in civil and criminal trials had the right to bail hearings and the possible release from detention on their own recognizance. Bail was not allowed for those accused of state security offenses. Unlike defendants in regular criminal and civil cases, security detainees did not have access to lawyers prior to or during questioning.

Detainees had no legal redress for false arrest. Security forces often did not provide detainees' families with information regarding their welfare or location while in detention. Consequently many persons who have disappeared in past years are believed to be in long-term detention without charge or possibly to have died in detention (see Section 1.b.). Many detainees brought to trial have been held incommunicado for years, and their trials often have been unfair (see Section 1.e.). In the past, there were reliable reports that the Government did not notify foreign governments when their citizens were arrested or detained.

Pretrial detention may be lengthy, even in cases not involving political or national security offenses. The criminal justice system is backlogged. Many criminal suspects were held in pretrial detention for months and may have their trials extended for additional months. Lengthy pretrial detention and drawn-out court proceedings are caused by a shortage of available courts and the absence of legal provisions for a speedy trial or plea bargaining (see Section 1.e.).

In May 2001, the Government released prominent political prisoner Nizar Nayyuf, who had been imprisoned since 1992 for founding an unlawful organization, disseminating false information, and undermining the Government; he immediately was placed under house arrest. In June 2001, the Government allowed Nayyuf to leave the country for medical treatment. In September 2001, Nayyuf was summoned to appear before an investigating court to respond to a complaint against him filed by Ba'th party lawyers for "inciting confessionalism, attempting to illegally change the Constitution, and publishing false reports abroad." Nayyuf had not returned by year's end. The NGO Reporters Without Borders (RSF) claimed that the Government harassed and intimidated members of Nayyuf's family following the issuance of the summons. The Government reportedly fired two members of his immediate family from their jobs. The municipality threatened to expel members of Nayyuf's family if they did not disavow publicly his statements (see Section 4).

In August 2001, the Government arrested independent Member of Parliament Ma'mun Humsi during his hunger strike protesting official corruption, the excessive powers of the security forces, and the continuation of the Emergency Law. In a departure from previous practice, the Interior Ministry issued a statement justifying Humsi's arrest under Penal Code articles dealing with crimes against state security (see Section 3). In September 2001, the Government detained independent Member of Parliament Riad Seif shortly after Seif reactivated his unlicensed political discussion forum. The principal charge against both individuals was attempting to illegally change the Constitution (see Section 3). In March and April, Humsi and Seif were convicted in criminal court of attempting to change the Constitution illegally and each sentenced to 5 years in prison (see Section 1.e.).

In September 2001, the Government detained prominent political activist and longtime detainee Riad al-Turk for violations of Penal Code articles dealing with crimes against state security, after al-Turk made derogatory public comments about late President Hafiz al-Asad. In June Al-Turk was convicted in closed Supreme State Security Court of attempting to change the Constitution illegally and sentenced to 30 months in prison (see Section 1.e.). On November 16, President Asad ordered Al-Turk released on humanitarian grounds.

In September 2001, the Government detained seven additional prominent human rights activists who had issued statements in support of Humsi, Seif, and al-Turk. The Government reportedly charged the seven activists under Penal Code articles dealing with crimes against state security (see Section 2.a.). Although all of the 10 civil society activists were arrested for Penal Code violations, only Humsi and Seif were tried in criminal court while all the others were tried in the Supreme State Security Court under the authority of the Emergency Law (see Section 1.e.).

At year's end, the leaders of the Turkomen who reportedly were detained without charge in 1996, remained in detention.

In 1999 and 2000, there were reports of arrests of hundreds of Syrian and Palestinian Islamists. Most of those arrested reportedly were released after signing an agreement not to participate in political activities; however, some may remain in detention. At year's end, there were no new reports on those detained. There were no credible reports that the Government arrested Islamists on political charges during the year.

There were no reports of the arrests of minors on political charges during the year.

In January 2001, the Jordanian press reported the release from Syrian jails of six Jordanian prisoners of Palestinian origin, who had been imprisoned for membership in Palestinian organizations. Between May and July 2000, there were unconfirmed reports that a large number of Jordanian prisoners were released. However, according to AI, only three of the Jordanians released in 2000 had been held for political reasons.

In March 2001, Syrian intelligence officials in Lebanon arrested three Syrian Druze men who had converted to Christianity, possibly on suspicion of membership in Jehovah's Witnesses. The men were released after 2 months.

In July and August 2001, there were unconfirmed regional press reports that approximately 500 political detainees were moved from Tadmur Prison to Saydnaya Prison in preparation for the eventual closing of Tadmur. In 2000 the Government also closed the Mazzah prison, which reportedly held numerous prisoners and detainees. In August, AI reported the release of Communist Action Party member Haytham Na'al after 27 years in prison.

In 2000 the Government declared an amnesty for 600 political prisoners and detainees and a general pardon for some nonpolitical prisoners. The highly publicized amnesty was the first time the Government acknowledged detention of persons for political reasons. There were no credible reports of transfers of political prisoners during the year.

Most of those arrested during crackdowns in the 1980s, in response to violent attacks by the Muslim Brotherhood, have been released; however, some may remain in prolonged detention without charge. Some union and professional association officials detained in 1980 may remain in detention (see Sections 2.b. and 6.a.).

The number of remaining political detainees is unknown. In June 2000, prior to the November 2000 prison amnesty, Amnesty International estimated that there were approximately 1,500 political detainees; many of the detainees reportedly were suspected supporters of the Muslim Brotherhood and the pro-Iraqi wing of the Ba'th party. There also were Jordanian, Lebanese, and Palestinian political detainees. Estimates of detainees are difficult to confirm because the Government does not verify publicly the number of detentions without charge,

the release of detainees or amnestied prisoners, or whether detainees subsequently are sentenced to prison (see Section 1.e.).

Former prisoners were subject to a so-called "rights ban," which begins from the day of sentencing and lasts until 7 years after the expiration of the sentence, in the case of felony convictions. Persons subject to this ban are not allowed to vote, run for office, or work in the public sector; they often also are denied passports.

The Constitution prohibits exile; however, the Government has exiled citizens in the past. The Government refused to reissue the passports of citizens who fled the country in the 1980s; such citizens consequently are unable to return to the country.

There were no known instances of forced exile during the year.

e. Denial of Fair Public Trial

The Constitution provides for an independent judiciary, but the two exceptional courts dealing with cases of alleged national security violations were not independent of executive branch control. The regular court system generally displayed considerable independence in civil cases, although political connections and bribery at times influenced verdicts.

The judicial system is composed of the civil and criminal courts, military courts, security courts, and religious courts, which adjudicate matters of personal status such as divorce and inheritance (see Section 5). The Court of Cassation is the highest court of appeal. The Supreme Constitutional Court is empowered to rule on the constitutionality of laws and decrees; it does not hear appeals.

Civil and criminal courts are organized under the Ministry of Justice. Defendants before these courts were entitled to the legal representation of their choice; the courts appoint lawyers for indigents. Defendants were presumed innocent; they are allowed to present evidence and to confront their accusers. Trials are public, except for those involving juveniles or sex offenses. Defendants may appeal their verdicts to a provincial appeals court and ultimately to the Court of Cassation. Such appeals are difficult to win because the courts do not provide verbatim transcripts of cases—only summaries prepared by the presiding judges. There are no juries.

Military courts have the authority to try civilians as well as military personnel. A military prosecutor decides the venue for a civilian defendant. There have been reports that the Government operates military field courts in locations outside established courtrooms. Such courts reportedly observed fewer of the formal procedures of regular military courts.

In September a military court charged lawyer and Chairman of the Syrian Human Rights Committee, Haytham al-Maleh, and three of his associates in abstentia for spreading false news outside of the country, belonging to a political association of an international nature without government approval, and publishing material that causes sectarian friction.

The two security courts are the Supreme State Security Court (SSSC), which tries political and national security cases, and the Economic Security Court (ESC), which tried cases involving financial crimes. Both courts operated under the state of emergency, not ordinary law, and did not observe constitutional provisions safeguarding defendants' rights.

Charges against defendants in the SSSC often were vague. Many defendants appeared to be tried for exercising normal political rights, such as free speech. For example, the Emergency Law authorizes the prosecution of anyone "opposing the goals of the revolution," "shaking the confidence of the masses in the aims of the revolution," or attempting to "change the economic or social structure of the State." Nonetheless, the Government contends that the SSSC tries only persons who have sought to use violence against the State.

Under SSSC procedures, defendants are not present during the preliminary or investigative phase of the trial, during which the prosecutor presents evidence. Trials usually were closed to the public. Lawyers were not ensured access to their clients before the trial and were excluded from the court during their client's initial interrogation by the prosecutor. Lawyers submitted written defense pleas rather than oral presentations. The State's case often was based on confessions, and defendants have not been allowed to argue in court that their confessions were coerced. There was no known instance in which the court ordered a medical examination for a defendant who claimed that he was tortured. The SSSC reportedly has acquitted some defendants, but the Government did not provide any statistics regarding the conviction rate. Defendants do not

have the right to appeal verdicts, but sentences are reviewed by the Minister of Interior, who may ratify, nullify, or alter them. The President also may intervene in the review process.

Accurate information regarding the number of cases heard by the SSSC was difficult to obtain, although hundreds of cases were believed to pass through the court annually. Many reportedly involved charges relating to membership in various banned political groups, including the Party of Communist Action and the pro-Iraqi wing of the Ba'th Party. Sentences as long as 15 years have been imposed in the past. Since 1997 there have been no visits by human rights NGOs to attend sessions of the SSSC (see Section 4).

The 10 civil society activists arrested in August and September 2001 were tried in criminal and state security courts. In February independent Parliamentarians Mamun Humsi and Riyad Seif were tried in criminal court proceedings that were open, for the first time, to foreign observers and the press. AI noted that their parliamentary immunity was lifted without due attention to the procedures established by law. Humsi and Seif were denied confidential access to their lawyers throughout their detention and observers noted a number of procedural irregularities during the trials. In March and April, respectively, the Government sentenced Humsi and Seif to 5 years' imprisonment each for attempting to change the constitution illegally and inciting racial and sectarian strife.

During the year, the eight other civil society activists arrested in August and September 2001 were tried in secrecy by the Supreme State Security Court under authority of the Emergency Law. Only the first session of former political prisoner Riad al-Turk's trial was open to the media and international observers. Al-Turk was sentenced to 30 months for attempting to change the Constitution illegally but was released by presidential decree in November (see Section 1.d.). Lawyer and member of Seif and Humsi's defense team, Habib Issa, and physician and cofounder of the Syrian Human Rights Society, Walid al-Buni, were each sentenced to 5 years in prison for attempting to change the Constitution illegally. Economist and regime critic Arif Dalila was sentenced to up to 10 years for the same offense. Civil society activist Habib Saleh received a 3-year sentence for opposing the objectives of the revolution and inciting ethnic and sectarian strife. Hassan Sa'dun, physician and member of the Committee for the Defense of Human Rights, Kamal al-Labwani, and engineer Fawaz Tillu were sentenced respectively to 2, 3, and 5 years in prison for instigating armed mutiny against the Government (see Sections 1.d., 2.a., and 3).

The ESC tried persons for alleged violations of foreign exchange laws and other economic crimes. The prosecution of economic crimes was not applied uniformly. Like the SSSC, the ESC did not ensure due process for defendants. Defendants were not provided adequate access to lawyers to prepare their defenses, and the State's case usually was based on confessions. High-ranking government officials may influence verdicts. Those convicted of the most serious economic crimes do not have the right of appeal, but those convicted of lesser crimes may appeal to the Court of Cassation. The Economic Penal Code allowed defendants in economic courts to be released on bail. The bail provision does not extend to those accused of forgery, counterfeiting, or auto theft; however, the amendment is intended to provide relief for those accused of other economic crimes, many of whom have been in pretrial detention for long periods of time. These amendments to the Economic Penal Code also limit the categories of cases that can be tried in the ESC. In November 2001, the Government approved a general pardon for nonpolitical prisoners and a reduction of sentences by one-third for persons convicted of economic crimes, with a provision to commute sentences entirely for persons who return embezzled funds to investors within 1 year of the law's effective date.

At least two persons arrested when late President Asad took power in 1970 may remain in prison, despite the expiration of one of the prisoners' sentences.

The Government in the past denied that it held political prisoners, arguing that although the aims of some prisoners may be political, their activities, including subversion, were criminal. The official media reported that the 600 beneficiaries of the November 2000 amnesty were political prisoners and detainees; this reportedly was the first time that the Government acknowledged that it held persons for political reasons. Nonetheless, the Emergency Law and the Penal Code are so broad and vague, and the Government's power so sweeping, that many persons were convicted and are in prison for the more expression of political opposition to the Government. The Government's sentencing of 10 prominent civil society and human rights activists for "crimes of state security" represented a retreat from recent modest attempts at political liberalization (see Sections 1.d. and 2.a.).

The exact number of political prisoners was unknown. Unconfirmed regional press reports estimated the total number of political prisoners at between 400 and 600. In April 2001, a domestic human rights organization estimated the number to be nearly 800, including approximately 130 belonging to the Islamic Liberation Party, 250 members and activists associated with the Muslim Brotherhood, 150 members of the pro-Iraq wing of the Ba'th Party, and 14 Communists. In its report for the year, the Syrian Human Rights Committee estimated that there were approximately 4,000 political prisoners still in detention.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

Although laws prohibit such actions, the Emergency Law authorizes the security services to enter homes and conduct searches without warrants if security matters, very broadly defined, are involved. The security services selectively monitored telephone conversations and fax transmissions. The Government opened mail destined for both citizens and foreign residents. It also prevented the delivery of human rights materials (see Section 2.a.).

The Government continued its practice of threatening or detaining the relatives of detainees or of fugitives in order to obtain confessions, minimize outside interference, or prompt the fugitive's surrender (see Section 1.d.). There have been reports that security personnel force prisoners to watch relatives being tortured in order to extract confessions. According to AI, security forces also detained family members of suspected oppositionists (see Section 1.d.).

In the past, the Government and the Ba'th Party monitored and attempted to restrict some citizens' visits to foreign embassies and cultural centers.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for the right to express opinions freely in speech and in writing, but the Government restricted these rights significantly in practice. The Government strictly controlled the dissemination of information and permitted little written or oral criticism of President Asad, his family, the Ba'th Party, the military, or the legitimacy of the Government. The Government also did not permit sectarian issues to be raised. Detention and beatings for individual expressions of opinion that violate these unwritten rules at times occurred. The Government also threatened activists to attempt to control their behavior. In January 2001, novelist Nabil Sulayman was attacked outside his apartment in Latakia. Some observers believed the attack was a message from the Government to civil society advocates to moderate their pressure for reform. The attack came just after Information Minister Adnan 'Umran publicly criticized civil society advocates.

In a speech in February 2001, President Asad explicitly criticized civil society advocates as elites "from outside" who wrongly claim to speak for the majority and said that openness would only be tolerated as long as it "does not threaten the stability of the homeland or the course of development." The Government required all social, political, and cultural forums and clubs to obtain advance official approval for meetings, to obtain approval for lecturers and lecture topics, and to submit lists of all attendees (see Section 2.b.). During the year, several unapproved forums met, which while technically unhindered, were under government observation.

In January 2001, the regional press reported on a "Group of 1,000" intellectuals that issued a statement calling for more comprehensive reforms than those demanded by a group of 99 intellectuals in September 2000. The group's statement called for lifting martial law, ending the state of emergency that has been in effect since 1963, releasing political prisoners, and expanding civil liberties in accordance with the provisions of the Constitution. Although the Government did not take action immediately against any of the signatories, in September 2001 it detained seven prominent human rights figures, reportedly charging them under articles in the Penal Code dealing with crimes against state security. A number of those detained were signatories of the "Group of 1,000" petition. The Government tried the 10 civil society and human rights activists in criminal and state security courts and sentenced them to 2 to 10 years in prison for crimes against state security (see Section 1.e.). In December 2000, a local human rights organization published an open letter in a Lebanese newspaper calling for the closure of the notorious Tadmur Prison.

The Emergency Law and Penal Code articles dealing with crimes against state security allow the Government broad discretion in determining what constitutes illegal expression. The Emergency Law prohibits the publication of "false information", which opposes "the goals of the revolution" (see Section 1.e.). Penal Code articles prohibit "attempting to illegally change the Constitution," "preventing authorities from executing their responsibilities," and "acts or speech inciting confessionalism." In August 2001, the Government amended the Press Law to permit the reestablishment of publications that were circulated prior to 1963 and established a framework in which the National Front Parties, as well as other approved private individuals and organizations, would be permitted to publish their own newspapers. However, the same amendments also stipulated imprisonment and stiff financial penalties as part of broad, vague provisions prohibiting the publication of "inaccurate" information, particularly if it "causes public unrest, disturbs international relations, violates the dignity of the state or national unity, affects the morale of the armed forces, or inflicts harm on the national economy and the safety of the monetary system." Persons found guilty of publishing such information were subject to prison terms ranging from 1 to 3 years and fines ranging from $10,000 to $20,000 (500,000 to 1 million Syrian pounds). The amendments also imposed strict punishments on reporters who do not reveal their

government sources in response to government requests. Critics claimed that the amendment would increase self-censorship by journalists, and that it strengthened, rather than relaxed, restrictions on the press.

The Government imprisoned journalists for failing to observe press restrictions. Official media reported that journalist Ibrahim Hamidi was arrested on December 23 on charges of "publishing unfounded news," a violation of Article 51 of the 2001 Publication Law. Although the announcement did not specify the violation, it was believed to be a December 20 article in the London-based al-Hayat discussing the Government's contingency planning for possible hostilities in Iraq. At year's end, Hamidi still was detained by authorities and denied contact with his family. State security services were known to threaten local journalists, including with the removal of credentials, for articles printed outside the country. In April and May the Government refused to renew the press credentials and/or residency permits of several journalists for reasons including "ill-intentioned reporting" and "violating the rules for accrediting correspondents and the tradition of the profession of journalism."

The Ministry of Information and the Ministry of Culture and National Guidance censored domestic and imported foreign press. They usually prevent the publication or distribution of any material deemed threatening or embarrassing by the security services to high levels of the Government. Censorship usually was stricter for materials in Arabic. Commonly censored subjects included: The Government's human rights record; Islamic fundamentalism; allegations of official involvement in drug trafficking; aspects of the Government's role in Lebanon; graphic descriptions of sexual activity; material unfavorable to the Arab cause in the Middle East conflict; and material that was offensive to any of the country's religious groups. In addition most journalists and writers practiced self-censorship to avoid provoking a negative government reaction.
There were several new private publications in 2000 and 2001, but only one appeared during this year. In January 2001, the Government permitted publication of the National Progressive Front's (NPF) Communist Party newspaper, The People's Voice. It became the first private paper distributed openly since 1963. In February 2001, the Government permitted publication of the NPF's Union Socialist Party's private newspaper, The Unionist. Also in February 2001, the Government permitted the publication of a private satirical weekly newspaper, The Lamplighter, which criticized politically nonsensitive instances of government waste and corruption. In June 2001, the Government permitted the publication of the private weekly newspaper The Economist, which was critical of the performance of the Government.

In his July 2000 inaugural speech, President Bashar Al-Asad emphasized the principle of media transparency. Since July 2000, both the print and electronic media at times have been critical of Ba'th Party and government performance and have reported openly on a range of social and economic issues. While this relaxation of censorship did not extend to domestic politics or foreign policy issues, it was a notable departure from past practice. Some Damascus-based correspondents for regional Arab media also were able to file reports on internal political issues, such as rumored governmental changes, new political discussion groups, and the possible introduction of new parties to the Ba'th Party-dominated National Progressive Front.

The media continued to broaden somewhat their reporting on regional developments, including the Middle East peace process. The media covered some peace process events factually, but other events were reported selectively to support official views. The government-controlled press increased its coverage of official corruption and governmental inefficiency. A few privately owned newspapers published during the year; foreign-owned, foreign-published newspapers continued to circulate relatively freely.

The Government or the Ba'th Party owned and operated the radio and television companies and most of the newspaper publishing houses. The Ministry of Information closely monitored radio and television news programs to ensure adherence to the government line. The Government did not interfere with broadcasts from abroad. Satellite dishes have proliferated throughout all regions and in neighborhoods of all social and economic categories, and in 2001 the Minister of Economy and Foreign Trade authorized private sector importers to import satellite receivers and visual intercommunication systems.

The Ministry of Culture and National Guidance censored fiction and nonfiction works, including films. It also approved which films may or may not be shown at the cultural centers operated by foreign embassies. The Government prohibited the publication of books and other materials in Kurdish; however, there were credible reports that Kurdish language materials were available in the country (see Section 5).

In 2000 cellular telephone service was introduced although its high cost severely limited the number of subscribers. Internet access and access to e-mail was limited but growing. The Government blocked access to selected Internet sites that contained information deemed politically sensitive or pornographic in nature. The Government also consistently blocked citizens' access to servers that provide free e-mail services. The Government has disrupted telephone services to the offices and residences of several foreign diplomats, allegedly because the lines were used to access Internet providers outside the country.

The Government restricted academic freedom. Public school teachers were not permitted to express ideas contrary to government policy, although authorities allowed somewhat greater freedom of expression at the university level.

b. Freedom of Peaceful Assembly and Association

Freedom of assembly does not exist under the law. Citizens may not hold demonstrations unless they obtain permission from the Ministry of Interior. Most public demonstrations were organized by the Government or the Ba'th Party. The Government selectively permitted some demonstrations, usually for political reasons. The Government applied the restrictions on public assembly in Palestinian refugee camps, where controlled demonstrations have been allowed.

During the year there continued to be numerous demonstrations, most of which were permitted or organized by the Government, and some of which were directed against diplomatic missions and international agencies in reaction to the Israeli Government's use of force against Palestinians in Israel, the West Bank, and Gaza.

In 2000 there were large demonstrations in Suwayda province following violent clashes between Bedouin shepherds and Druze residents of the province (see Sections 1.a. and 5).

The Government restricted freedom of association. During the year, it required private associations to register with authorities and denied several such requests, presumably on political grounds. The Government usually granted registration to groups not engaged in political or other activities deemed sensitive. The Government required political forums and discussion groups to obtain prior approval to hold lectures and seminars and to submit lists of all attendees. Despite these restrictions, during the year several domestic human rights and civil society groups held meetings without registering with the Government or obtaining prior approval for the meetings.

The authorities did not allow the establishment of independent political parties (see Section 3).

The Government sentenced 10 human rights activists who had called for the expansion of civil liberties and organized public dialogue to lengthy prison stays for committing crimes against state security (see Sections 1.d. and 2.a.).

In 1980 the Government dissolved, and then reconstituted under its control, the executive boards of professional associations after some members staged a national strike and advocated an end to the state of emergency. The associations have not been independent since that time and generally are led by members of the Ba'th Party, although nonparty members may serve on their executive boards. At year's end, there was no new information on whether any persons detained in 1980 crackdowns on union and professional association officials remained in detention (see Sections 1.d. and 6.a.).

c. Freedom of Religion

The Constitution provides for freedom of religion, and the Government generally respected this right in practice; however, it imposed restrictions in some areas. The Constitution requires that the President be a Muslim. There is no official state religion; Sunni Muslims constitute the majority of the population.

All religions and orders must register with the Government, which monitors fund raising and requires permits for all meetings by religious groups, except for worship. There is a strict separation of religious institutions and the state. Religious groups tended to avoid any involvement in internal political affairs. The Government in turn generally refrained from becoming involved in strictly religious issues.

The Government considers militant Islam a threat and follows closely the practice of its adherents. The Government has allowed many new mosques to be built; however, sermons are monitored and controlled, and mosques are closed between prayers.

In 1999 and 2000, there were large-scale arrests, and torture in some cases, of Syrian and Palestinian Islamists affiliated with the Muslim Brotherhood and the Islamic Salvation Party (see Sections 1.c. and 1.d.).

Officially all schools are government run and nonsectarian, although some schools are run in practice by Christian, Druze, and Jewish minorities. There is mandatory religious instruction in schools, with government-approved teachers and curriculums. Religion courses are divided into separate classes for Muslim, Druze, and Christian students. Although Arabic is the official language in public schools, the Government permits the

teaching of Armenian, Hebrew, Syriac (Aramaic), and Chaldean in some schools on the basis that these are "liturgical languages."

Religious groups are subject to their respective religious laws on marriage, divorce, child custody, and inheritance (see Section 5).

Government policy officially disavows sectarianism of any kind. However, in the case of Alawis, religious affiliation can facilitate access to influential and sensitive posts. For example, members of the President's Alawi sect hold a predominant position in the security services and military, well out of proportion to their percentage of the population, estimated at 12 percent (see Section 3).

For primarily political rather than religious reasons, the less than 100 Jews remaining in the country generally are barred from government employment and do not have military service obligations. Jews are the only religious minority group whose passports and identity cards note their religion.

There generally was little societal discrimination or violence against religious minorities, including Jews.

For a more detailed discussion see the 2002 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The Government limited freedom of movement. The Government restricted travel near the Golan Heights. Travel to Israel was illegal. Exit visas generally no longer were required for women, men over 50 years old, and citizens living abroad. Individuals have been denied permission to travel abroad on political grounds, although government officials deny that this practice occurs. The authorities may prosecute any person found attempting to emigrate or to travel abroad illegally, or who has been deported from another country, or who is suspected of having visited Israel. Women over the age of 18 have the legal right to travel without the permission of male relatives. However, a husband or a father may file a request with the Ministry of Interior to prohibit his wife or daughter's departure from the country (see Section 5). Security checkpoints continued, although primarily in military and other restricted areas. There were few police checkpoints on main roads and in populated areas. Generally the security services set up checkpoints to search for smuggled goods, weapons, narcotics, and subversive literature. The searches took place without warrants.

The Government has refused to recognize the citizenship of or to grant identity documents to some persons of Kurdish descent. Their lack of citizenship or identity documents restricts them from traveling to and from the country (see Section 5). Emigres who did not complete mandatory military service may pay a fee to avoid being conscripted while visiting the country.

As of June, 401,185 Palestinian refugees were registered with the U.N. Relief and Works Agency (UNRWA) in the country. In general Palestinian refugees no longer report unusual difficulties travelling in and out of the country, as has been the case in the past. The Government restricted entry by Palestinians who were not resident in the country.

Citizens of Arab League countries may enter the country without a visa for a stay of up to 3 months, a period that is renewable on application to government authorities. Residency permits require proof of employment and a fixed address in the country.

The law does not provide for the granting of asylum or refugee status in accordance with the 1951 U.N. Convention Relating to the Status of Refugees or its 1967 Protocol. The Government cooperates on a case-by-case basis with the office of the United Nations High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting refugees. The Government provides first asylum but is selective about extending protection to refugees; 2,260 persons sought asylum during the year. Although the Government denied that it forcibly repatriated persons with a valid claim to refugee status, it apparently did so in the past. In September there were 3,018 non-Palestinian refugees in the country, all of whom were receiving assistance from the UNHCR, including 1,812 refugees of Iraqi origin.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

Although citizens vote for the President and Members of Parliament, they did not have the right to change their government. The late President Hafiz Al-Asad was confirmed by unopposed referenda five times after taking power in 1970. His son, Bashar Al-Asad, also was confirmed by an unopposed referendum in July 2000. The Government is headed by a Cabinet, which the President has the discretion to change. Political opposition to

the President is vigorously suppressed. The President and his senior aides, particularly those in the military and security services, ultimately make most basic decisions in political and economic life, with a very limited degree of public accountability. Moreover the Constitution mandates that the Ba'th Party is the ruling party and is ensured a majority in all government and popular associations, such as workers' and women's groups. Six smaller political parties are permitted to exist and, along with the Ba'th Party, make up the National Progressive Front (NPF), a grouping of parties that represents the sole framework of legal political party participation for citizens. While created to give the appearance of a multiparty system, the NPF is dominated by the Ba'th Party and does not change the essentially one-party character of the political system. Non-Ba'th Party members of the NPF exist as political parties largely in name only and conform strictly to Ba'th Party and government policies. In 2000 there were reports that the Government was considering legislation to expand the NPF to include new parties and several parties previously banned; however, at year's end, there were no new developments.

The Ba'th Party dominates the Parliament, which is known as the People's Council. Although parliamentarians may criticize policies and modify draft laws, the executive branch retains ultimate control over the legislative process. The Government has allowed independent non-NPF candidates to run for a limited allotment of seats in the 250-member People's Council. The allotment of non-NPF deputies was 83, ensuring a permanent absolute majority for the Ba'th Party-dominated NPF. Elections for the 250 seats in the People's Council last took place in 1998.

In March and April, the Government sentenced independent Members of Parliament Ma'mun Humsi and Riad Seif to 5 year prison terms for attempting to illegally change the Constitution (see Section 1.d.).

Persons convicted by the State Security Court may be deprived of their political rights after they are released from prison. Such restrictions include a prohibition against engaging in political activity, the denial of passports, and a bar on accepting government jobs and some other forms of employment. The duration of such restrictions is 7 years after expiration of the sentence in the case of felony convictions; however, in practice the restrictions may continue beyond that period. The Government contends that this practice is mandated by the Penal Code; it has been in effect since 1949.

Women and minorities, with the exception of the Jewish population and stateless Kurds (see Section 5), participated in the political system without restriction. There were 2 female cabinet ministers, and 26 of the 250 members of Parliament were women. No figures of the percentage of women and minorities who vote were available; however, citizens are required by law to vote.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The Government did not allow domestic human rights groups to exist legally. Human rights groups have operated legally but ultimately were banned by the Government. The Government's sentencing of 10 civil society leaders this year to lengthy prison sentences stifled the activities of human rights activists and organizations (see Sections 1.d., 1.e., and 2.a.).

In February 2001, Human Rights Watch criticized the Government for restricting civil society groups from meeting. Human Rights Watch claimed that such groups had grown in popularity in the preceding months, but that on February 18, 2001 the Government informed many leaders of such groups that their meetings could not be held without government permission.

The Government has met only twice with international human rights organizations: Human Rights Watch in 1995 and Amnesty International in 1997.

As a matter of policy, the Government in its dealings with international groups denied that it commits human rights abuses. It has not permitted representatives of international organizations to visit prisons. The Government stated that it responds in writing to all inquiries from NGOs regarding human rights issues, including the cases of individual detainees and prisoners, through an interagency governmental committee established expressly for that purpose. The Government usually responds to queries from human rights organizations and foreign embassies regarding specific cases by claiming that the prisoner in question has violated national security laws.

Section 5 Discrimination Based on Race, Sex, Disability, Language, or Social Status

The Constitution provides for equal rights and equal opportunity for all citizens. However, in practice membership in the Ba'th Party or close familial relations with a prominent party member or powerful

Syria

government official can be important for economic, social, or educational advancement. Party or government connections paved the way for entrance into better elementary and secondary schools, access to lucrative employment, and greater power within the Government, the military, and the security services. Certain prominent positions, such as that of provincial governor, were reserved solely for Ba'th Party members. Apart from some discrimination against Jews and stateless Kurds, there were no apparent patterns of systematic government discrimination based on race, sex, disability, language, or social status. However, there were varying degrees of societal discrimination in each of these areas.

Women

Violence against women occurred, but there were no reliable statistics regarding the prevalence of domestic violence or sexual assault. The vast majority of cases likely were unreported, and victims generally were reluctant to seek assistance outside the family. Battered women have the legal right to seek redress in court, but few do so because of the social stigma attached to such action. The Syrian Women's Federation offers services to battered wives to remedy individual family problems. The Syrian Family Planning Association also attempts to deal with this problem. Some private groups, including the Family Planning Association, have organized seminars on violence against women, which were reported by the government press. There are a few private, nonofficial, specifically designated shelters or safe havens for battered women who seek to flee their husbands.

Rape is a felony; however, there are no laws against spousal rape.

Prostitution is prohibited by law, and it was not a widespread problem.

The law specifically provides for reduced sentences in "honor" crimes (violent assaults with intent to kill against a female by a male for alleged sexual misconduct). Instances of honor crimes were rare and occurred primarily in rural areas in which Bedouin customs prevail.

The law prohibits sexual harassment and specifies different punishments depending on whether the victim is a minor or an adult. Sexual harassment was rarely reported.

The Constitution provides for equality between men and women and equal pay for equal work. Moreover the Government has sought to overcome traditional discriminatory attitudes toward women and encourages women's education. However, the Government has not yet changed personal status, retirement, and social security laws that discriminate against women. In addition, some secular laws discriminate against women. For example, under criminal law, the punishment for adultery for a woman is twice that as for the same crime committed by a man.

Christians, Muslims, and other religious groups are subject to their respective religious laws on marriage, divorce, and inheritance. For Muslims, personal status law on divorce is based on Shari'a (Islamic law), and some of its provisions discriminate against women. For example, husbands may claim adultery as grounds for divorce, but wives face more difficulty in presenting the same argument. If a woman requests a divorce from her husband, she may not be entitled to child support in some instances. In addition, under the law a woman loses the right to custody of boys when they reach age 9 and girls at age 12.

Inheritance for Muslims also is based on Shari'a. Accordingly Muslim women usually are granted half of the inheritance share of male heirs. However, Shari'a mandates that male heirs provide financial support to the female relatives who inherit less. If they do not, females have the right to sue.

Polygyny is legal but is practiced only by a small minority of Muslim men.

A husband may request that his wife's travel abroad be prohibited (see Section 2.d.). Women generally are barred from travelling abroad with their children unless they are able to prove that the father has granted permission for the children to travel.

Women participated actively in public life and were represented in most professions, including the military. Women were not impeded from owning or managing land or other real property. Women constituted approximately 7 percent of judges, 10 percent of lawyers, 57 percent of teachers below university level, and 20 percent of university professors.

Children

There was no legal discrimination between boys and girls in education or in health care. The Government provides free, public education from primary school through university. Education is compulsory for all children, male or female, between the ages of 6 and 12. According to the Syrian Women's Union, approximately 46 percent of the total number of students through the secondary level are female. Nevertheless, societal pressure for early marriage and childbearing interferes with girls' educational progress, particularly in rural areas, in which the dropout rates for female students remained high.

The Government provides medical care for children until the age of 18.

Although there are cases of child abuse, there is no societal pattern of abuse against children. The law provides for severe penalties for those found guilty of the most serious abuses against children.

Child prostitution and trafficking in children are rare; incidents that arise mainly involve destitute orphans.

The law emphasizes the need to protect children, and the Government has organized seminars regarding the subject of child welfare.

Persons with Disabilities

The law prohibits discrimination against persons with disabilities and seeks to integrate them into the public sector work force. However, implementation is inconsistent. Regulations reserving four percent of government and public sector jobs for persons with disabilities are not implemented rigorously. Persons with disabilities may not legally challenge alleged instances of discrimination. There are no laws that mandate access to public buildings for persons with disabilities.

National/Racial/Ethnic Minorities

The Government generally permitted national and ethnic minorities to conduct traditional, religious, and cultural activities; however, the Government's attitude toward the Kurdish minority was a significant exception. Although the Government contends that there was no discrimination against the Kurdish population, it placed limits on the use and teaching of the Kurdish language. It also restricted the publication of books and other materials written in Kurdish (see Section 2.a.), Kurdish cultural expression, and, at times, the celebration of Kurdish festivals. The Government tacitly accepted the importation and distribution of Kurdish language materials, particularly in the northeast region where most of the Kurds in the country reside. Some members of the Kurdish community have been tried by the Supreme State Security Court for expressing support for greater Kurdish autonomy or independence. Although the Government stopped the practice of stripping Kurds of their Syrian nationality (some 120,000 had lost Syrian nationality under this program in the 1960s), it never restored the nationality to those who lost it earlier. As a result, those who had lost their nationality, and their children, have been unable to obtain passports, or even identification cards and birth certificates. Without Syrian nationality, these stateless Kurds, who according to UNHCR estimates number approximately 200,000, are unable to own land, are not permitted to practice as doctors or engineers or be employed by the Government, are ineligible for admission to public hospitals, have no right to vote, and cannot travel to and from the country. They also encounter difficulties in enrolling their children in school, and in some cases, in registering their marriages.

In November 2000, a number of armed clashes occurred between Bedouin shepherds and Druze residents of Suwayda Province that required government military intervention to stop. Local press reported that between 15 and 20 Druze, Bedouin, and security forces personnel were killed. There were large demonstrations following the deaths (see Sections 1.a. and 2.b.).

In August President Asad became the first president in 40 years to visit Hasakeh province in the northeast, where most Kurds reside. In meetings with regional and Kurdish leaders, he reportedly acknowledged the importance of Kurds to the local cultural heritage and stated his willingness to discuss citizenship problems.

Section 6 Worker Rights

a. The Right of Association

Although the Constitution provides for this right, workers were not free to establish unions independent of the Government. All unions must belong to the General Federation of Trade Unions (GFTU), which is dominated by the Ba'th Party and is in fact a part of the State's bureaucratic structure. The GFTU is an information channel between political decision-makers and workers. The GFTU transmits instructions downward to the

unions and workers but also conveys information to decision-makers about worker conditions and needs. The GFTU advises the Government on legislation, organizes workers, and formulates rules for various member unions. The GFTU president is a senior member of the Ba'th Party. He and his deputy may attend cabinet meetings on economic affairs. The GFTU controls nearly all aspects of union activity.

There were no reports of antiunion discrimination. Since the unions are part of the Government's bureaucratic structure, they are protected by law from antiunion discrimination.

The GFTU is affiliated with the International Confederation of Arab Trade Unions.

In 1992 the country's eligibility for tariff preferences under the U.S. Generalized System of Preferences was suspended because the Government failed to afford internationally recognized worker rights to workers.

b. The Right to Organize and Bargain Collectively

The right to organize and bargain collectively does not exist in any meaningful sense. Government representatives were part of the bargaining process in the public sector. In the public sector, unions did not normally bargain collectively on wage issues, but there was some evidence that union representatives participated with representatives of employers and the supervising ministry in establishing minimum wages, hours, and conditions of employment. Workers serve on the boards of directors of public enterprises, and union representatives always are included on the boards.

The law provides for collective bargaining in the private sector, although past repression by the Government dissuaded most workers from exercising this right.

Unions have the right to litigate disputes over work contracts and other workers' interests with employers and may ask for binding arbitration. In practice labor and management representatives settle most disputes without resort to legal remedies or arbitration. Management has the right to request arbitration, but that right seldom is exercised. Arbitration usually occurs when a worker initiates a dispute over wages or severance pay.

The law does not prohibit strikes; however, previous government crackdowns deterred workers from striking. In 1980 the security forces arrested many union and professional association officials who planned a national strike. Some of them are believed to remain in detention, either without trial or after being tried by the State Security Court (see Sections 1.d. and 2.b.). During the year, there were no strikes.

There are no unions in the seven free trade zones. Firms in the zones are exempt from the laws and regulations governing hiring and firing, although they must observe some provisions on health, safety, hours, and sick and annual leave.

c. Prohibition of Forced or Bonded Labor

There is no law prohibiting forced or bonded labor, including that performed by children. There were no reports of forced or bonded labor by children, or forced labor involving foreign workers or domestic servants. Forced labor has been imposed as a punishment for some convicted prisoners.

d. Status of Child Labor Practices and Minimum Age for Employment

The Labor Law provides for the protection of children from exploitation in the workplace; however, the Government tolerated child labor in some instances. Independent information and audits regarding government enforcement were not available. The compulsory age for schooling is 6 to 12 years of age; however, in 2000 the Parliament approved legislation that raised the private sector minimum age for employment from 12 to 15 years for most types of nonagricultural labor, and from 16 to 18 years for heavy work, Working hours for youths of legal age do not differ from those established for adults. In all cases, parental permission is required for children under the age of 16. The law prohibits children from working at night. However, the law applies only to children who work for a salary. Those who work in family businesses and who technically are not paid a salary--a common phenomenon--do not fall under the law. Children under the age of 16 are prohibited by law from working in mines, at petroleum sites, or in other dangerous fields. Children are not allowed to lift, carry, or drag heavy objects. The exploitation of children for begging purposes also is prohibited. The Government claims that the expansion of the private sector has led to more young children working.

The Ministry of Labor and Social Affairs monitored employment conditions for persons under the age of 18, but

it does not have enough inspectors to ensure compliance with the laws. The Ministry has the authority to specify the industries in which children 15 and 16 years of age may work.

The Labor Inspection Department performed unannounced spot checks of employers on a daily basis to enforce the law; however, the scope of these checks was unknown. The majority of children under age 16 who work did so for their parents in the agricultural sector without remuneration. The ILO reported in 1998 that 10.5 percent of children under the age of 18 participate in the labor force, which amounts to 4.7 percent of the total work force.

The law does not prohibit forced or bonded labor by children; however, such practices were not known to occur.

e. Acceptable Conditions of Work

The Minister of Labor and Social Affairs is responsible for enforcing minimum wage levels in the public and private sectors. In May the Government increased public sector minimum wages by 20 percent to $69 (3,175 Syrian pounds) per month, plus other compensation (for example, meals, uniforms, and transportation). In August the Government announced a 20 percent increase in private sector minimum wages. The gain in minimum wage levels was largely cancelled out by the increase in prices. These wages did not provide a decent standard of living for a worker and family. As a result, many workers in both the public and private sectors take additional jobs or are supported by their extended families.

The statutory workweek for administrative staff is 6 days of 6 hours each, and laborers work 6 days a week of 8 hours each. In some cases a 9-hour workday is permitted. The laws mandate one 24-hour rest day per week. Rules and regulations severely limit the ability of an employer to dismiss employees without cause. Even if a person is absent from work without notice for a long period, the employer must follow a lengthy procedure of trying to find the person and notify him, including through newspaper notices, before he is able to take any action against the employee. Dismissed employees have the right of appeal to a committee of representatives from the union, management, the Ministry of Labor and Social Affairs, and the appropriate municipality. Such committees usually find in favor of the employee. Dismissed employees are entitled to 80 percent of salary benefits while the dispute is under consideration. No additional back wages are awarded should the employer be found at fault, nor are wage penalties imposed in cases in which the employer is not found at fault. The law does not protect temporary workers who are not subject to regulations on minimum wages. Small private firms and businesses employ such workers to avoid the costs associated with hiring permanent employees.

The law mandates safety in all sectors, and managers are expected to implement them fully. In practice there is little enforcement without worker complaints, which occur infrequently despite government efforts to post notices regarding safety rights and regulations. Large companies, such as oil field contractors, employ safety engineers.

The ILO noted in 1998 that a provision in the Labor Code allowing employers to keep workers at the workplace for as many as 11 hours a day might lead to abuse. However, there have been no reports of such abuses. Officials from the Ministries of Health and Labor are designated to inspect work sites for compliance with health and safety standards; however, such inspections appear to be sporadic, apart from those conducted in hotels and other facilities that cater to foreigners. The enforcement of labor laws in rural areas also is more lax than in urban areas, where inspectors are concentrated. Workers may lodge complaints about health and safety conditions, with special committees established to adjudicate such cases. Workers have the right to remove themselves from hazardous conditions without risking loss of employment.

The law provides protection for foreign workers who reside legally in the country; but not for illegal workers. There were no credible estimates available on the number of illegal workers in the country.

f. Trafficking in Persons

There are no laws that specifically prohibit trafficking in persons; however, there were no reports that persons were systematically being trafficked to, from, or within the country. Standard labor laws could be applied in the event of allegations of trafficking. The Penal Code penalizes prostitution and trafficking of citizen women abroad.

 **The National Endowment for Democracy** 
*Supporting freedom around the world*

Events >> 20th Anniversary of the National Endowment for Democracy

For Immediate Release
Office of the Press Secretary
November 6, 2003

**President Bush Discusses Freedom In Iraq and Middle East**
Remarks by the President at the 20th Anniversary of the National Endowment for
Democracy
United States Chamber of Commerce
Washington, D.C.

THE PRESIDENT: Thank you all very much.
Please be seated. Thanks for the warm welcome,
and thanks for inviting me to join you in this 20th
anniversary of the National Endowment for
Democracy. The staff and directors of this
organization have seen a lot of history over the
last two decades, you've been a part of that
history. By speaking for and standing for freedom,



you've lifted the hopes of people around the world, and you've brought great credit to
America.

I appreciate Vin for the short introduction. I'm a man who likes short introductions. And
he didn't let me down. But more importantly, I appreciate the invitation. I appreciate the
members of Congress who are here, senators from both political parties, members of
the House of Representatives from both political parties. I appreciate the ambassadors
who are here. I appreciate the guests who have come. I appreciate the bipartisan spirit,
the nonpartisan spirit of the National Endowment for Democracy. I'm glad that
Republicans and Democrats and independents are working together to advance
human liberty.

The roots of our democracy can be traced to England, and to its Parliament -- and so
can the roots of this organization. In June of 1982, President Ronald Reagan spoke at
Westminster Palace and declared, the turning point had arrived in history. He argued
that Soviet communism had failed, precisely because it did not respect its own people -
- their creativity, their genius and their rights.

President Reagan said that the day of Soviet tyranny was passing, that freedom had a
momentum which would not be halted. He gave this organization its mandate: to add to
the momentum of freedom across the world. Your mandate was important 20 years
ago; it is equally important today. (Applause.)

A number of critics were dismissive of that speech by the President. According to one
editorial of the time, "It seems hard to be a sophisticated European and also an
admirer of Ronald Reagan." (Laughter.) Some observers on both sides of the Atlantic
pronounced the speech simplistic and naive, and even dangerous. In fact, Ronald
Reagan's words were courageous and optimistic and entirely correct. (Applause.)

The great democratic movement President Reagan described was already well
underway. In the early 1970s, there were about 40 democracies in the world. By the
middle of that decade, Portugal and Spain and Greece held free elections. Soon there

**Program:**

**Welcoming Remarks a
Introductions**
Vin Weber
Chairman, National
Endowment for Democra

**Congressional Remark**
Senator Evan Bayh
Senator Sam Brownback
Rep. Chris Cox
Rep. Tom Lantos

**Keynote Address**
George W. Bush
President of the United
States

**Closing Remarks**
Carl Gershman
President, National
Endowment for Democra

▶ VIDEO  Watch this
event.

**Press Release**

**Program** [pdf]

**Sponsors**

*Speech available in* Arabic

were new democracies in Latin America, and free institutions were spreading in Korea, in Taiwan, and in East Asia. This very week in 1989, there were protests in East Berlin and in Leipzig. By the end of that year, every communist dictatorship in Central America* had collapsed. Within another year, the South African government released Nelson Mandela. Four years later, he was elected president of his country -- ascending, like Walesa and Havel, from prisoner of state to head of state.

As the 20th century ended, there were around 120 democracies in the world -- and I can assure you more are on the way. (Applause.) Ronald Reagan would be pleased, and he would not be surprised.

We've witnessed, in little over a generation, the swiftest advance of freedom in the 2,500 year story of democracy. Historians in the future will offer their own explanations for why this happened. Yet we already know some of the reasons they will cite. It is no accident that the rise of so many democracies took place in a time when the world's most influential nation was itself a democracy.

The United States made military and moral commitments in Europe and Asia, which protected free nations from aggression, and created the conditions in which new democracies could flourish. As we provided security for whole nations, we also provided inspiration for oppressed peoples. In prison camps, in banned union meetings, in clandestine churches, men and women knew that the whole world was not sharing their own nightmare. They knew of at least one place -- a bright and hopeful land -- where freedom was valued and secure. And they prayed that America would not forget them, or forget the mission to promote liberty around the world.

Historians will note that in many nations, the advance of markets and free enterprise helped to create a middle class that was confident enough to demand their own rights. They will point to the role of technology in frustrating censorship and central control -- and marvel at the power of instant communications to spread the truth, the news, and courage across borders.

Historians in the future will reflect on an extraordinary, undeniable fact: Over time, free nations grow stronger and dictatorships grow weaker. In the middle of the 20th century, some imagined that the central planning and social regimentation were a shortcut to national strength. In fact, the prosperity, and social vitality and technological progress of a people are directly determined by extent of their liberty. Freedom honors and unleashes human creativity -- and creativity determines the strength and wealth of nations. Liberty is both the plan of Heaven for humanity, and the best hope for progress here on Earth.

The progress of liberty is a powerful trend. Yet, we also know that liberty, if not defended, can be lost. The success of freedom is not determined by some dialectic of history. By definition, the success of freedom rests upon the choices and the courage of free peoples, and upon their willingness to sacrifice. In the trenches of World War I, through a two-front war in the 1940s, the difficult battles of Korea and Vietnam, and in missions of rescue and liberation on nearly every continent, Americans have amply displayed our willingness to sacrifice for liberty.

The sacrifices of Americans have not always been recognized or appreciated, yet they have been worthwhile. Because we and our allies were steadfast, Germany and Japan are democratic nations that no longer threaten the world. A global nuclear standoff with the Soviet Union ended peacefully -- as did the Soviet Union. The nations of Europe are moving towards unity, not dividing into armed camps and descending into genocide. Every nation has learned, or should have learned, an important lesson: Freedom is worth fighting for, dying for, and standing for -- and the advance of freedom leads to peace. (Applause.)

And now we must apply that lesson in our own time. We've reached another great turning point -- and the resolve we show will shape the next stage of the world

democratic movement.

Our commitment to democracy is tested in countries like Cuba and Burma and North Korea and Zimbabwe -- outposts of oppression in our world. The people in these nations live in captivity, and fear and silence. Yet, these regimes cannot hold back freedom forever -- and, one day, from prison camps and prison cells, and from exile, the leaders of new democracies will arrive. (Applause.) Communism, and militarism and rule by the capricious and corrupt are the relics of a passing era. And we will stand with these oppressed peoples until the day of their freedom finally arrives. (Applause.)

Our commitment to democracy is tested in China. That nation now has a sliver, a fragment of liberty. Yet, China's people will eventually want their liberty pure and whole. China has discovered that economic freedom leads to national wealth. China's leaders will also discover that freedom is indivisible -- that social and religious freedom is also essential to national greatness and national dignity. Eventually, men and women who are allowed to control their own wealth will insist on controlling their own lives and their own country.

Our commitment to democracy is also tested in the Middle East, which is my focus today, and must be a focus of American policy for decades to come. In many nations of the Middle East -- countries of great strategic importance -- democracy has not yet taken root. And the questions arise: Are the peoples of the Middle East somehow beyond the reach of liberty? Are millions of men and women and children condemned by history or culture to live in despotism? Are they alone never to know freedom, and never even to have a choice in the matter? I, for one, do not believe it. I believe every person has the ability and the right to be free. (Applause.)

Some skeptics of democracy assert that the traditions of Islam are inhospitable to the representative government. This "cultural condescension," as Ronald Reagan termed it, has a long history. After the Japanese surrender in 1945, a so-called Japan expert asserted that democracy in that former empire would "never work." Another observer declared the prospects for democracy in post-Hitler Germany are, and I quote, "most uncertain at best" -- he made that claim in 1957. Seventy-four years ago, The Sunday London Times declared nine-tenths of the population of India to be "illiterates not caring a fig for politics." Yet when Indian democracy was imperiled in the 1970s, the Indian people showed their commitment to liberty in a national referendum that saved their form of government.

Time after time, observers have questioned whether this country, or that people, or this group, are "ready" for democracy -- as if freedom were a prize you win for meeting our own Western standards of progress. In fact, the daily work of democracy itself is the path of progress. It teaches cooperation, the free exchange of ideas, and the peaceful resolution of differences. As men and women are showing, from Bangladesh to Botswana, to Mongolia, it is the practice of democracy that makes a nation ready for democracy, and every nation can start on this path.

It should be clear to all that Islam -- the faith of one-fifth of humanity -- is consistent with democratic rule. Democratic progress is found in many predominantly Muslim countries -- in Turkey and Indonesia, and Senegal and Albania, Niger and Sierra Leone. Muslim men and women are good citizens of India and South Africa, of the nations of Western Europe, and of the United States of America.

More than half of all the Muslims in the world live in freedom under democratically constituted governments. They succeed in democratic societies, not in spite of their faith, but because of it. A religion that demands individual moral accountability, and encourages the encounter of the individual with God, is fully compatible with the rights and responsibilities of self-government.

Yet there's a great challenge today in the Middle East. In the words of a recent report by Arab scholars, the global wave of democracy has -- and I quote -- "barely reached

the Arab states." They continue: "This freedom deficit undermines human development and is one of the most painful manifestations of lagging political development." The freedom deficit they describe has terrible consequences, of the people of the Middle East and for the world. In many Middle Eastern countries, poverty is deep and it is spreading, women lack rights and are denied schooling. Whole societies remain stagnant while the world moves ahead. These are not the failures of a culture or a religion. These are the failures of political and economic doctrines.

As the colonial era passed away, the Middle East saw the establishment of many military dictatorships. Some rulers adopted the dogmas of socialism, seized total control of political parties and the media and universities. They allied themselves with the Soviet bloc and with international terrorism. Dictators in Iraq and Syria promised the restoration of national honor, a return to ancient glories. They've left instead a legacy of torture, oppression, misery, and ruin.

Other men, and groups of men, have gained influence in the Middle East and beyond through an ideology of theocratic terror. Behind their language of religion is the ambition for absolute political power. Ruling cabals like the Taliban show their version of religious piety in public whippings of women, ruthless suppression of any difference or dissent, and support for terrorists who arm and train to murder the innocent. The Taliban promised religious purity and national pride. Instead, by systematically destroying a proud and working society, they left behind suffering and starvation.

Many Middle Eastern governments now understand that military dictatorship and theocratic rule are a straight, smooth highway to nowhere. But some governments still cling to the old habits of central control. There are governments that still fear and repress independent thought and creativity, and private enterprise -- the human qualities that make for a -- strong and successful societies. Even when these nations have vast natural resources, they do not respect or develop their greatest resources -- the talent and energy of men and women working and living in freedom.

Instead of dwelling on past wrongs and blaming others, governments in the Middle East need to confront real problems, and serve the true interests of their nations. The good and capable people of the Middle East all deserve responsible leadership. For too long, many people in that region have been victims and subjects -- they deserve to be active citizens.

Governments across the Middle East and North Africa are beginning to see the need for change. Morocco has a diverse new parliament; King Mohammed has urged it to extend the rights to women. Here is how His Majesty explained his reforms to parliament: "How can society achieve progress while women, who represent half the nation, see their rights violated and suffer as a result of injustice, violence, and marginalization, notwithstanding the dignity and justice granted to them by our glorious religion?" The King of Morocco is correct: The future of Muslim nations will be better for all with the full participation of women. (Applause.)

In Bahrain last year, citizens elected their own parliament for the first time in nearly three decades. Oman has extended the vote to all adult citizens; Qatar has a new constitution; Yemen has a multiparty political system; Kuwait has a directly elected national assembly; and Jordan held historic elections this summer. Recent surveys in Arab nations reveal broad support for political pluralism, the rule of law, and free speech. These are the stirrings of Middle Eastern democracy, and they carry the promise of greater change to come.

As changes come to the Middle Eastern region, those with power should ask themselves: Will they be remembered for resisting reform, or for leading it? In Iran, the demand for democracy is strong and broad, as we saw last month when thousands gathered to welcome home Shirin Ebadi, the winner of the Nobel Peace Prize. The regime in Teheran must heed the democratic demands of the Iranian people, or lose its last claim to legitimacy. (Applause.)

For the Palestinian people, the only path to independence and dignity and progress is
the path of democracy. (Applause.) And the Palestinian leaders who block and
undermine democratic reform, and feed hatred and encourage violence are not leaders
at all. They're the main obstacles to peace, and to the success of the Palestinian
people.

The Saudi government is taking first steps toward reform, including a plan for gradual
introduction of elections. By giving the Saudi people a greater role in their own society,
the Saudi government can demonstrate true leadership in the region.

The great and proud nation of Egypt has shown the way toward peace in the Middle
East, and now should show the way toward democracy in the Middle East. (Applause.)
Champions of democracy in the region understand that democracy is not perfect, it is
not the path to utopia, but it's the only path to national success and dignity.

As we watch and encourage reforms in the region, we are mindful that modernization
is not the same as Westernization. Representative governments in the Middle East will
reflect their own cultures. They will not, and should not, look like us. Democratic
nations may be constitutional monarchies, federal republics, or parliamentary systems.
And working democracies always need time to develop -- as did our own. We've taken
a 200-year journey toward inclusion and justice -- and this makes us patient and
understanding as other nations are at different stages of this journey.

There are, however, essential principles common to every successful society, in every
culture. Successful societies limit the power of the state and the power of the military --
so that governments respond to the will of the people, and not the will of an elite.
Successful societies protect freedom with the consistent and impartial rule of law,
instead of selecting applying -- selectively applying the law to punish political
opponents. Successful societies allow room for healthy civic institutions -- for political
parties and labor unions and independent newspapers and broadcast media.
Successful societies guarantee religious liberty -- the right to serve and honor God
without fear of persecution. Successful societies privatize their economies, and secure
the rights of property. They prohibit and punish official corruption, and invest in the
health and education of their people. They recognize the rights of women. And instead
of directing hatred and resentment against others, successful societies appeal to the
hopes of their own people. (Applause.)

These vital principles are being applied in the nations of Afghanistan and Iraq. With the
steady leadership of President Karzai, the people of Afghanistan are building a modern
and peaceful government. Next month, 500 delegates will convene a national
assembly in Kabul to approve a new Afghan constitution. The proposed draft would
establish a bicameral parliament, set national elections next year, and recognize
Afghanistan's Muslim identity, while protecting the rights of all citizens. Afghanistan
faces continuing economic and security challenges -- it will face those challenges as a
free and stable democracy. (Applause.)

In Iraq, the Coalition Provisional Authority and the Iraqi Governing Council are also
working together to build a democracy -- and after three decades of tyranny, this work
is not easy. The former dictator ruled by terror and treachery, and left deeply ingrained
habits of fear and distrust. Remnants of his regime, joined by foreign terrorists,
continue their battle against order and against civilization. Our coalition is responding
to recent attacks with precision raids, guided by intelligence provided by the Iraqis,
themselves. And we're working closely with Iraqi citizens as they prepare a
constitution, as they move toward free elections and take increasing responsibility for
their own affairs. As in the defense of Greece in 1947, and later in the Berlin Airlift, the
strength and will of free peoples are now being tested before a watching world. And we
will meet this test. (Applause.)

Securing democracy in Iraq is the work of many hands. American and coalition forces

are sacrificing for the peace of Iraq and for the security of free nations. Aid workers from many countries are facing danger to help the Iraqi people. The National Endowment for Democracy is promoting women's rights, and training Iraqi journalists, and teaching the skills of political participation. Iraqis, themselves -- police and borders guards and local officials -- are joining in the work and they are sharing in the sacrifice.

This is a massive and difficult undertaking -- it is worth our effort, it is worth our sacrifice, because we know the stakes. The failure of Iraqi democracy would embolden terrorists around the world, increase dangers to the American people, and extinguish the hopes of millions in the region. Iraqi democracy will succeed -- and that success will send forth the news, from Damascus to Teheran -- that freedom can be the future of every nation. (Applause.) The establishment of a free Iraq at the heart of the Middle East will be a watershed event in the global democratic revolution. (Applause.)

Sixty years of Western nations excusing and accommodating the lack of freedom in the Middle East did nothing to make us safe -- because in the long run, stability cannot be purchased at the expense of liberty. As long as the Middle East remains a place where freedom does not flourish, it will remain a place of stagnation, resentment, and violence ready for export. And with the spread of weapons that can bring catastrophic harm to our country and to our friends, it would be reckless to accept the status quo. (Applause.)

Therefore, the United States has adopted a new policy, a forward strategy of freedom in the Middle East. This strategy requires the same persistence and energy and idealism we have shown before. And it will yield the same results. As in Europe, as in Asia, as in every region of the world, the advance of freedom leads to peace. (Applause.)

The advance of freedom is the calling of our time; it is the calling of our country. From the Fourteen Points to the Four Freedoms, to the Speech at Westminster, America has put our power at the service of principle. We believe that liberty is the design of nature; we believe that liberty is the direction of history. We believe that human fulfillment and excellence come in the responsible exercise of liberty. And we believe that freedom -- the freedom we prize -- is not for us alone, it is the right and the capacity of all mankind. (Applause.)

Working for the spread of freedom can be hard. Yet, America has accomplished hard tasks before. Our nation is strong; we're strong of heart. And we're not alone. Freedom is finding allies in every country; freedom finds allies in every culture. And as we meet the terror and violence of the world, we can be certain the author of freedom is not indifferent to the fate of freedom.

With all the tests and all the challenges of our age, this is, above all, the age of liberty. Each of you at this Endowment is fully engaged in the great cause of liberty. And I thank you. May God bless your work. And may God continue to bless America. (Applause.)

National Endowment for Democracy | 1101 Fifteenth Street, NW, Suite 700 | Washington DC, 20005 | 202/293-9072 | Fax 202/223-6042
Updated: 12/03/2003 15:06:24 http://www.ned.org/events/anniversary/oct1603-Bush.html | webmaster@ned.org



News Home Page
Nation
National Security
Science
Courts
Columns
Search the States
Special Reports
America at War
□ Archive
- Bioterrorism
- Business
- Editorials
- Investigation
- New York
- Opinions
- Washington
- The Human Toll
- Retaliation
- September 11
Photo Galleries
Live Online
Nation Index
World
Metro
Business
Technology
Sports
Style
Education
Travel
Health
Real Estate - NEW
Home & Garden
Food
Opinion
Weather
Weekly Sections
News Digest
Classifieds
Print Edition
Archives
Site Index

# U.S. Behind Secret Transfer of Terror Suspects

*By Rajiv Chandrasekaran and Peter Finn*
Washington Post Foreign Service
Monday, March 11, 2002; Page A01

JAKARTA, Indonesia, March 10 -- Arriving here from Pakistan in mid-November, Muhammad Saad Iqbal Madni told acquaintances that he had come to Indonesia to disburse an inheritance to his late father's second wife. But instead of writing a check and leaving, he settled into a small boarding house in a crowded, lower-middle-class neighborhood, where he visited the local mosque and spent hours on end watching television at a friend's house.

Stocky and bearded, Iqbal, 24, betrayed little about his life in Pakistan, except to hand out business cards identifying him as a Koran reader for an Islamic radio station. In early January, however, the CIA informed Indonesia's State Intelligence Agency that Iqbal had another occupation, according to Indonesian officials and foreign diplomats. Iqbal, they said, was an al Qaeda operative who had worked with Richard C. Reid, the Briton charged with trying to detonate explosives in his shoes on an American Airlines flight from Paris to Miami on Dec. 22.

The officials and diplomats said the CIA provided information about Iqbal's whereabouts and urged Indonesia to apprehend

SEARCH:
News

Search Opt

Find Post Stories by Topic:
Investigation     Find
--or--
Search Story Archive by Keyword:
Find

Advanced Search

* Subscribe to Daily Newsletter

——Top Stories——

* Resistance Light as Afghans Advance (The Washington Post, Mar 13, 2002)
* Terrorist Pilots' Student Visas Arrive (The Washington Post, Mar 13, 2002)
* National Alert System Defines Five Shades of Terrorist Threat (The Washington Post, Mar 13, 2002)
* Full Coverage

——Online Extras——

Photo Galleries
* 10 Days In September
* Best of Post 2001
* Sept. 11 Archive

Live Online Discussions
* Upcoming Discussions
* America at War Transcripts

Guides
* Philippines and Terrorism
* Somalia and the War on Terrorism
* Understanding Pakistan
* India and the War on Terrorism

Background
* Multimedia Features
* America at War: News Graphics
* America at War: Transcripts

Keep up with 218 countries. Register to customize Headlines.

him. A few days later, the
Egyptian government formally
asked Indonesia to extradite Iqbal,
who carried an Egyptian as well

☐ E-Mail This Article
☐ Printer-Friendly Version
☐ Subscribe to The Post

as a Pakistani passport, a senior Indonesian official said. The Egyptian
request alleged Iqbal was wanted in connection with terrorism, he said.
It did not specify the crime, he said, but Indonesian officials were told
the charges were unrelated to the Reid case.

By Jan. 9, Iqbal was in the hands of Indonesian intelligence agents. Two
days later -- without a court hearing or a lawyer -- he was hustled aboard
an unmarked, U.S.-registered Gulfstream V jet parked at a military
airport in Jakarta and flown to Egypt, the Indonesian officials said.

Since Sept. 11, the U.S. government has secretly transported dozens of
people suspected of links to terrorists to countries other than the United
States, bypassing extradition procedures and legal formalities, according
to Western diplomats and intelligence sources. The suspects have been
taken to countries, including Egypt and Jordan, whose intelligence
services have close ties to the CIA and where they can be subjected to
interrogation tactics -- including torture and threats to families -- that are
illegal in the United States, the sources said. In some cases, U.S.
intelligence agents remain closely involved in the interrogation, the
sources said.

"After September 11, these sorts of movements have been occurring all
the time," a U.S. diplomat said. "It allows us to get information from
terrorists in a way we can't do on U.S. soil."

U.S. officials would not comment on evidence linking Iqbal to Reid, but
Western diplomats in Jakarta said Iqbal's name appeared on al Qaeda
documents discovered by U.S. intelligence agents in Afghanistan.
Indonesian officials said U.S. officials did not detail Iqbal's alleged
involvement with terrorism other than to say he was connected to Reid,
and as a consequence, he was highly sought by the U.S. government.

Iqbal remains in custody in Egypt, intelligence sources said. The sources
said he has been questioned by U.S. agents but there was no word on his
legal status, a situation that resembles that of other Islamic activists
taken into custody in cooperation with the CIA.

In October, for instance, a Yemeni microbiology student wanted in
connection with the bombing of the USS Cole was flown from Pakistan
to Jordan on a U.S.-registered Gulfstream jet after Pakistan's intelligence
agency surrendered him to U.S. authorities at the Karachi airport,
Pakistani government sources said. The hand-over of the shackled and
blindfolded student, Jamil Qasim Saeed Mohammed, who was alleged to
be an al Qaeda operative, occurred in the middle of the night at a remote
corner of the airport without extradition or deportation procedures, the
sources said.

U.S. forces seized five Algerians and a Yemeni in Bosnia on Jan. 19 and
flew them to a detention camp at the U.S. naval base at Guantanamo
Bay, Cuba, after they were ordered released by the Bosnian Supreme
Court for lack of evidence -- and despite an injunction from the Bosnian
Human Rights Chamber that four of them be allowed to remain in the
country pending further proceedings. The Human Rights Chamber,
created under the U.S.-brokered Dayton peace accords that ended the
1992-95 war, was designed to protect human rights and due process.

U.S. involvement in seizing terrorism suspects in third countries and
shipping them with few or no legal proceedings to the United States or
other countries -- known as "rendition" -- is not new. In recent years,
U.S. agents, working with Egyptian intelligence and local authorities in
Africa, Central Asia and the Balkans, have sent dozens of suspected
Islamic extremists to Cairo or taken them to the United States, according
to U.S. officials, Egyptian lawyers and human rights groups. U.S.
authorities are urging Pakistan to take the same step with the chief
suspect in the kidnapping and killing of Wall Street Journal reporter
Daniel Pearl.

In 1998, U.S. agents spirited Talaat Fouad Qassem, 38, a reputed leader
of the Islamic Group, an Egyptian extremist organization, to Egypt after
he was picked up in Croatia while traveling to Bosnia from Denmark,
where he had been granted political asylum. Qassem was allegedly an
associate of Ayman Zawahiri, the number-two man in Osama bin
Laden's al Qaeda network. Egyptian lawyers said he was questioned
aboard a U.S. ship off the Croatian coast before being taken to Cairo,
where a military tribunal had already sentenced him to death in absentia.
Egyptian officials have refused to discuss his case.

U.S. intelligence officers are also believed to have participated in the
1998 seizure in Azerbaijan of three members of Egypt's other main
underground group, Egyptian Islamic Jihad, according to testimony
provided to their attorneys in Cairo.

Also in 1998, CIA officers working with Albanian police seized five
members of Egyptian Islamic Jihad who were allegedly planning to
bomb the U.S. Embassy in Tirana, Albania's capital.

After three days of interrogation, the five men were flown to Egypt
aboard a plane that was chartered by the CIA; two were put to death.
The five were among 13 suspects known to have been picked up in the
Balkans with U.S. involvement and taken to Egypt for trial.

Between 1993 and 1999, terrorism suspects also were rendered to the
United States from Nigeria, the Philippines, Kenya and South Africa in
operations acknowledged by U.S. officials. Dozens of other covert
renditions, often with Egyptian cooperation, were also conducted, U.S.
officials said. The details of most of these operations, which often
ignored local and international extradition laws, remain closely guarded.

Even when local intelligence agents are involved, diplomats said it is preferable to render a suspect secretly because it prevents lengthy court battles and minimizes publicity that could tip off the detainee's associates. Rendering suspects to a third country, particularly Muslim nations such as Egypt or Jordan, also helps to defuse domestic political concerns in predominantly Muslim nations such as Indonesia, the diplomats said.

Sending a suspect directly to the United States, the diplomats said, could prompt objections from government officials who fear that any publicity of such an action would lead to a backlash from fundamentalist Islamic groups.

In Iqbal's case, Indonesian government officials told local media that he had been sent to Egypt because of visa violations. A spokesman for the immigration department said Iqbal failed to identify a sponsor for his visit to Indonesia on his visa application form, which was submitted in Islamabad, Pakistan.

A senior Indonesian government official said disclosing the U.S. role would have exposed President Megawati Sukarnoputri to criticism from Muslim-oriented political parties in her governing coalition. "We can't be seen to be cooperating too closely with the United States," the official said.

The official said an extradition request from Egypt and the discovery of Iqbal's visa infraction provided political cover to comply with the CIA's request. "This was a U.S. deal all along," the senior official said. "Egypt just provided the formalities."

Indonesian officials believe Iqbal, who arrived in Jakarta on Nov. 17, came to the vast Southeast Asian archipelago not to plan an attack but to seek refuge as the Taliban neared collapse and al Qaeda leaders sought to flee Afghanistan. Western officials said they do not have a full picture of what Iqbal was doing in Indonesia and they cannot rule out the possibility that he was engaged in terrorist activities here.

Iqbal had lived in Jakarta as a teenager while his father, who also was an expert Koran reader, taught at the Arab Language Institute. Shortly after Iqbal arrived in November, he returned to his old neighborhood, a district in east Jakarta with narrow, winding streets and open sewers. There he met up with one of his father's former students, Mohammed Rizard, who helped him get a room at a nearby boarding house.

Rizard, a printer, said Iqbal often would spend afternoons at his house, watching television and singing Indian karaoke tunes. Although Iqbal said he came to Indonesia to distribute an inheritance to his father's second wife, he appeared to be in no hurry to perform the task, Rizard said.

Case 1:04-cv-00249-DGT-SMG   Document 1   Filed 01/22/04   Page 54 of 82 PageID #: 54

"He was taking it easy," Rizard said. "He was more interested in talking about girls and singing karaoke."

Just before his arrest, Iqbal visited Solo, a city in central Java, Indonesia's main island, saying he was going to see his stepmother. The city is regarded by Western and Asian intelligence officials as a base for Jemaah Islamiah, a militant Muslim group with bases in Indonesia, Singapore and Malaysia that is alleged to be affiliated with al Qaeda. The group is accused of plotting to blow up Western embassies and U.S. naval vessels in Singapore and of aiding two of the Sept. 11 hijackers during a trip they made to Malaysia in 2000.

Rizard said he never discussed politics with Iqbal or inquired about his life in Pakistan. "He never talked about jihad or America," Rizard said. Rizard also said he rifled through Iqbal's suitcase and "found nothing suspicious."

In December, Iqbal sent several letters to friends in Pakistan, Rizard said. Three replies arrived at Rizard's house, which Iqbal used as a return address, after he had been seized and sent to Egypt. Rizard gave the unopened letters to correspondents for The Washington Post and the Weekend Australian newspaper.

The handwritten letters, in the Urdu language, contain no incriminating details but do suggest that Iqbal's missives had expressed deep frustration and despair.

"Why have you lost all hope?" one of his friends, Hafiz Mohammad Riazuddin, wrote. "Please keep your head and spirits up."

"Surprisingly you have asked about the Taliban," Riazuddin continued. "How did you become interested in politics? Anyway, by the time you sent this letter, Taliban rule has ended in Afghanistan. U.S. and British troops have landed in Afghanistan. The U.S. has taken bases in Pakistan and Pakistan's nuclear program is in danger."

A lengthy letter from a woman who appears to be his girlfriend suggested Iqbal had left Pakistan suddenly and had not told those close to him where he was going. "It gives great pleasure to know that you are alive," she wrote.

Another letter, from a man named Shahid, refers to plans to visit an "uncle in America" and talk to an "Uncle Babar" in Malaysia.

Despite criticism from some U.S. officials as well as from neighboring Singapore and Malaysia that Indonesia is not moving aggressively enough against suspected terrorists, particularly members of Jemaah Islamiah, officials here quickly point to Iqbal's rendition as proof they are cooperating, albeit quietly, in the global fight against terrorism.

"The CIA asked us to find this guy and hand him over," the senior Indonesian official said. "We did what they wanted."

*Finn reported from Berlin. Correspondent Howard Schneider in Cairo, special correspondent Kamran Khan in Karachi, Pakistan, and staff writers Dan Eggen and Walter Pincus in Washington contributed to this report.*

© 2002 The Washington Post Company

---

**Related Links**

Full Mideast Coverage

More World News

Full Africa Coverage

Latest World News

Full Asia Coverage

Latest World News

washingtonpost.com

# U.S. Decries Abuse but Defends Interrogations
'Stress and Duress' Tactics Used on Terrorism Suspects Held in Secret
Overseas Facilities

By Dana Priest and Barton Gellman
Washington Post Staff Writers
Thursday, December 26, 2002; Page A01

Deep inside the forbidden zone at the U.S.-occupied Bagram air base in
Afghanistan, around the corner from the detention center and beyond the
segregated clandestine military units, sits a cluster of metal shipping
containers protected by a triple layer of concertina wire. The containers hold
the most valuable prizes in the war on terrorism -- captured al Qaeda
operatives and Taliban commanders.

Those who refuse to cooperate inside this secret CIA interrogation center are
sometimes kept standing or kneeling for hours, in black hoods or spray-
painted goggles, according to intelligence specialists familiar with CIA
interrogation methods. At times they are held in awkward, painful positions
and deprived of sleep with a 24-hour bombardment of lights -- subject to what
are known as "stress and duress" techniques.

Those who cooperate are rewarded with creature comforts, interrogators
whose methods include feigned friendship, respect, cultural sensitivity and, in
some cases, money. Some who do not cooperate are turned over -- "rendered,"
in official parlance -- to foreign intelligence services whose practice of torture
has been documented by the U.S. government and human rights organizations.


▼ ADVERTISING

Who has time
for dial up?

Activate your
high-speed Internet
access and get a
free modem*.

click for details

*offer does not apply to
Cablevision customers

In the multifaceted global war on terrorism waged by the Bush administration,
one of the most opaque -- yet vital -- fronts is the detention and interrogation
of terrorism suspects. U.S. officials have said little publicly about the captives'
names, numbers or whereabouts, and virtually nothing about interrogation
methods. But interviews with several former intelligence officials and 10
current U.S. national security officials -- including several people who
witnessed the handling of prisoners -- provide insight into how the U.S. government is prosecuting this
part of the war.

The picture that emerges is of a brass-knuckled quest for information, often in concert with allies of
dubious human rights reputation, in which the traditional lines between right and wrong, legal and
inhumane, are evolving and blurred.

While the U.S. government publicly denounces the use of torture, each of the current national security
officials interviewed for this article defended the use of violence against captives as just and necessary.
They expressed confidence that the American public would back their view. The CIA, which has
primary responsibility for interrogations, declined to comment.

"If you don't violate someone's human rights some of the time, you probably aren't doing your job," said
one official who has supervised the capture and transfer of accused terrorists. "I don't think we want to

Case 1:04-cv-00249-DGT-SMG   Document 1   Filed 01/22/04   Page 57 of 82 PageID #: 57

be promoting a view of zero tolerance on this. That was the whole problem for a long time with the CIA."

The off-limits patch of ground at Bagram is one of a number of secret detention centers overseas where U.S. due process does not apply, according to several U.S. and European national security officials, where the CIA undertakes or manages the interrogation of suspected terrorists. Another is Diego Garcia, a somewhat horseshoe-shaped island in the Indian Ocean that the United States leases from Britain.

U.S. officials oversee most of the interrogations, especially those of the most senior captives. In some cases, highly trained CIA officers question captives through interpreters. In others, the intelligence agency undertakes a "false flag" operation using fake decor and disguises meant to deceive a captive into thinking he is imprisoned in a country with a reputation for brutality, when, in reality, he is still in CIA hands. Sometimes, female officers conduct interrogations, a psychologically jarring experience for men reared in a conservative Muslim culture where women are never in control.

In other cases, usually involving lower-level captives, the CIA hands them to foreign intelligence services -- notably those of Jordan, Egypt and Morocco -- with a list of questions the agency wants answered. These "extraordinary renditions" are done without resort to legal process and usually involve countries with security services known for using brutal means.

According to U.S. officials, nearly 3,000 suspected al Qaeda members and their supporters have been detained worldwide since Sept. 11, 2001. About 625 are at the U.S. military's confinement facility at Guantanamo Bay, Cuba. Some officials estimated that fewer than 100 captives have been rendered to third countries. Thousands have been arrested and held with U.S. assistance in countries known for brutal treatment of prisoners, the officials said.

At a Sept. 26 joint hearing of the House and Senate intelligence committees, Cofer Black, then head of the CIA Counterterrorist Center, spoke cryptically about the agency's new forms of "operational flexibility" in dealing with suspected terrorists. "This is a very highly classified area, but I have to say that all you need to know: There was a before 9/11, and there was an after 9/11," Black said. "After 9/11 the gloves come off."

According to one official who has been directly involved in rendering captives into foreign hands, the understanding is, "We don't kick the [expletive] out of them. We send them to other countries so *they* can kick the [expletive] out of them." Some countries are known to use mind-altering drugs such as sodium pentathol, said other officials involved in the process.

Abu Zubaida, who is believed to be the most important al Qaeda member in detention, was shot in the groin during his apprehension in Pakistan in March. National security officials suggested that Zubaida's painkillers were used selectively in the beginning of his captivity. He is now said to be cooperating, and his information has led to the apprehension of other al Qaeda members. .

U.S. National Security Council spokesman Sean McCormack declined to comment earlier this week on CIA or intelligence-related matters. But, he said: "The United States is treating enemy combatants in U.S. government control, wherever held, humanely and in a manner consistent with the principles of the Third Geneva Convention of 1949."

The convention outlined the standards for treatment of prisoners of war. Suspected terrorists in CIA hands have not been accorded POW status.

Case 1:04-cv-00249-DGT-SMG   Document 1   Filed 01/22/04   Page 58 of 82 PageID #: 58

Other U.S. government officials, speaking on condition of anonymity, acknowledged that interrogators deprive some captives of sleep, a practice with ambiguous status in international law.

The U.N. High Commissioner for Human Rights, the authoritative interpreter of the international Convention Against Torture, has ruled that lengthy interrogation may incidentally and legitimately cost a prisoner sleep. But when employed for the purpose of breaking a prisoner's will, sleep deprivation "may in some cases constitute torture."

The State Department's annual human rights report routinely denounces sleep deprivation as an interrogation method. In its 2001 report on Turkey, Israel and Jordan, all U.S. allies, the department listed sleep deprivation among often-used alleged torture techniques.

U.S. officials who defend the renditions say the prisoners are sent to these third countries not because of their coercive questioning techniques, but because of their cultural affinity with the captives. Besides being illegal, they said, torture produces unreliable information from people who are desperate to stop the pain. They look to foreign allies more because their intelligence services can develop a culture of intimacy that Americans cannot. They may use interrogators who speak the captive's Arabic dialect and often use the prospects of shame and the reputation of the captive's family to goad the captive into talking.

### 'Very Clever Guys'

In a speech on Dec. 11, CIA director George J. Tenet said that interrogations overseas have yielded significant returns recently. He calculated that worldwide efforts to capture or kill terrorists had eliminated about one-third of the al Qaeda leadership. "Almost half of our successes against senior al Qaeda members has come in recent months," he said.

Many of these successes have come as a result of information gained during interrogations. The capture of al Qaeda leaders Ramzi Binalshibh in Pakistan, Omar al-Faruq in Indonesia, Abd al-Rahim al-Nashiri in Kuwait and Muhammad al Darbi in Yemen were all partly the result of information gained during interrogations, according to U.S. intelligence and national security officials. All four remain under CIA control.

Time, rather than technique, has produced the most helpful information, several national security and intelligence officials said. Using its global computer database, the CIA is able to quickly check leads from captives in one country with information divulged by captives in another.

"We know so much more about them now than we did a year ago -- the personalities, how the networks are established, what they think are important targets, how they think we will react," said retired Army general Wayne Downing, the Bush administration's deputy national security adviser for combating terrorism until he resigned in June.

"The interrogations of Abu Zubaida drove me nuts at times," Downing said. "He and some of the others are very clever guys. At times I felt we were in a classic counter-interrogation class: They were telling us what they think we already knew. Then, what they thought we wanted to know. As they did that, they fabricated and weaved in threads that went nowhere. But, even with these ploys, we still get valuable information and they are off the street, unable to plot and coordinate future attacks."

In contrast to the detention center at Guantanamo Bay, where military lawyers, news reporters and the Red Cross received occasional access to monitor prisoner conditions and treatment, the CIA's overseas

interrogation facilities are off-limits to outsiders, and often even to other government agencies. In addition to Bagram and Diego Garcia, the CIA has other secret detention centers overseas, and often uses the facilities of foreign intelligence services.

Free from the scrutiny of military lawyers steeped in the international laws of war, the CIA and its intelligence service allies have the leeway to exert physically and psychologically aggressive techniques, said national security officials and U.S. and European intelligence officers.

Although no direct evidence of mistreatment of prisoners in U.S. custody has come to light, the prisoners are denied access to lawyers or organizations, such as the Red Cross, that could independently assess their treatment. Even their names are secret.

This month, the U.S. military announced that it had begun a criminal investigation into the handling of two prisoners who died in U.S. custody at the Bagram base. A base spokesman said autopsies found one of the detainees died of a pulmonary embolism, the other of a heart attack.

Al Qaeda suspects are seldom taken without force, and some suspects have been wounded during their capture. After apprehending suspects, U.S. take-down teams -- a mix of military special forces, FBI agents, CIA case officers and local allies -- aim to disorient and intimidate them on the way to detention facilities.

According to Americans with direct knowledge and others who have witnessed the treatment, captives are often "softened up" by MPs and U.S. Army Special Forces troops who beat them up and confine them in tiny rooms. The alleged terrorists are commonly blindfolded and thrown into walls, bound in painful positions, subjected to loud noises and deprived of sleep. The tone of intimidation and fear is the beginning, they said, of a process of piercing a prisoner's resistance.

The take-down teams often "package" prisoners for transport, fitting them with hoods and gags, and binding them to stretchers with duct tape.

Bush administration appointees and career national security officials acknowledged that, as one of them put it, "our guys may kick them around a little bit in the adrenaline of the immediate aftermath." Another said U.S. personnel are scrupulous in providing medical care to captives, adding in a deadpan voice, that "pain control [in wounded patients] is a very subjective thing."

### 'We're Not Aware'

The CIA's participation in the interrogation of rendered terrorist suspects varies from country to country.

"In some cases [involving interrogations in Saudi Arabia], we're able to observe through one-way mirrors the live investigations," said a senior U.S. official involved in Middle East security issues. "In others, we usually get summaries. We will feed questions to their investigators. They're still very much in control."

The official added: "We're not aware of any torture or even physical abuse."

Tenet acknowledged the Saudis' role in his Dec. 11 speech. "The Saudis are proving increasingly important support to our counterterrorism efforts -- from making arrests to sharing debriefing results," he said.

But Saudi Arabia is also said to withhold information that might lead the U.S. government to conclusions or policies that the Saudi royal family fears. U.S. teams, for that reason, have sometimes sent Saudi nationals to Egypt instead.

Jordan is a favored country for renditions, several U.S. officials said. The Jordanians are considered "highly professional" interrogators, which some officials said meant that they do not use torture. But the State Department's 2001 human rights report criticized Jordan and its General Intelligence Directorate for arbitrary and unlawful detentions and abuse.

"The most frequently alleged methods of torture include sleep deprivation, beatings on the soles of the feet, prolonged suspension with ropes in contorted positions and extended solitary confinement," the 2001 report noted. Jordan also is known to use prisoners' family members to induce suspects to talk.

Another significant destination for rendered suspects is Morocco, whose general intelligence service has sharply stepped up cooperation with the United States. Morocco has a documented history of torture, as well as longstanding ties to the CIA..

The State Department's human rights report says Moroccan law "prohibits torture, and the government claims that the use of torture has been discontinued; however, some members of the security forces still tortured or otherwise abused detainees."

In at least one case, U.S. operatives led the capture and transfer of an al Qaeda suspect to Syria, which for years has been near the top of U.S. lists of human rights violators and sponsors of terrorism. The German government strongly protested the move. The suspect, Mohammed Haydar Zammar, holds joint German and Syrian citizenship. It could not be learned how much of Zammar's interrogation record Syria has provided the CIA.

The Bush administration maintains a legal distance from any mistreatment that occurs overseas, officials said, by denying that torture is the intended result of its rendition policy. American teams, officials said, do no more than assist in the transfer of suspects who are wanted on criminal charges by friendly countries. But five officials acknowledged, as one of them put it, "that sometimes a friendly country can be invited to 'want' someone we grab." Then, other officials said, the foreign government will charge him with a crime of some sort.

One official who has had direct involvement in renditions said he knew they were likely to be tortured. "I . . . do it with my eyes open," he said.

According to present and former officials with firsthand knowledge, the CIA's authoritative Directorate of Operations instructions, drafted in cooperation with the general counsel, tells case officers in the field that they may not engage in, provide advice about or encourage the use of torture by cooperating intelligence services from other countries.

"Based largely on the Central American human rights experience," said Fred Hitz, former CIA inspector general, "we don't do torture, and we can't countenance torture in terms of we can't know of it." But if a country offers information gleaned from interrogations, "we can use the fruits of it."

Bush administration officials said the CIA, in practice, is using a narrow definition of what counts as "knowing" that a suspect has been tortured. "If we're not there in the room, who is to say?" said one official conversant with recent reports of renditions.

Case 1:04-cv-00249-DGT-SMG   Document 1   Filed 01/22/04   Page 61 of 82 PageID #: 61

The Clinton administration pioneered the use of extraordinary rendition after the bombings of U.S. embassies in Kenya and Tanzania in 1998. But it also pressed allied intelligence services to respect lawful boundaries in interrogations.

After years of fruitless talks in Egypt, President Bill Clinton cut off funding and cooperation with the directorate of Egypt's general intelligence service, whose torture of suspects has been a perennial theme in State Department human rights reports.

"You can be sure," one Bush administration official said, "that we are not spending a lot of time on that now."

*Staff writers Bob Woodward, Susan Schmidt and Douglas Farah, and correspondent Peter Finn in Berlin, contributed to this report.*

© 2002 The Washington Post Company

| ADVERTISER LINKS | | What's this? |
|---|---|---|
| **America's Second Harvest** Create a hunger-free America. Your donation will help feed millions. www.secondharvest.org | **NBTF - Get Important Info** Brain tumor diagnosis, treatment, support groups, news and more. braintumor.org | **The Green Guide** The Source for Eco-Friendly Advice. Product Reviews, Shopping Tips. www.thegreenguide.com |

**latimes.com.**
Los Angeles Times

http://www.latimes.com/news/nationworld/world/la-fg-mullah1feb01,0,7768057.story?coll=la%
2Dhome%2Dheadlines

advertisement


what's your
lifestyle?
Advertising Supplement

# Key to U.S. Case Denies Iraq-Al Qaeda Link

By Sebastian Rotella
Times Staff Writer

February 1, 2003

BRUSSELS — The strangest thing about the strange story of Mullah Krekar, the leader of an Islamic terrorist group operating in the wilds of northern Iraq, is the fact that he remains a free man, living in peaceful Norway.

Krekar, who U.S. leaders charge could be proof of Al Qaeda's alleged links to Saddam Hussein, said Friday that he would be upset but not surprised if Secretary of State Colin L. Powell names him next week during a much-anticipated U.N. presentation of the case against Iraq.

"I can say to you that this is not true that I am a link between Saddam Hussein and Al Qaeda," Krekar, 47, said during a telephone interview from Oslo, the Norwegian capital. "I will wait until Wednesday, and if Powell says anything against me, I can use documents to prove it is not true. Everything: that we have chemical bombs, [ties to] Osama bin Laden, Saddam Hussein, all of those things."

Although some counter-terrorism officials in the U.S. and Europe doubt that connections between Al Qaeda and the Iraqi president exist, U.S. authorities call Krekar a dangerous man. Moreover, Jordan wants to extradite him on drug trafficking charges. The Dutch locked him up for four months, then deported him to Norway, where he has refugee status. Norwegian police have spent days questioning him about alleged asylum fraud and terror activity related to his leadership of Ansar al-Islam, an armed Kurdish group.

"The U.S. has an interest in making sure people associated with terrorism can't facilitate terrorist acts," said a spokesman at the U.S. Embassy in Oslo. "We believe he is linked to terrorism generally and Al Qaeda specifically. We hope Norway will take some action regarding him."

Although the FBI has interviewed Krekar twice, U.S. officials acknowledge that they are not able to charge him with a crime or to request his extradition. The Norwegians and the Dutch say they don't have enough evidence to hold him.

That is the best defense, Krekar declares triumphantly, against anyone using him to argue that a war on Iraq would also be a war on terrorism. He challenges the Bush administration to grant him a visa so he can plead his case.

"I said to the FBI, 'I can come to America and prove it's not true in your court,' " said Krekar, who studied Islamic theology with a founder of Al Qaeda and has publicly praised Bin Laden. "I am not an

enemy of America. Not Powell, but Rumsfeld and Wolfowitz want to push George Bush to war," he added, referring to Defense Secretary Donald H. Rumsfeld and Deputy Defense Secretary Paul D. Wolfowitz.

Rhetoric aside, Krekar is not the only notorious Islamic leader to elude arrest in Europe despite plenty of suspicion and effort in a number of countries. As his case shows, the global nature of Islamic extremism often combines with Europe's patchwork of conflicting justice systems and immigration policies to frustrate counter-terrorism investigators.

The debate about Iraq has thrown a divisive new element into the mix: the high-stakes politics of a world on the edge of war. Krekar accuses the United States of leaning on smaller countries to do its dirty work.

"I told the Norwegians, 'Don't let America touch me with your hand,' " Krekar said.

Krekar's odyssey has been confused and occasionally goofy. To the dismay of U.S. officials, the Dutch deported him last month thinking that Norwegian police would arrest him on the spot, according to knowledgeable officials. But nobody met the Dutch police who walked Krekar off the plane Jan. 13; Norwegian police saw no reason to arrest him.

The mullah walked free.

Krekar's real name is Faraj Ahmad. The shaggy, bearded cleric claims to be the author of 30 books, including volumes of poetry, and says he became the leader of Ansar al-Islam in December 2001. Officials in Kurd-controlled northern Iraq call him a vicious terrorist whose Islamic marauders have imposed Taliban-style living conditions in the area they control and massacred Kurdish rivals.

Last year, Krekar traveled from Amsterdam, where he has relatives, to Iran. Authorities there arrested him and expelled him to the Netherlands. Dutch prosecutors held him based on a Jordanian extradition request for heroin trafficking, a charge he denies.

Shortly after the arrest, U.S. Atty. Gen. John Ashcroft expressed great interest in the case during a meeting with Dutch Justice Minister Piet Donner, according to Donner. Jordan has no extradition treaty with the Netherlands, but two countries may extradite drug suspects under a U.N. treaty.

Krekar's lawyers say they suspect that the U.S. and Jordan orchestrated the drug case in the hope that Krekar would end up in the hands of Jordanian intelligence agents. As part of a practice known as "rendering," the U.S. has steered suspected terrorists to Middle Eastern allies whose security services have reputations for harsh interrogation techniques.

"We suspected drugs was a cover-up," said Britta Bohler, a Dutch lawyer. "It's very strange. Maybe the U.S. government had an interest that Jordan interrogate him more."

FBI agents interviewed Krekar twice in Dutch custody. The agents asked about his activity in Iraq, Al Qaeda and Saddam Hussein, according to Krekar and his lawyers, but did not give the impression they were investigating a specific case.

U.S. officials did not comment on the interviews. They said there is no public indictment of Krekar. Asked if he was under investigation, a U.S. official said: "There is a lot of interest in him."

Krekar denies allegations of involvement with Al Qaeda figures such as Abu Musab Zarqawi, a

chemical warfare expert whom investigators suspect was the mastermind of attack plots by an Algerian network in Britain and France. But U.S., Kurdish and European officials say Ansar's ties to Al Qaeda appear well documented.

Clear ties to Hussein seem more elusive. U.S. and Kurdish officials point to Abu Wael, a fellow leader of Ansar accused of being an Iraqi intelligence liaison to the Islamic terrorists. Krekar claims that Iraqi agents tried to poison him in 1992 and would kill him if they could.

"Our aim has always been the toppling of the Iraqi Baath regime," he said. But he said he opposes a U.S. attack on Iraq because "Saddam attaches no importance to humanitarian values, and if he is cornered and realizes that he is going to be hit, he will sink the boat with everyone and everything in it."

As the international debate about Iraq mounted, Krekar's case became increasingly uncomfortable for Dutch authorities. Ten days before his scheduled extradition hearing, authorities decided to deport him to Norway, where his wife and four children live.

His lawyers assert that the Jordanian case was weak and that the Dutch government wanted to avoid another terrorism-related embarrassment. Late last year, a Dutch court acquitted accused members of an alleged Al Qaeda cell who prosecutors charged had plotted to bomb the U.S. Embassy in Paris.

Today, Krekar's Norwegian lawyer fears that Norway wants to strip the mullah of his refugee passport, leaving him stateless. The obstacle to a terrorism case in Oslo, however, is a law that says he must be a threat to Norway to be charged. "His fight is against other Kurds," said the lawyer, Brynjar Meling. "That charge is hopeless."

Krekar sees himself as a pawn of the U.S. government. "This is only for a war against Iraq," he said. "Our group didn't do anything against America."

If you want other stories on this topic, search the Archives at latimes.com/archives.

Click here for article licensing and reprint options

Copyright 2004 Los Angeles Times

washingtonpost.com

# Deported Terror Suspect Details Torture in Syria

Canadian's Case Called Typical of CIA

By DeNeen L. Brown and Dana Priest
Washington Post Staff Writers
Wednesday, November 5, 2003; Page A01

TORONTO, Nov. 4 -- A Canadian citizen who was detained last year at John
F. Kennedy International Airport in New York as a suspected terrorist said
Tuesday he was secretly deported to Syria and endured 10 months of torture
in a Syrian prison.

Maher Arar, 33, who was released last month, said at a news conference in
Ottawa that he pleaded with U.S. authorities to let him continue on to Canada,
where he has lived for 15 years and has a family. But instead, he was flown
under U.S. guard to Jordan and handed over to Syria, where he was born. Arar
denied any connection to terrorism and said he would fight to clear his name.

U.S. officials said Tuesday that Arar was deported because he had been put on
a terrorist watch list after information from "multiple international intelligence
agencies" linked him to terrorist groups.

Officials, speaking on condition of anonymity, said that the Arar case fits the
profile of a covert CIA "extraordinary rendition" -- the practice of turning
over low-level, suspected terrorists to foreign intelligence services, some of
which are known to torture prisoners.

Arar's case has brought repeated apologies from the Canadian government,
which says it is investigating what information the Royal Canadian Mounted
Police gave to U.S. authorities. Canada's foreign minister, Bill Graham, also
said he would question the Syrian ambassador about Arar's statements about
torture. In an interview on CBC Radio, Imad Moustafa, the Syrian chargé d'affaires in Washington,
denied that Arar had been tortured.

Arar said U.S. officials apparently based the terrorism accusation on his connection to Abdullah
Almalki, another Syrian-born Canadian. Almalki is being detained by Syrian authorities, although no
charges against him have been reported. Arar said he knew Almalki only casually before his detention
but encountered him at the Syrian prison where both were tortured.

Arar, whose case has become a cause celebre in Canada, demanded a public inquiry. "I am not a
terrorist," he said. "I am not a member of al Qaeda. I have never been to Afghanistan."

He said he was flying home to Montreal via New York on Sept. 26, 2002, from a family visit to Tunisia.

"This is when my nightmare began," he said. "I was pulled aside by immigration and taken [away]. The
police came and searched my bags. I asked to make a phone call and they would not let me." He said an
FBI agent and a New York City police officer questioned him. "I was so scared," he said. "They told me

▼ ADVERTISING



Who has time
for dial up?

Activate your
high-speed Internet
access and get a
free modem*.
click for details

*offer does not apply to
Cablevision customers

Case 1:04-cv-00249-DGT-SMG   Document 1   Filed 01/22/04   Page 66 of 82 PageID #: 66

I had no right to a lawyer because I was not an American citizen."

Arar said he was shackled, placed on a small jet and flown to Washington, where "a new team of people got on the plane" and took him to Amman, the capital of Jordan. Arar said U.S. officials handed him over to Jordanian authorities, who "blindfolded and chained me and put me in a van. . . . They made me bend my head down in the back seat. Then these men started beating me. Every time I tried to talk, they beat me."

Hours later, he said, he was taken to Syria and there he was forced to write that he had been to a training camp in Afghanistan. "They kept beating me, and I had to falsely confess," he said. "I was willing to confess to anything to stop the torture."

Arar said his prison cell "was like a grave, exactly like a grave. It had no light, it was three feet wide, it was six feet deep, it was seven feet high. . . . It had a metal door. There was a small opening in the ceiling. There were cats and rats up there, and from time to time, the cats peed through the opening into the cell."

Steven Watt, a human rights fellow at the Center for Constitutional Rights in Washington, said Arar's case raised questions about U.S. counterterrorism measures. "Here we have the United States involved in the removal of somebody to a country where it knows persons in custody of security agents are tortured," Watt said. "The U.S. was possibly benefiting from the fruits of that torture. I ask the question: Why wasn't he removed to Canada?"

A senior U.S. intelligence official discussed the case in terms of the secret rendition policy. There have been "a lot of rendition activities" since the Sept. 11, 2001, terrorist attacks in the United States, the official said. "We are doing a number of them, and they have been very productive."

Renditions are a legitimate option for dealing with suspected terrorists, intelligence officials argue. The U.S. government officially rejects the assertion that it knowingly sends suspects abroad to be tortured, but officials admit they sometimes do that. "The temptation is to have these folks in other hands because they have different standards," one official said. "Someone might be able to get information we can't from detainees," said another.

Syria, where use of torture during imprisonment has been documented by the State Department, maintains a secret but growing intelligence relationship with the CIA, according to intelligence experts.

"The Syrian government has provided some very useful assistance on al Qaeda in the past," said Cofer Black, former director of counterterrorism at the CIA who is now the counterterrorism coordinator at the State Department.

One senior intelligence official said Tuesday that Arar is still believed to have connections to al Qaeda. The Justice Department did not have enough evidence to detain him when he landed in the United States, the official said, and "the CIA doesn't keep people in this country."

With those limitations, and with a secret presidential "finding" authorizing the CIA to place suspects in foreign hands without due process, Arar may have been one of the people whisked overseas by the CIA.

In the early 1990s, renditions were exclusively law enforcement operations in which suspects were snatched by covert CIA or FBI teams and brought to the United States for trial or questioning. But CIA teams, working with foreign intelligence services, now capture suspected terrorists in one country and

render them to another, often after U.S. interrogators have tried to gain information from them.

Renditions are considered a covert action. Congress, which oversees the CIA, knows of only the broad authority to carry out renditions but is not informed about individual cases, according to intelligence officials.*Priest reported from Washington. Staff writers John Mintz and Glenn Kessler in Washington contributed to this report.*

© 2003 The Washington Post Company

| ADVERTISER LINKS | | What's this? |
|---|---|---|
| **Help Brain Tumor Patients** Learn how your support can help the lives of people with brain tumors. braintumor.org | **Are You a New Dad?** She might be having the baby, but there is a lot for dad to do! www.marchofdimes.com | **Hunger Relief in America** It's easy to be involved & informed at America's Second Harvest. www.secondharvest.org |

DEC 02 '03 11:38 FR                                                    P.02/12

U.S. Department of Justice
Immigration and Naturalization Service

Refer to the following file number:

File No.

Date _October 07, 2002_

To:

ARAR, Maher Abdal Hamid, aka.
ARAR, Maar,
ARAR, Maher Abdul Hamid,
ARAR, Maher' Abd Al-Hamid

This concerns your application for admission to the United States at the port of _____ on _____ and the notice of temporary inadmissibility (Form I-147) previously served on you. I have determined that you are inadmissible under:

☐ Section 212(a)(7)(A) (other than clause (i))

☒ Section 212(a)(3)(B)(i)(V)

☐ Section 212(a)(3)(C)

of the Immigration and Nationality Act (Act).

IT IS ORDERED that you be removed without further inquiry before an immigration judge, in accordance with section 235(c) of the Act and Title 8, Code of Federal Regulations, part 235.8. If you enter or attempt to enter the United States for any purpose, without the prior written authorization of the Attorney General, you will be subject to arrest, removal, and possible criminal prosecution.

The Commissioner of the Immigration and Naturalization Service has determined that your removal to Syria would be consistent with Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.

_(signature)_
(signature of regional director)
(Printed name of regional director)

REGIONAL DIRECTOR

CERTIFICATE OF SERVICE

I _____ served a copy of this notice to the above named alien.

☐ Interpreter used: _NONE_
                                    (language)

_10/8/02 4AM_
(date)

(printed name of officer)

I acknowledge that a copy of this notice has been given to me, read, and explained to me, and I understand it.

_Maher A._
(signature of alien)

(left thumb rotation)

DEC 02 '03 11:39 FR                                                    P.03/12

FILE: ▮▮▮▮▮▮▮             )
                          )        In Removal Proceedings under
IN THE MATTER OF:         )        Section 235(c) of the Immigration
                          )        and Nationality Act
ARAR, Maher Abdul Hamid   )
a/k/a  ARAR, Maher        )
a/k/a ARAR, Maher Abdul Hamid )
       ARAR, Maher 'Abd Al-Hamid) )
                          )
      APPLICANT           )


## Decision of the Regional Director

### Introduction

In accordance with my responsibilities as Regional Director, I have, pursuant to section
235(c)(2)(B) of the Immigration and Nationality Act (INA) and 8 C.F.R. § 235.8(b),
reviewed the documentation submitted to me by the New York District Director
concerning the application of Maher Abdul Hamid Arar (Arar) for admission to the
United States. This review has included consideration of both classified and unclassified
information concerning Arar.[1]  As a result of this review, I have concluded on the basis of
classified information that Arar is clearly and unequivocally inadmissible to the United
States under INA § 212(a)(3)(B)(i)(V) in that he is a member of an organization that has
been designated by the Secretary of State as a Foreign Terrorist Organization, to wit: Al-
Qaeda, a/k/a al-Qa'ida.  In addition, pursuant to section 235(c) of the INA, and after

---

[1]  Section 235(c)(2)(B)(ii) of the INA states that a decision under this provision is to be based on
"confidential" information. Throughout this decision, for the sake of clarity, the terms classified and
unclassified are employed, rather than the term confidential.

consulting with appropriate security agencies of the United States, I have concluded that disclosure of the classified information upon which this decision is based would be prejudicial to the public interest, safety, or security.

## Background

Arar is a native of Syria and a citizen of Canada and Syria. Arar arrived at John F. Kennedy International Airport in New York, New York on September 26, 2002, via American Airlines ███████████████ from Zurich, Switzerland. Upon arrival, Arar presented Canadian passport number ███████████ and applied for admission to transit to Canada. Upon secondary inspection, it was determined that Arar was the subject of a TECS/NAILS lookout as being a member of a known terrorist organization.

On October 1, 2002, the Immigration and Naturalization Service initiated removal proceedings under section 235(c) of the INA against Arar with service of Form I-147, charging him with being inadmissible to the United States. Specifically, the Service charges Arar with being temporarily inadmissible under INA § 212(a)(3)(B)(i)(V) in that he is an alien who is a member of a foreign terrorist organization.

On October 1, 2002, upon initiating removal proceedings against Arar under section 235(c), the INS, in accordance with 8 C.F.R. § 235.1, provided Arar with 5 days to respond to the charge. On October 1, 2002, the Service served upon Arar all unclassified documents that the Service relied upon in issuing the Form I-147. These documents included: (1) an executed I-147 noticing Arar of the requirement to respond within five

2

days from October 1, 2002, to INS with a written statement and any accompanying
information regarding the allegations and the charge of inadmissibility; (2) an attachment
to the I-147 alleging Arar to be a member of an organization that has been designated by
the Secretary of State as a Foreign Terrorist Organization, to wit: Al-Qaeda, and charging
Arar with inadmissibility pursuant to section 212(a)(3)(B)(i)(V) of the INA; (3) a
publication issued by the Department of State pursuant to section 219 of the INA listing
Al-Qaeda, as a Foreign Terrorist Organization; and (4) a publication from the Executive
Office for Immigration Review of free legal service providers in the New York area.

### Arar's Submissions

As of October 7, 2002, Arar failed to provide a written statement and any additional
information in response to the charge.

### Evidence of Inadmissibility

The documentation I have reviewed, including information received from other agencies,
clearly and unequivocally reflects that Arar is a member of a foreign terrorist
organization, to wit: Al-Qaeda, so designated by the Secretary of State pursuant to INA §
219. 66 FR 51088-01 (October 5, 2001).

The information I have reviewed is composed of both classified and unclassified
materials. The following is a descriptive inventory of the more significant evidentiary
materials that form the basis of my decision.

3

Unclassified

An INS investigation officer interviewed Arar on September 26, 2002 at JFK
International Airport regarding his application for admission to the United States. Arar
stated that he was a native of Syria and a citizen of Canada and Syria. Arar indicated that
he used Canadian passport number ████████ to apply for admission to the United
States. Arar informed the immigration officer that he had lived in Tunis, Tunisia for
three months prior to his application for admission. Arar denied having any affiliation or
link to a terrorist organization.

The FBI interviewed Arar on September 27, 2002 at JFK International Airport. During
the interview, Arar admitted his association with Abdullah Al-Malki and Abdullah Al-
Malki's brother, Nazih Al-Malki. Arar advised the FBI that he was friendly with Nazih
Al-Malki in Syria while they were in school together and that he [Arar] worked with
Nazih Al-Malki at Nex Link Communications. Arar also advised the FBI that Al-Malki
exports radios and one of his customers was the Pakistani military. Arar also advised that
he had three business dealings with Al-Malki. Arar also admitted to the FBI about
meeting Abdullah Al-Malki at the restaurant where he and Al-Malki went outside and
talked in the rain in October 2001.

During the September 27, 2002 interview at JFK, Arar admitted knowing Ahman El-
Maati.

4

Classified

A detailed discussion of the classified information I relied upon is contained in a separate, Classified Addendum.

## Conclusions

Pursuant to section 240(c)(2) of the INA, an alien who is an applicant for admission has the burden of establishing clearly and beyond doubt that he or she is entitled to be admitted and is not inadmissible under section 212. Although Arar has denied the charge of inadmissibility, he has offered no evidence in support of his denial. Based upon all of the information made available to me, both classified and unclassified, I find that Arar is clearly and unequivocally inadmissible under INA § 212(a)(3)(B)(i)(V) in that he is a member of a foreign terrorist organization.

I have determined that Arar is a member of the designated foreign terrorist organization known as Al-Qaeda. Pursuant to section 219 of the INA, this organization could not be designated unless the "terrorist activity or terrorism of the organization threatens the security of United States' nationals or the national security of the United States." Specifically, Al-Qaeda has been found responsible for multiple terrorist attacks upon the United States, and is considered a "clear and imminent threat to the United States."[2]

---

2   "The most serious international terrorist threat to US interests today stems from Sunni Islamic extremists, such as Usama bin laden and individuals affiliated with his Al-Qaeda organization. Al-Qaeda leaders, including Usama bin laden, had been harbored in Afghanistan since 1996 by the extremist Islamic regime of the Taliban. Despite recent military setbacks suffered by the Taliban and the apparent death of Al-Qaeda operational commander Mohamed Atef resulting from a US bombing raid, Al-Qaeda must continue to be viewed as a potent and highly capable terrorist network. The network's willingness and capability to inflict large-scale violence and destruction against US persons and interests as it demonstrated with the September 11 attack, the bombing of the USS Cole in October 2000, and the bombings of two US Embassies in east Africa in August 1998, among other plots, makes it a "clear and

5

As discussed above, and more fully in the Classified Addendum, Arar's membership in this organization bars him from admission to the United States, because he is presumed to share the goals and support methods of an organization which he freely joined and with which he continues to meaningfully associate. This organization has been determined responsible for acts of terrorism against the U.S. in the past, and represents a "clear and imminent threat to the United States."

Based upon the foregoing, and upon the classified information referred to above, I further find that there are reasonable grounds to believe that Arar is a danger to the security of the United States.

imminent threat to the United States." Statement for the Record of J. T. Caruso, Deputy Executive Assistant Director Counterterrorism /Counterintelligence, Federal Bureau of Investigation, On Combating Terrorism: Protecting the United States Before the House Subcommittee on National Security, Veterans Affairs, and International Relations March 21, 2002. Less than one month ago, the Attorney General determined that Al-Qaeda might be planning specific attacks on the U.S. See Remarks of the Attorney General, Threat Level Press Conference, September 10, 2002.

Accordingly, for the reasons set forth above, I am satisfied that the evidence establishes that Amr is inadmissible, and I hereby ORDER that he be removed from the United

States.

_Actober 7, 2002_
Date

J. Scott Blackman
Regional Director
Eastern Region
U.S. Immigration and
Naturalization Service

7

P.10/12

# CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of October 2003 a copy of the foregoing was served by personal service upon the applicant at MDC Brooklyn, NY

Witness:

                                                                            3

                                                                    TOTAL P.10
                                                                    TOTAL P.89



©CBSNEWS.com

Home | U.S. | Iraq | World | Politics | SciTech | HealthWatch | Entertainment | Opinion | FREE i-Video

**REAL LIFE DRAMA**

January 21, 2004 17:20:41    The Early Show    CBS Evening News    48 Hours    60 Minutes    60 Minutes II    All B

## 48 HOURS   • Section Front

✉ E-mail This Story    🖶 Printable Version

# His Year In Hell

Jan. 21, 2004

Maher Arar is a Syrian-born Canadian citizen who was taken into custody, under suspicion of being connected with al Qaeda, while changing planes in New York. (Photo: CBS)

"I cooperated with them 100 percent. And they always kept telling me, 'We'll let you go on the next plane.' They did not."
Maher Arar

It would be more than a year before Arar would see his wife, Monia, and two children again. (Photo: CBS)

(CBS) Is it possible the United States sent an innocent man out of the country to be tortured?

That's the disturbing question at the heart of a case that may reveal a secret side of the war on terrorism -- one that the government does not want to talk about.

It involves an accusation that the justice department sent a man from the U.S. to Syria to be interrogated and tortured.

The man making the claim is a Syrian-born Canadian citizen who was taken into custody, under suspicion of being connected with al Qaeda, while changing planes in New York.

Now, Maher Arar tells correspondent Vicki Mabrey about what became his year in hell, which began when federal agents stopped him for questioning at JFK International Airport.

"I cooperated with them 100 percent. And they always kept telling me, 'We'll let you go on the next plane,'" says Arar. "They did not."

It would be more than a year before Arar would see his family again. In September 2002, he'd taken his wife and two children on a beach vacation in Tunisia. But he flew home alone early for his job as a software engineer.

What he didn't know is that he'd been placed on the U.S. immigration watch list. So when the agents began questioning him, he tells *60 Minutes II* that he wasn't concerned – at least not at first.

"The interrogation lasted about seven or eight hours, and then they came, and shackled and chained me," recalls Arar. "I said, 'What's happening here?' And they would not tell me. They said, 'You are gonna know tomorrow.'"

He spent the night in a holding cell. The next day, he was shackled, driven to the Metropolitan Detention Center in Brooklyn and locked in solitary confinement. Agents told him they had evidence that he'd been seen in the company of terrorist suspects in Canada.

• Program Facts
• Archives
• Tapes And Transcripts
• Up Next
• Blos
• Letters To 48 Hours
• Contact Info

INTERACTIVE

**Bin Laden & Al Qaeda**

Where al Qaeda operates, who's been caught, how they're financed and a timeline of attacks on Americans.

INTERACTIVE

**America On Guard**

Find out about national security threats and improvements in the air, water and on land.

NEWS TOOLS

**Syria**

Learn about the people, economy and history.

Spon

**Grow**
Discov
turn y
into a
haven
www.nw

**A Tea**
**Drean**
Free. I
plan &
busine
on lea
www.Biz

**Ameri**
**Diabe**
Stay ir
up for
newsle
www.dia

AidCa
Intern
Volunt
Overs
Third V
Develo
Projec
www.Aid

"What they accused me of being is very serious. Being a member of al Qaeda," says Arar, who denies any involvement with the organization.

Arar wasn't allowed to make a phone call, so when his wife, Monia, didn't hear from him, she called the Canadian embassy.

"Nobody knew at that time where he was. He vanished," says Monia, who didn't hear from him for six days. Then, American officials acknowledged they were holding Arar in Brooklyn. A Canadian consular official visited and assured Arar he'd be deported home to Canada.

But the justice department had a different plan. After two weeks in U.S.custody, Arar was taken from his cell by federal agents in the middle of the night.

"They read me the document. They say, 'The INS director decided to deport you to Syria,'" recalls Arar. "And of course, the first thing I did was I started crying, because everyone knows that Syria practices torture."

Arar says he knows because he was born in Syria. He emigrated to Canada with his parents as a teenager. But, returning to Syria as an accused terrorist, he had good reason to be afraid.

Torture in Syrian prisons is well-documented. The state department's own report cites an array of gruesome tortures routinely used in Syrian jails. And in a speech last fall, President Bush condemned Syria, alongside Iraq, for what he called the country's "legacy of torture and oppression."

Nevertheless, deportation agents flew Arar on a specially chartered jet to Jordan, and the Jordanians drove him to Syria.

"When I arrived there, I saw the photos of the Syrian president, and that's why I realized I was indeed in Syria," says Arar. "I wished I had a knife in my hand to kill myself."

The next morning, Arar says a Syrian intelligence officer arrived carrying a black electrical cable, two inches thick and about two feet long.

"He said, 'Do you know what this is?' I said, I was crying, you know, 'Yes, I know what it is. It's a cable.' And he said, 'Open your right hand.' I opened my right hand ... and he beat me very strongly," says Arar. "He said, 'Open your left hand.' And I opened my left hand. And he beat me on my palm, on my left palm. And then he stopped, and he asked me questions. And I said to him, 'I have nothing to hide.'"

Arar says the physical torture took place during the first two weeks, but he says he also went through psychological and mental torture: "They would take me back to a room, they call it the waiting room. And I hear people screaming. And they, I mean, people, they're being tortured. And I felt my heart was going to go out of my chest."

But Imad Moustapha, Syria's highest-ranking diplomat in Washington, says Arar was treated well. He also told Mabrey that Syrian intelligence had never heard of Arar before the U.S. government asked Syria to take him.

"We did our investigations. We traced links. We traced relations. We tried to find anything. We couldn't," says Moustapha, who adds that they shared their reports with the U.S. "We always share information with anybody alleged to be in close contact with al Qaeda with the United States."

The Syrians allowed Canadian officials six short visits with Arar. But Arar says he was warned not to tell them about the torture or how he was being held -- in an underground cell 3 feet wide, 6 feet long and 7 feet high. It was his home for a full 10 months.

"It's a grave. It's the same size of a grave. It's a dark place. It's underground,"

says Arar.

He says the Syrians were pressing him to confess he'd been to an al Qaeda training camp in Afghanistan: "They just wanted to find something that the Americans did not find -- and that's when they asked me about Afghanistan. They said, 'You've been to Afghanistan,' so they would hit me three, four times. And, if I hesitate, they would hit me again."

Arar says he signed a confession because he was "ready to do anything to stop the torture." But he claims that he had never been to Afghanistan, or trained at a terrorist camp. "Just one hit of this cable, it's like you just forget everything in your life. Everything," he says.

Back in Canada, Monia was fighting for her husband's life. She marched in front of parliament, and protested in front of the U.S. embassy.

Eventually, she got the ear of then-Canadian Prime Minister Jean Chretien. On the floor of parliament, Chretien voiced mounting frustration with the U.S. The job eventually went to Gar Pardy, then one of Canada's top diplomats, to get answers from the Americans.

"The American authorities acknowledged this was a Canadian citizen that they were dealing with. He was traveling on a Canadian passport. There was no ambiguity about any of these issues," says Pardy, who believes he should have been sent to Canada, or dealt with under American law in the United States. But not sent to Syria.

But while Canadian diplomats were demanding answers from the U.S., it turns out that it was the Royal Canadian mounted police who had been passing U.S. intelligence the information about Arar's alleged terrorist associations.

However, U.S. government officials we spoke to say they told Canadian intelligence that they were sending Arar to Syria -- and the Canadians signed off on the decision.

"If that's true, it would have been wrong all around," says Pardy. "I would dispute that the people who were making any statements in this context were speaking for the Canadian government. A policeman talking to a policeman in this context is not necessarily speaking for the Canadian government.

And the Canadian government wanted Arar back. It took a year and a week from the time Arar was detained in New York for Arar to be released. He arrived home in Canada dazed and exhausted.

Why did Syrian officials let him go? "Why shouldn't we leave him to go? We thought that would be a gesture of good will towards Canada, which is a friendly nation. For Syria, second, we could not substantiate any of the allegations against him," says Moustapha.

He added that the Syrian government now considers Arar completely innocent. But does he feel any remorse about taking a year out of Arar's life?

"If this was the case, it's not our problem," says Arar. "We did not create this problem."

*60 Minutes II* has learned that the decision to deport Arar was made at the highest levels of the U.S. justice department, with a special removal order signed by John Ashcroft's former deputy, Lary Thompson.

Ashcroft made his only public statement about the case in November, where he said the U.S. deported Arar to protect Americans -- and had every right to do so.

"I consider that really an utter fabrication and a lie," says Michael Rather,

Arar's attorney and head of the Center For Constitutional Rights. He plans to file a lawsuit against Ashcroft and several other American officials.

"They knew when they were sending him to Syria, that Syria would use certain kinds of information-gathering techniques, including torture, on him. They knew it," says Ratner. "That's why he was sent there. That's why he wasn't sent to Canada."

Before deporting Arar to Syria, American officials involved in the case told *60 Minutes II* they had obtained assurances from the Syrian government that Arar would not be tortured – that he would "be treated humanely"

"The fact that you went looking for assurances, which is reflected here, tells you that even in the minds of people who made this decision," says Pardy. "I mean, there were some second thoughts."

No one at the justice department would talk to *60 Minutes II* on camera about Arar, but they sent us this statement saying:

"The facts underlying Arar's case...[are] classified and cannot be released publicly."

"We have information indicating that Mr. Arar is a member of al Qaeda and, therefore, remains a threat to U.S. national security."

Despite the American accusations, Arar has never been charged with a crime and, today, he's free in canada. He's afraid, though, that he might never be able to clear his name. .

Arar's case is unusual because he was sent directly from U.S. soil to Syria. But intelligence sources tell **60 Minutes** II that since 9/11, the U.S. has quietly transported hundreds of terror suspects captured in different parts of the world to Middle Eastern countries for tough interrogations. Arar says he hopes his lawsuit will shed light on the practice.

© MMIII, CBS Worldwide Inc. All Rights Reserved.



• Tonight: It's Just Sex
• Prime Suspect
• The Other Woman
• The Bookie's Wife
• We Get Letters...
• Rich Girls: The Olsen Twins
• Frankie Muniz: Hollywood Star
• Notebook: The Other Woman

 Back To Top

• Help  • Advertise  • Feedback  • Terms of Service  • Privacy  • CBS News Bios
©MMIV, CBS Broadcasting Inc. All Rights Reserved.

(◎ cbsnews.com)