UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x

MAHER ARAR,

                        Plaintiff,

        - against -

JOHN ASHCROFT, formerly Attorney
General of the United States;
LARRY D. THOMPSON, formerly Acting
Deputy Attorney General; TOM
RIDGE, formerly Secretary for
Homeland Security; JAMES W.
ZIGLAR, formerly Commissioner for        Civil Action No.
Immigration and Naturalization           CV-04-0249 (DGT)(VVP)
Services; J. SCOTT BLACKMAN,
formerly Regional Director of the        MEMORANDUM AND ORDER
Eastern Regional Office of the
Immigration and Naturalization
Service; PAULA CORRIGAN, Regional
Director of Immigration and
Customs Enforcement; EDWARD J.
McELROY, formerly District
Director of Immigration and
Naturalization Services for New
York District and now District
Director of Immigration and
Customs Enforcement; ROBERT
MUELLER, Director of the Federal
Bureau of Investigation; and JOHN
DOES 1-10, Federal Bureau of
Investigation and/or Immigration
and Naturalization Service Agents,

                        Defendants.
--------------------------------------------------x

TRAGER, J.

        Plaintiff Maher Arar brings this action against defendants,

U.S. officials, who allegedly held him virtually incommunicado

for thirteen days at the U.S. border and then ordered his removal

to Syria for the express purpose of detention and interrogation

under torture by Syrian officials.  He brings claims under the

Torture Victim Prevention Act and the Fifth Amendment to the U.S. Constitution.

Defendants have filed motions to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The questions presented by these motions are whether the facts alleged can give rise to any theory of liability under those provisions of law and, if so, whether those claims can survive on prudential grounds in light of the national-security and foreign policy issues involved.

**Background**

All statements contained in parts (1) through (4) in this background section of the opinion are taken from the complaint, attached exhibits, or documents referred to in the complaint and are presumed true for the limited purposes of these motions to dismiss. The alleged facts will be presented as they have been pled and will be borrowed liberally from the complaint.

**(1)**

Plaintiff Maher Arar ("Arar" or "plaintiff") is a 33-year-old native of Syria who immigrated to Canada with his family when he was a teenager. He is a dual citizen of Syria and Canada and presently resides in Ottawa. In September 2002, while vacationing with family in Tunisia, he was called back to work by his employer to consult with a prospective client. He purchased

a return ticket to Montreal with stops in Zurich and New York and
left Tunisia on September 25, 2002.

On September 26, 2002, Arar arrived from Switzerland at John
F. Kennedy Airport ("JFK Airport") in New York to catch a
connecting flight to Montreal. Upon presenting his passport to
an immigration inspector, he was identified as "the subject of a
. . . lookout as being a member of a known terrorist
organization." Complaint ("Cplt.") Ex. D (Decision of J. Scott
Blackman, Regional Director) at 2. He was interrogated by
various officials for approximately eight hours. The officials
asked Arar if he had contacts with terrorist groups, which he
categorically denied. Arar was then transported to another site
at JFK Airport, where he was placed in solitary confinement. He
alleges that he was transported in chains and shackles and was
left in a room with no bed and with lights on throughout the
night.

The following morning, September 27, 2002, starting at
approximately 9:00 a.m., two FBI agents interrogated Arar for
about five hours, asking him questions about Osama bin Laden,
Iraq and Palestine. Arar alleges that the agents yelled and
swore at him throughout the interrogation. They ignored his
repeated requests to make a telephone call and see a lawyer. At
2:00 p.m. that day, Arar was taken back to his cell, chained and
shackled and provided a cold McDonald's meal – his first food in

3

nearly two days.

That evening, Arar was given an opportunity to voluntarily return to Syria, but refused, citing a fear of being tortured if returned there and insisting that he be sent to Canada or returned to Switzerland. An immigration officer told Arar that the United States had a "special interest" in his case and then asked him to sign a form, the contents of which he was not allowed to read. That evening, Arar was transferred, in chains and shackles, to the Metropolitan Detention Center ("MDC") in Brooklyn, New York, where he was strip-searched and placed in solitary confinement. During his initial three days at MDC, Arar's continued requests to meet with a lawyer and make telephone calls were refused.

On October 1, 2002, the Immigration and Naturalization Service ("INS") initiated removal proceedings against Arar, who was charged with being temporarily inadmissible because of his membership in al Qaeda, a group designated by the Secretary of State as a foreign terrorist organization. Upon being given permission to make one telephone call, Arar called his mother-in-law in Ottawa, Canada.

Upon learning Arar's whereabouts, his family contacted the Office for Consular Affairs ("Canadian Consulate") and retained an attorney, Amal Oummih, to represent him. The Canadian Consulate had not been notified of Arar's detention. On October

4

3, 2002, Arar received a visit from Maureen Girvan from the Canadian Consulate, who, when presented with the document noting Arar's inadmissibility within the U.S., assured Arar that removal to Syria was not an option.  On October 4, 2002, Arar designated Canada as the country to which he wished to be removed.

On October 5, 2002, Arar had his only meeting with counsel. The following day, he was taken in chains and shackles to a room where approximately seven INS officials questioned him about his reasons for opposing removal to Syria.  His attorney was not provided advance notice of the interrogation, and Arar further alleges that U.S. officials misled him into thinking his attorney had chosen not to attend.  During the interrogation, Arar continued to express his fear of being tortured if returned to Syria.  At the conclusion of the six-hour interrogation, Arar was informed that the officials were discussing his case with "Washington, D.C."  Arar was asked to sign a document that appeared to be a transcript.  He refused to sign the form.

The following day (October 7, 2002), attorney Oummih received two telephone calls informing her that Arar had been taken for processing to an INS office at Varick Street in Manhattan, that he would eventually be placed in a detention facility in New Jersey and that she should call back the following morning for Arar's exact whereabouts.  However, Arar alleges that he never left MDC and that the contents of both of

these phone calls to his counsel were false and misleading.

That same day, October 7, 2002, the INS Regional Director, J. Scott Blackman, determined from classified and unclassified information that Arar is "clearly and unequivocally" a member of al Qaeda and, therefore, "clearly and unequivocally inadmissible to the United States" under 8 U.S.C. § 1182(a)(3)(B)(i)(V). See Cplt. Ex. D. at 1, 3, 5. Based on that finding, Blackman concluded "that there are reasonable grounds to believe that [Arar] is a danger to the security of the United States." Id. at 6.

At approximately 4:00 a.m. on October 8, 2002, Arar learned that, based on classified information, INS regional director Blackman had ordered that Arar be sent to Syria and that his removal there was consistent with Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). Arar pleaded for reconsideration but was told by INS officials that the agency was not governed by the "Geneva Conventions" and that Arar was barred from reentering the country for a period of five years and would be admissible only with the permission of the Attorney General.

Later that day, Arar was taken in chains and shackles to a New Jersey airfield, where he boarded a small jet bound for Washington, D.C. From there, he was flown to Amman, Jordan, arriving there on October 9, 2002. He was then handed over to

Jordanian authorities, who delivered him to the Syrians later that day.  At this time, U.S. officials had not informed either Canadian Consulate official Girvan or attorney Oummih that Arar had been removed to Syria.  Arar alleges that Syrian officials refused to accept Arar directly from the United States.

Arar's Final Notice of Inadmissability ("Final Notice") ordered him removed without further inquiry before an immigration judge.  See Cplt. Ex. D.  According to the Final Notice: "The Commissioner of the Immigration and Naturalization Service has determined that your removal to Syria would be consistent with [CAT]."  Id.  It was dated October 8, 2002, and signed by Deputy Attorney General Larry Thompson.  After oral argument on these motions to dismiss, in a letter dated August 18, 2005, counsel for Arar clarified that he received the Final Notice within hours of boarding the aircraft taking him to Jordan.  See Dkt. No. 93.

**(2)**

During his ten-month period of detention in Syria, Arar alleges that he was placed in a "grave" cell measuring six-feet long, seven feet high and three feet wide.  The cell was located within the Palestine Branch of the Syrian Military Intelligence ("Palestine Branch").  The cell was damp and cold, contained very little light and was infested with rats, which would enter the cell through a small aperture in the ceiling.  Cats would urinate on Arar through the aperture, and sanitary facilities were

nonexistent.  Arar was allowed to bathe himself in cold water
once per week.  He was prohibited from exercising and was
provided barely edible food.  Arar lost forty pounds during his
ten-month period of detention in Syria.

During his first twelve days in Syrian detention, Arar was
interrogated for eighteen hours per day and was physically and
psychologically tortured.  He was beaten on his palms, hips and
lower back with a two-inch-thick electric cable.  His captors
also used their fists to beat him on his stomach, face and back
of his neck.  He was subjected to excruciating pain and pleaded
with his captors to stop, but they would not.   He was placed in
a room where he could hear the screams of other detainees being
tortured and was told that he, too, would be placed in a spine-
breaking "chair," hung upside down in a "tire" for beatings and
subjected to electric shocks.  To lessen his exposure to the
torture, Arar falsely confessed, among other things, to having
trained with terrorists in Afghanistan, even though he had never
been to Afghanistan and had never been involved in terrorist
activity.

Arar alleges that his interrogation in Syria was coordinated
and planned by U.S. officials, who sent the Syrians a dossier
containing specific questions.  As evidence of this, Arar notes
that the interrogations in the U.S. and Syria contained identical
questions, including a specific question about his relationship

with a particular individual wanted for terrorism.  In return,
the Syrian officials supplied U.S. officials with all information
extracted from Arar; plaintiff cites a statement by one Syrian
official who has publicly stated that the Syrian government
shared information with the U.S. that it extracted from Arar.
See Cplt. Ex. E (January 21, 2004 transcript of CBS's Sixty
Minutes II: "His Year In Hell").

**(3)**

The Canadian Embassy contacted the Syrian government about
Arar on October 20, 2002, and, the following day, Syrian
officials confirmed that they were detaining him.  At this point,
the Syrian officials ceased interrogating and torturing Arar.

Canadian officials visited Arar at the Palestine Branch five
times during his ten-month detention.  Prior to each visit, Arar
was warned not to disclose that he was being mistreated.  He
complied but eventually broke down during the fifth visit,
telling the Canadian consular official that he was being tortured
and kept in a grave.

Five days later, Arar was brought to a Syrian investigation
branch, where he was forced to sign a confession stating that he
had participated in terrorist training in Afghanistan even
though, Arar states, he has never been to Afghanistan or
participated in any terrorist activity.  Arar was then taken to
an overcrowded Syrian prison, where he remained for six weeks.

On September 28, 2003, Arar was transferred back to the Palestine Branch, where he was held for one week. During this week, he heard other detainees screaming in pain and begging for their torture to end.

On October 5, 2003, Syria, without filing any charges against Arar, released him into the custody of Canadian Embassy officials in Damascus. He was flown to Ottawa the following day and reunited with his family.

Arar contends that he is not a member of any terrorist organization, including al Qaeda, and has never knowingly associated himself with terrorists, terrorist organizations or terrorist activity. He claims that the individual about whom he was questioned was a casual acquaintance whom Arar had last seen in October 2001. He believes that he was removed to Syria for interrogation under torture because of his casual acquaintances with this individual and others believed to be involved in terrorist activity. But Arar contends "on information and belief" that there has never been, nor is there now, any reasonable suspicion that he was involved in such activity.[1]  Cplt. ¶ 2.

_____

[1] Prior to oral argument, counsel for Arar submitted a letter providing supplemental information in support of plaintiff's opposition to the U.S. Government's assertion of state-secrets privilege. See Dkt. No. 85 (Letter dated July 27, 2005 from Maria LaHood ("LaHood Letter")). The LaHood Letter contains certain publicly available information arising out of the Canadian Commission of Inquiry Into the Actions of Canadian

Arar alleges that he continues to suffer adverse effects from his ordeal in Syria. He claims that he has trouble relating to his wife and children, suffers from nightmares, is frequently branded a terrorist and is having trouble finding employment due to his reputation and inability to travel in the United States.

---

Officials in Relation to Maher Arar.

In that letter, plaintiff's counsel explains that Arar was a potential witness, but not a suspect or target, in an investigation by "Project A-O Canada," a Canadian team investigating terrorist suspects in Ottawa. According to the letter, Arar was contacted by an investigator with Project A-O Canada on January 22, 2002, during which time he was in Tunisia. On January 25, Arar told the investigator "he could perhaps be available" on Monday, July 28 for an interview. See LaHood Letter at 2. Later that day, however, Arar's attorney "contacted the investigator to advise him that there would need to be parameters for the interview." Id. at 2-3. The attorney "requested that the interview take place in his office and that Mr. Arar's statement not be used in proceedings as a substitution for his actual testimony; clearly the information gathered could be used for the investigation, and nothing would preclude calling Mr. Arar to testify." Id. at 3. As a result of these conditions – which were shared with U.S. officials – and because the investigation wound up focusing on other areas, Arar was never contacted again for an interview. See id. The LaHood letter claims that, in light of plaintiff's decision to exercise his constitutional right to remain silent, which was known to U.S. officials, Arar's interrogation within the United States took place in disregard of Arar and his attorney's request.

To some extent, the contents of the LaHood letter undermine plaintiff's claim, "on information and belief," that there has never been, nor is there now, any reasonable suspicion that he was involved in such activity. Although the account of what occurred in the Canadian investigation could not give rise to an adverse inference in a criminal prosecution, the change in Arar's posture would certainly justify at least some suspicion (and perhaps reasonable suspicion) on the part of U.S. officials during their investigation about Arar's activities.

The complaint alleges on information and belief that Arar was removed to Syria under a covert U.S. policy of "extraordinary rendition," according to which individuals are sent to foreign countries to undergo methods of interrogation not permitted in the United States.  The extraordinary rendition policy involves the removal of "non-U.S. citizens detained in this country and elsewhere and suspected – reasonably or unreasonably – of terrorist activity to countries, including Syria, where interrogations under torture are routine."  Cplt. ¶ 24.  Arar alleges on information and belief that the United States sends individuals "to countries like Syria precisely because those countries can and do use methods of interrogation to obtain information from detainees that would not be morally acceptable or legal in the United States and other democracies."  <u>Id.</u>  The complaint further alleges that "these officials have facilitated such human rights abuses, exchanging dossiers with intelligence officials in the countries to which non-U.S. citizens are removed."  <u>Id.</u>  The complaint also alleges that the U.S. involves Syria in its extraordinary rendition program to extract counter-terrorism information.

This extraordinary rendition program is not part of any official or declared U.S. public policy; nevertheless, it has received extensive attention in the press, where unnamed U.S.

officials and certain foreign officials have admitted to the existence of such a policy.  Plaintiff details a number of articles in the mainstream press recounting both the incidents of this particular case and the extraordinary rendition program more broadly.  These articles are attached as Exhibit C of his complaint.

Arar alleges that defendants directed the interrogations by providing information about Arar to Syrian officials and receiving reports on Arar's responses.  Consequently, the defendants conspired with, and/or aided and abetted, Syrian officials in arbitrarily detaining, interrogating and torturing Arar.  Plaintiff argues in the alternative that, at a minimum, defendants knew or at least should have known that there was a substantial likelihood that he would be tortured upon his removal to Syria.

**(5)**

Arar's claim that he faced a likelihood of torture in Syria is supported by U.S. State Department reports on Syria's human rights practices.  <u>See</u>, <u>e.g.</u>, Bureau of Democracy, Human Rights, and Labor, United States Department of State, 2004 Country Reports on Human Rights Practices (Released February 28, 2005) ("2004 Report").  According to the State Department, Syria's "human rights record remained poor, and the Government continued to commit numerous, serious abuses . . . includ[ing] the use of

13

torture in detention, which at times resulted in death." 2004
Report at 1. Although the Syrian constitution officially
prohibits such practices, "there was credible evidence that
security forces continued to use torture frequently." Id. at 2.
The 2004 report cites "numerous cases of security forces using
torture on prisoners in custody." Id. Similar references
throughout the 2004 Report, as well as State Department reports
from prior years, are legion. See, e.g., Cplt. Ex. A (2002 State
Department Human Rights Report on Syria).

**(6)**

Arar seeks both declaratory and monetary relief. With
respect to declaratory relief, he has sued John Ashcroft, Robert
Mueller, Tom Ridge and Paula Corrigan in their official
capacities. The United States has moved to dismiss these claims
under Rule 12(b)(1) for lack of subject-matter jurisdiction and
under Rule 12(b)(6) for failure to state a claim upon which
relief can be granted.

With respect to monetary relief, Arar has sued John
Ashcroft, Robert Mueller, J. Scott Blackman, James W. Ziglar,
Edward J. McElroy and Larry D. Thompson in their personal
capacities. Each of these defendants has filed a separate motion
to dismiss these claims under Rules 12(b)(1) and 12(b)(6).

The complaint also names ten John Doe law enforcement agents
employed by the FBI or INS who, singly or collectively, subjected

Arar to coercive and involuntary custodial interrogation and unreasonably harsh and punitive conditions of detention.

## Discussion

Arar raises four claims for relief.

First, he alleges that defendants violated the Torture Victim Prevention Act by conspiring with and/or aiding and abetting Jordanian and Syrian officials to bring about his torture (Count 1).

Second, Arar alleges that defendants violated his rights under the Fifth Amendment to the U.S. Constitution ("Fifth Amendment") by knowingly and intentionally subjecting him to torture and coercive interrogation in Syria (Count 2).

Third, Arar alleges that as a result of the actions of the defendants, he was subjected to arbitrary and indefinite detention in Syria, including the denial of access to counsel, the courts and his consulate, all of which also violated the Fifth Amendment (Count 3).

Fourth, Arar alleges that he suffered outrageous, excessive, cruel, inhumane and degrading conditions of confinement in the United States, was subjected to coercive and involuntary custodial interrogation and deprived of access to lawyers and courts, in violation of the Fifth Amendment (Count 4). Although Arar's complaint also alleges that defendants violated "treaty law," he appears to have abandoned any such claims in the

subsequent briefing.

As clarified at oral argument, Arar seeks a declaratory judgment with respect to Counts 2, 3 and 4 and compensatory and punitive damages with respect to all four counts.

## (1)

### Standards

**a.  12(b)(1)**

A motion to dismiss under Rule 12(b)(1) tests the jurisdictional basis for the underlying complaint.  Under Rule 12(b)(1), a "plaintiff has the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists."  <u>Lunney v. U.S.</u>, 319 F.3d 550, 554 (2d Cir. 2003).  When defendants move to dismiss under Rule 12(b)(1), "a court accepts as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff."  <u>Id.</u>

**b.  12(b)(6)**

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint.  Under Rule 12(b)(6), a "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).  <u>See</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, 78 S.Ct. 99,

102, 2 L.Ed.2d 80 (1957) ("[A] complaint should not be dismissed

for failure to state a claim unless it appears beyond doubt that

the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief.").

**(2)**

**Declaratory Relief**

Arar seeks a declaration that his detention in the United

States and his detention and torture in Syria violated his rights

under the Due Process Clause of the U.S. Constitution.  The

United States (or the "government"), on behalf of the defendants

sued in their official capacities,[2] argues that Arar lacks

standing to bring a claim for declaratory relief because the

challenged activity is neither ongoing nor likely to impact him

in the future.  The government further argues that the injuries

for which Arar seeks declaratory relief are not redressable or

fairly traceable to the underlying actions Arar challenges in

this lawsuit.

In <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 112 S.Ct.

---

[2] Claims against official-capacity defendants "generally
represent only another way of pleading an action against an
entity of which an officer is an agent." <u>Kentucky v. Graham</u>, 473
U.S. 159, 165-66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985)
(citing <u>Monell v. New York City Dept. of Social Services</u>, 436
U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611
(1978)).  "As long as the government entity receives notice and
an opportunity to respond, an official-capacity suit is, in all
respects other than name, to be treated as a suit against the
entity." <u>Id.</u> at 166, 105 S.Ct. at 3105.

2130, 119 L.Ed.2d 351 (1992), the Supreme Court articulated three

elements necessary to establish Article III standing:

> First, the plaintiff must have suffered an "injury in fact"
> – an invasion of a legally protected interest which is (a)
> concrete and particularized . . . and (b) "actual or
> imminent, not 'conjectural' or 'hypothetical.' " . . .
> Second, there must be a causal connection between the injury
> and the conduct complained of – the injury has to be "fairly
> . . . trace[able] to the challenged action of the defendant,
> and not . . . th[e] result [of] the independent action of
> some third party not before the court." . . . Third, it must
> be "likely," as opposed to merely "speculative," that the
> injury will be "redressed by a favorable decision." . . .

Id. at 560-61, 112 S.Ct. at 2136 (citations and footnote

omitted).

In his opposition brief, and as clarified at oral argument,

Arar states that he seeks a declaratory judgment invalidating his

domestic detention as well as his removal to, and torture in,

Syria.  At the same time, however, Arar contends that his only

continuing injury is a five-year bar to reentry.  Defendants

argue that this injury is untethered to the detention, torture

and unlawful conditions of confinement at the heart of this suit

and that, therefore, Arar's claim for declaratory relief fails to

satisfy the requisite constitutional minima needed for Article

III standing.

Plaintiff argues that Swaby v. Ashcroft, 357 F.3d 156 (2d

Cir. 2004), establishes his standing to sue.  In Swaby, a

deported alien brought a habeas petition challenging the

determination that he was ineligible for a waiver of deportation.

18

The government argued that Swaby's deportation, which occurred before he filed suit, rendered it moot, but the Second Circuit held that the deportation would not moot any "immigration appeal or a collateral attack on an order of removal." <u>Id.</u> at 160, n.8. The Second Circuit reasoned that a favorable ruling on the merits would vacate the order of removal, rendering the petitioner eligible to return to the United States. In that regard, his lifetime bar from reentering the United States constituted an "actual injury" with "a sufficient likelihood of being redressed by the relief petitioner seeks from this Court." <u>Id.</u> at 160.

The circumstances of <u>Swaby</u> are not present here. At the outset, Arar avers in his opposition brief that he "does not challenge his removal order." Pl. Mem. at 15. Moreover, he "does not complain about the decision to classify him as inadmissible into the United States." <u>Id.</u> at 13. Thus, any judgment declaring unlawful the conditions of his detention or his removal to Syria would not alter in any way his ineligibility to reenter this country. Consequently, Arar's claim for declaratory relief fails to meet the requirement in <u>Lujan</u> that it be "'likely,' as opposed to merely 'speculative,' that the injury" – for these purposes, the bar to reentry – would "be 'redressed by a favorable decision.'" <u>Id.</u> at 561, 112 S.Ct. at

2136 (citations and footnote omitted).[3]  Arar's request for

declaratory relief is therefore denied with respect to all

counts, and all claims against defendants sued in their official

capacities are dismissed.[4]

**(3)**

**Torture Victim Protection Act**

Count 1 of plaintiff's complaint alleges that the

individually named defendants violated the Torture Victim

Protection Act (or "TVPA"), Pub. L. No. 102-256, 106 Stat. 73

(enacted March 12, 1992) (codified as Note to 28 U.S.C. § 1350),

by conspiring with and/or aiding and abetting unnamed Jordanian

and Syrian officials in bringing about Arar's torture in Syria.[5]

The Torture Victim Protection Act was enacted in 1992 to

---

[3] There is also a serious question whether Arar satisfies the traceability requirement, given that the five-year bar to reentry did not result from Arar's detention or the alleged mistreatment he suffered abroad.  Thus, it would appear that his claim for declaratory relief would fail to demonstrate "a causal connection between the injury and the conduct complained of." Lujan, 504 U.S. at 560, 112 S.Ct. at 2136 (citation omitted).

[4] For the remainder of this opinion, the remaining defendants, all of whom are sued in their individual capacities, will be referred to collectively as "defendants."

[5] With respect to the Torture Victim Protection Act, the United States would appear to be protected by sovereign immunity, given that it has not consented to be sued in this matter.  U.S. v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941) ("The United States, as sovereign, is immune from suit save as it consents to be sued").  In any event, it appears that plaintiff's Torture Victim Protection Act claims are brought exclusively against defendants in their individual capacities. See Pl. Mem. 39-54.

provide a cause of action in cases of officially sanctioned

torture and extrajudicial killing.  It states:

> An individual who, under actual or apparent authority, or
> color of law, of any foreign nation --
>
> (1) subjects an individual to torture shall, in a civil
> action, be liable for damages to that individual; or
>
> (2) subjects an individual to extrajudicial killing shall,
> in a civil action, be liable for damages to the individual's
> legal representative, or to any person who may be a claimant
> in an action for wrongful death.

TVPA § 2(a).  Torture is defined under the TVPA as

> any act, directed against an individual in the offender's
> custody or physical control, by which severe pain or
> suffering (other than pain or suffering arising only from or
> inherent in, or incidental to, lawful sanctions), whether
> physical or mental, is intentionally inflicted on that
> individual for such purposes as obtaining from that
> individual or a third person information or a confession,
> punishing that individual for an act that individual or a
> third person has committed or is suspected of having
> committed, intimidating or coercing that individual or a
> third person, or for any reason based on discrimination of
> any kind.

TVPA § 3(b)(1).  The statute requires that all adequate and

available local remedies be exhausted, see id. § 2(b).  There

does not seem to be any dispute that Arar is without any

adequate, alternative remedy in Syria.  Finally, it imposes a

ten-year statute of limitations, see id. § 2(c)).

**a.  Subject Matter Jurisdiction**

The Torture Victim Protection Act is appended as a statutory

note to the Alien Tort Claims Act ("ATCA"), codified at 28 U.S.C.

§ 1350.  However, unlike the ATCA, the TVPA does not in itself

supply a jurisdictional basis for Arar's claim.  As the Second

Circuit noted in Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir.

1995), the Torture Victim Protection Act, "unlike the Alien Tort

[Claims] Act, is not itself a jurisdictional statute."  See Wiwa

v. Royal Dutch Petroleum Co., No. 96 Civ. 8386 (KMW), 2002 WL

319887, at *3 (S.D.N.Y. Feb. 28, 2002) ("[T]he TVPA works in

conjunction with the ATCA, expanding the ATCA's reach to torts

committed against United States citizens (not just 'aliens') who,

while in a foreign country, are victims of torture or 'extra-

judicial killing.'").

In Kadic, the Second Circuit held that "[t]he Torture Victim

Act permits the appellants to pursue their claims of official

torture under the jurisdiction conferred by the Alien Tort

[Claims] Act and also under the general federal question

jurisdiction of section 1331."  70 F.3d 232, 246 (2d Cir. 1995).

Although this statement appears to allow Torture Victim

Protection Act plaintiffs to ground their cause of action either

under the jurisdiction provided under the ATCA or under § 1331,

subsequent case law creates a more ambiguous picture.  After

Kadic, the Second Circuit notes, without resolving, a split of

authority on the issue whether a claim under the Torture Victim

Protection Act could be based solely under § 1331.  See Flores v.

Southern Peru Copper Corp., 414 F.3d 233, 247 (2d Cir. 2003).

Moreover, after Flores, at least one court within this district

has noted that "[w]hether subject matter jurisdiction for a claim asserted under the TVPA must be conferred on this Court through the ATCA or can be based solely on 28 U.S.C. § 1331 is a thorny issue." Arndt v. UBS AG, 342 F. Supp. 2d 132, 141 (E.D.N.Y. 2004).

This ambiguity notwithstanding, there is no proscription against basing Torture Victim Protection Act claims exclusively under § 1331. The language of Kadic certainly appears to be consistent with such a notion. In any event, it is only logical that § 1331 apply to any action "arising under" federal law. See Al-Odah v. United States, 321 F.3d 1134, 1146 (D.C. Cir. 2003) (Randolph, J., concurring) ("The Torture Victim Act does not contain its own jurisdictional provision. But it is clear that any case brought pursuant to that statute would arise under federal law and thus come within 28 U.S.C. § 1331, the grant of general federal question jurisdiction."), rev'd on other grounds, 542 U.S. 466, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004); Xuncax v. Gramajo, 886 F. Supp. 162, 178 (D. Mass. 1995) (permitting plaintiff to pursue Torture Victim Protection Act claims directly under § 1331).[6]

## b. Secondary Liability

The Torture Victim Protection Act does not specifically grant a right of action against those who aid or abet, or

---

[6] It could be that diversity jurisdiction is also present, but plaintiff has chosen not to rely upon it.

conspire with, primary violators.  Noting this, defendants argue
that only primary, not secondary, violators are liable.  But
every court construing this question has reached the contrary
outcome, holding that the TVPA can be interpreted to allow claims
for secondary liability.  E.g., Hilao v. Estate of Marcos, 103
F.3d 767, 779 (9th Cir. 1996); Wiwa, 2002 WL 319887, at *16; see
also Cabello v. Fernandez Larios, 402 F.3d 1148, 1158 (11th Cir.
2005).  Those courts have reached that conclusion by interpreting
the legislative history of the Torture Victim Protection Act.

Although the plain language of the statute does not
expressly call for secondary liability, its legislative history
offers proof of an intention to impose it.  As noted in the
Senate Report, "a higher official need not have personally
performed or ordered the abuses in order to be held liable . . .
anyone with higher authority who authorized, tolerated or
knowingly ignored those acts is liable for them."  S.Rep. No. 249
("TVPA Senate Report"), 102d Cong., 1st Sess. at 9 (1991)
(footnote omitted).

Defendants rely on Central Bank of Denver, N.A. v. First
Interstate Bank of Denver, N.A., 511 U.S. 164, 173, 114 S.Ct.
1439, 1446, 128 L.Ed.2d 119 (1994), to support a narrower reading
of the Torture Victim Protection Act.  In Central Bank, the
Supreme Court held that § 10(b) of the Securities Exchange Act of
1934, prohibiting manipulative or deceptive practices in
connection with securities transactions, does not allow for
24

private suits alleging aiding and abetting liability.  <u>See also</u>

<u>Dinsmore v. Squandron, Ellenoff, Plesent, Sheinfeld & Sorkin</u>, 135

F.3d 837 (2d Cir. 1998) (applying the reasoning of <u>Central Bank</u>

to preclude conspiracy liability under federal securities law).

But the principle enunciated in <u>Central Bank</u> does not, as

defendants contend, require an unequivocal congressional mandate

before allowing a claim for secondary liability.  Rather, the

case holds that the scope of liability must be based on a fair

reading of statutory text.  <u>Central Bank</u>, 511 U.S. at 175, 114

S.Ct. at 1447 ("Our consideration of statutory duties, especially

in cases interpreting § 10(b), establishes that the statutory

text controls the definition of conduct covered by § 10(b).");

<u>Dinsmore</u>, 135 F.3d at 844 ("The statutory text . . . was the

determinative issue in <u>Central Bank</u>, and it controls here as

well.").  <u>Accord</u> <u>Wiwa</u>, 2002 WL 319887, at *16 ("Neither <u>Central</u>

<u>Bank</u> nor <u>Dinsmore</u> holds that a statute must explicitly allow for

secondary liability in order for a court to hold aiders and

abetters or co-conspirators liable.  Rather, <u>Central Bank</u> and

<u>Dinsmore</u> support the proposition that the scope of liability

under a statute should be determined based on a reading of the

text of the specific statute.").

Defendants also fail to note that <u>Central Bank</u> involved an

aiding and abetting claim in the context of an <u>implied</u>, not

express, right of action.  <u>See</u> <u>Central Bank</u>, 511 U.S. at 173, 114

S.Ct. at 1446.  The TVPA, by contrast, provides an express cause

of action, and thus the link to secondary liability under the Act is less attenuated than would have been the case in <u>Central Bank</u>.

Defendants further argue that Arar does not adequately plead the existence of a conspiracy to commit torture or that defendants aided and abetted torture. But Arar's allegations clearly meet the notice-pleading requirements of Fed. R. Civ. P. 8(a), and the allegations of a conspiracy, as well as aiding and abetting liability, are adequately pled. Indeed, a plaintiff need not "yet know the details of the alleged conspiracy" to successfully plead one under liberal pleading rules. <u>Brown v. Western Conn. State Univ.</u>, 204 F. Supp. 2d 355, 364 (D. Conn. 2002). At present, the allegations of conspiracy or aiding and abetting liability are sufficient.

**c. Custody or Control**

Section 3(b)(1) of the Torture Victim Protection Act further requires that a plaintiff be in the offender's "custody or physical control." Defendants argue that this element is lacking because the alleged torture occurred while Arar was in Syrian custody. However, according to the complaint, defendants orchestrated Arar's ordeal by sending him to Syria for the express purpose of being confined and questioned there under torture. Arar alleges that defendants provided the Syrians a dossier on him to be used during interrogations conducted under conditions of torture and that U.S. officials were supplied with information gained from those investigations. <u>See</u> Cplt. ¶¶ 55-

56.  Such allegations, he argues, sufficiently demonstrate that
these actions occurred while he was in defendants' "custody or
control."

Plaintiff also cites at least one decision applying a broad
interpretation of the "custody or control requirement," see
Xuncax, 886 F. Supp. at 178 n. 15, and relies on language in the
legislative history that "a higher official need not have
personally performed or ordered the abuses in order to be held
liable. . . ."  Pl. Mem. at 61 (citing TVPA Senate Report).

The Xuncax court allowed a U.S. citizen to bring a Torture
Victim Protection Act claim against a Guatemalan Defense Minister
for abuses suffered at the hands of the Guatemalan military
forces.  However, there is an obvious difference between the
vertical control exercised by a higher official over his
subordinates, as was the case there, and the degree of custody or
control exercised by U.S. officials over Syrian officials, even
if, as plaintiff alleges, the Syrians acted at the behest of U.S.
officials.  Regardless, the issue of custody or physical control
need not be resolved.  Assuming, arguendo, that defendants can be
deemed to have had custody or control of Arar while he was
detained and tortured in Syria, his Torture Victim Protection Act
claim must still overcome concerns raised by the Torture Victim
Protection Act's statutory requirement that the tort be committed
under "color of law, of any foreign nation," TVPA § 2(a), as well
as implicit limitations on the reach of the TVPA based on other

27

relevant statutory provisions and materials.

**c.    The Torture Victim Protection Act's Statutory Context**

    **(i)    Alien Tort Claims Act**

The legislative history to the Torture Victim Protection Act explains that the statute, a statutory note to the ATCA, was intended to provide an explicit grant of a cause of action to victims of torture committed in foreign nations and to extend the remedy under the ATCA to U.S. citizens tortured abroad. "While the Alien Tort Claims Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad." H.R. Rep. No. 102-367, 102d Cong., 2d Sess. ("TVPA House Report"), at *4 (1991). Numerous cases interpreting the Torture Victim Protection Act have noted this purpose as well. Enahoro v. Abubakar, 408 F.3d 877, 888 (7th Cir. 2005) ("While the Alien Tort Claims Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad."); Cabello v. Fernandez-Larios, 402 F.3d 1148, 1154 (11th Cir. 2005) ("[T]he TVPA extended the ATCA, which had been limited to aliens, to allow citizens of the United States to bring suits for torture and extrajudicial killings in United States courts."); Flores v. S. Peru Copper Corp., 414 F.3d 233, 247 (2d Cir. 2003) ("the TVPA ... extend[s] a civil remedy also to U.S. citizens who may have been tortured abroad.") (citation omitted); Kadic, 70 F.3d at 241 ("Congress enacted the Torture Victim Act to . . . further extend

that cause of action to plaintiffs who are U.S. citizens.").  The legislative history and these case citations strongly suggest that U.S. citizens, and only U.S. citizens, are covered by the TVPA.

**(ii)   Foreign Affairs Reform and Restructuring Act (FARRA)**

The Torture Victim Protection Act "executes" in part the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 1465 U.N.T.S. 85, G.A. Res. 39/46, 39 (1984), 23 I.L.M. 1027, to which the Senate gave its consent on October 27, 1990.  S. Treaty Doc. No. 100-20, 136 Cong. Rec. D 1442 (1990).  In addition to enacting the Torture Victim Protection Act and creating a private cause of action for officially sanctioned torture, Congress implemented Article 3 of the CAT by enacting the Foreign Affairs Reform and Restructuring Act of 1988 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231).

Under FARRA, "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture. . . ."  FARRA § 2242(a).  Regulations promulgated under FARRA, <u>see</u> 8 C.F.R. §§ 208.16-18, provide that the United States will not send individuals to countries where they are "more likely than not to be tortured. . . ."  8 C.F.R.

§ 208.16(c))(4).

Although FARRA and its regulations are highly relevant to the facts of this case, plaintiff does not advance any claim under that statute, a decision based no doubt upon the absence of a private cause of action in that statute. To be sure, the absence of a right of action under FARRA sheds light on the Torture Victim Protection Act, specifically with regard to "whether Congress intended to create a remedy" under the TVPA in situations like Arar's. California v. Sierra Club, 451 U.S. 287, 297, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981) ("The federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide.").

In addition to the absence of any express right of action for damages under FARRA, Congress appears to have foreclosed the possibility of a court implying a cause of action under the statute as well. Evidence for this foreclosure can be found in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). That statute, which amends 8 U.S.C. § 1231, states that nothing within that section, which includes FARRA (a statutory note to § 1231), "shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1231(h).

The absence of any private right of action under FARRA, combined with the provision of the Immigration and Nationality

Act ("INA") barring any substantive right enforceable against the
United States or its officials, forecloses any substantive right
under FARRA.[7]  That conclusion, moreover, casts important light
on the reach of the Torture Victim Protection Act in this case.[8]

**e.  Color of Foreign Law**

The Torture Victim Protection Act makes clear that
individuals are liable only if they have committed torture or
extrajudicial killing "under actual or apparent authority, or
color of law, of any foreign nation."  TVPA § 2(a).  The Second
Circuit has held that the "color of law" requirement of the TVPA
is "intended to 'make[ ] clear that the plaintiff must establish
some governmental involvement in the torture or killing to prove
a claim,' and that the statute 'does not attempt to deal with
torture or killing by purely private groups.'"  Kadic v.
Karadzic, 70 F.3d 232, 245 (2d Cir. 1995) (citing TVPA House
Report, at *5).  Plaintiff argues that defendants operated under

_____

[7] There is no need to analyze two additional arguments
raised by defendants – first, that a cause of action under FARRA
(possibly via regulations promulgated under FARRA) is foreclosed
because, outside the process of challenging a final order of
removal in the relevant court of appeals, FARRA § (d)
presumptively bars federal jurisdiction over other types of
claims brought under FARRA like the kind raised here; and second,
that FARRA § (c) is not applicable to any alien considered a
potential danger to the security of the United States as
described in 8 U.S.C. § 1231(b)(3)(B).

[8] It is also noteworthy, in this regard, that Congress has
specifically chosen to criminalize conspiracy to commit torture.
See 18 U.S.C. § 2340A.  Although this statute applies with full
force against U.S. officials, it creates no civil liability.

31

color of law of a foreign nation by conspiring with, or aiding
and abetting, Syrian officials in their unlawful detention and
torture of Arar.

Defendants argue that they cannot be held liable under the
Torture Victim Protection Act because any "law" under which they
were acting in this case would be domestic – not foreign – and,
therefore, the language in the Torture Victim Protection Act
regarding "color of law[] of any foreign nation" does not apply
to them.

Only one court has considered this question to date.  That
case, Schneider v. Kissinger, 310 F. Supp. 2d. 251 (D.D.C. 2004),
aff'd 412 F.3d 190 (D.C. Cir. 2005), held that a U.S. official
acting under the directive of the President of the United States
would ipso facto act only under auspices of U.S., not foreign,
law.  Schneider involved claims arising out of the CIA's alleged
involvement in the anti-Allende coup in Chile.  The survivors and
personal representative of General René Schneider, who was killed
during a botched kidnaping by plotters of the 1970 Chilean
government coup, sued the United States and former national
security advisor Henry A. Kissinger, alleging that President
Nixon had ordered Kissinger, the CIA and others to do whatever
would be necessary to prevent the election of Dr. Salvadore
Allende as Chile's first Socialist President and that Kissinger,
apparently unconcerned with the risks involved, allocated $10
million to effect a military coup, leading to Schneider's death.

32

Id. at 255.

After concluding that the plaintiffs' claims presented non-justiciable political questions, the district court went on to briefly consider alternative bases for dismissal, including under the Torture Victim Protection Act.  See id. at 264, n. 13.  In a terse discussion, the district court reasoned that Kissinger could not be held to have acted color of law of a foreign nation. "In carrying out the direct orders of the President of the United States . . . Dr. Kissinger was most assuredly acting pursuant to U.S. law, if any, despite the fact that his alleged foreign co-conspirators may have been acting under color of Chilean law." Id. at 267.

Plaintiff argues that Schneider is inapposite because, in that case, Kissinger was acting at the direction of the President, whereas, here, the defendants are not alleged to have acted at the behest of President Bush.  However, Arar's complaint alleges unconstitutional conduct by some of the highest policy-making officials of this country, not low-level officers acting on their own.  Thus, in this case, as in Schneider, the defendants' alleged conduct would have been taken pursuant to U.S., not Syrian, law.  Although Schneider does not provide extensive analysis of the issue, its analysis would seem applicable here.

Plaintiff contends, nevertheless, that defendants, by acting in conspiracy with foreign officials, can be deemed to have acted

under color of foreign law.  To support this argument, plaintiff

draws upon, by way of analogy, the jurisprudence developed under

42 U.S.C. § 1983.  Plaintiff notes Second Circuit case law

directing courts construing Torture Victim Protection Act claims

to interpret the "color of law" requirement in light of § 1983.

Kadic, 70 F.3d at 245; TVPA House Report, at *5 ("Courts should

look to 42 U.S.C. § 1983 i[n] construing 'color of law' and

agency law in construing 'actual or apparent authority.'").

Noting this, plaintiff argues that U.S. officials can be deemed

to have acted under color of Syrian law in the same way courts

have found federal officials to have acted under color of state

law under § 1983.

Indeed, courts have held that, under certain circumstances,

joint action between federal and state officials can amount to

conduct under color of state law for purposes of § 1983.  "When

the violation is the joint product of the exercise of a State

power and of a non-State power then the test . . . is whether the

state or its officials played a 'significant' role in the

result."  Kletschka v. Driver, 411 F.2d 436, 449 (2d Cir. 1969).

See Jorden v. Nat'l Guard Bureau, 799 F.2d 99, 111 n. 17 (3d Cir.

1986); Knights of the KKK v. East Baton Rouge Parish School

Board, 735 F.2d 895, 900 (5th Cir. 1984); Reuber v. U.S., 750

F.2d 1039, 1061 (D.C. Cir. 1984).

Kletschka extended to federal officials the reach of prior

holdings establishing that private individuals acting jointly

with state officers could be held to violate § 1983.  <u>See</u> <u>Burton</u>
<u>v. Wilmington Parking Auth.</u>, 365 U.S. 715, 81 S.Ct. 856,
6 L.Ed.2d 45 (1961); <u>Lombard v. Louisiana</u>, 373 U.S. 267, 83 S.Ct.
1122, 10 L.Ed.2d 338 (1963).  The Second Circuit saw "no reason
why a joint conspiracy between federal and state officials should
not carry the same consequences under § 1983 as does joint action
by state officials and private persons." <u>Kletschka</u>, 411 F.2d at
448.

However, plaintiff's analogy to § 1983 ultimately fails.
Preliminarily, it is perfectly reasonable to hold federal
officials liable for constitutional wrongs committed under color
of state law because federal officials, when acting under color
of state law, are still acting under a legal regime established
by our constitution and our well-defined jurisprudence in the
domestic arena.  However, this equation of the duties and
obligations of federal officials under state and federal law is
ill-suited to the foreign arena.  The issues federal officials
confront when acting in the realm of foreign affairs may involve
conduct and relationships of an entirely different order and
policy-making on an entirely different plane.  In the realm of
foreign policy, U.S. officials deal with unique dangers not seen
in domestic life and negotiate with foreign officials and
individuals whose conduct is not controlled by the standards of
our society.  The negotiations are often more delicate and subtle
than those occurring in the domestic sphere and may contain

misrepresentations that would be unacceptable in a wholly domestic context. Thus, it is by no means a simple matter to equate actions taken under the color of state law in the domestic front to conduct undertaken under color of foreign law. That arena is animated by different interests and issues.

Applying the logic of <u>Kletschka</u> to the Torture Victim Protection Act breaks down for another reason. Federal officials, in order to be held liable under § 1983 for joint action with state officials, must act "under the control or influence of the State defendants"; otherwise, § 1983 liability is lacking. <u>Id.</u> at 449. Indeed, where federal officials direct state officers to violate federal law, § 1983 liability will not be found. <u>See</u> <u>Billings v. United States</u>, 57 F.3d 797, 801 (9th Cir. 1995) (affirming dismissal of § 1983 claims against county officials who "were clearly acting at the behest and under the direction of the federal agents" and noting that any joint action between the two would have arisen under color of federal, not state, law). Thus, plaintiff's analogy works only if Syrian officials ordered U.S. officials to torture Arar, not vice versa – as alleged.

**f. Conclusion**

The decision by Congress not to provide a private cause of action under FARRA for individuals improperly removed to countries practicing torture militates against creating one in this case under the Torture Victim Protection Act. Moreover, the

color of "foreign law" requirement, combined with the intent by
Congress to use the Torture Victim Protection Act as a remedy for
U.S. citizens subjected to torts committed overseas, strongly
supports defendants' claim that the Torture Victim Protection Act
does not apply here.  In conclusion, plaintiff does not meet the
statutory requirements of the Torture Victim Protection Act, and,
accordingly, Count 1 of the complaint is dismissed.

**(4)**

**Due Process Claims for Detention and Torture in Syria**

Counts 2 and 3 of plaintiff's complaint allege that
defendants violated Arar's rights to substantive due process by
removing him to Syria and subjecting him to both torture and
coercive interrogation (Count 2) and arbitrary and indefinite
detention (Count 3).  He seeks damages under <u>Bivens v. Six
Unknown Fed. Narcotics Agents</u>, 403 U.S. 388, 91 S.Ct. 1999, 29
L.Ed.2d 619 (1971), claiming deprivation of Fifth Amendment due
process rights.

<u>Bivens</u> establishes "that the victims of a constitutional
violation by a federal agent have a right to recover damages
against the official in federal court despite the absence of any
statute conferring such a right." <u>Carlson v. Green</u>, 446 U.S. 14,
18, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980).  The threshold
inquiry is whether Arar alleges a violation of federal law that
can be vindicated in his <u>Bivens</u> claim.  Preliminarily, however,
defendants argue that there is no subject-matter jurisdiction to

even consider the substance of Arar's complaint.  That
jurisdictional argument will be taken up first.

**a.    Jurisdiction**

Defendants argue that, under the INA, this court is without
jurisdiction to consider any claims arising out of Counts 2 and 3
of the complaint and that any and all questions involving Arar's
transfer, detention and torture in Syria – including
constitutional claims – must be dismissed.  Defendants rely on
three provisions of the INA, as amended by IIRIRA, Pub. L. No.
104-208, 110 Stat. 3009-546 (1996), all of which purportedly
preclude subject-matter jurisdiction.  They also point to one
provision of FARRA that would divest this court of jurisdiction
as well.

The three separate provisions upon which defendants rely
are: (1) 8 U.S.C. § 1252(b)(9), the "zipper clause," which
channels all questions of law and fact arising from removal
proceedings to the federal courts of appeals; (2) 8 U.S.C.
§ 1252(g), which prevents district courts from exercising
subject-matter jurisdiction over the Attorney General's decision
to execute removal orders; and (3) 8 U.S.C. § 1252(a)(2)(B)(ii),
which bars judicial review of "any" discretionary decision of the
Attorney General covered by applicable provisions of Title 8 of
the U.S. Code.  According to defendants, IIRIRA expands the
withdrawal of federal question jurisdiction by channeling
judicial review of the execution of removal orders to the circuit

courts of appeals (8 U.S.C. § 1252(g)), consolidates in the courts of appeals all legal and factual questions arising from said removal proceedings (8 U.S.C. § 1252(b)(9)), and bars federal jurisdiction altogether for discretionary decisions of any kind (8 U.S.C. § 1252(a)(2)(B)(ii)). Finally, defendants point to FARRA, § 2242(d), which strips all federal court jurisdiction over claims brought under the CAT except as part of a final order of removal in a court of appeals.

Any analysis of these provisions must start with the proposition that they be interpreted in light of "the strong presumption in favor of judicial review of administrative action," INS v. St. Cyr, 533 U.S. 289, 298, 121 S.Ct. 2271, 2278, 150 L.Ed.2d 347 (2001), as well as the "'the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien.'" Id. at 320, 121 S.Ct. at 2290 (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 449, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987)). Finally, "[w]here Congress intends to preclude judicial review of constitutional claims [of aliens] its intent to do so must be clear." Demore v. Kim, 538 U.S. 510, 517, 123 S.Ct. 1708, 1714, 155 L.Ed.2d 724 (2003) (citing Webster v. Doe, 486 U.S. 592, 603, 108 S.Ct. 2047, 2053, 100 L.Ed.2d 632 (1988)).

The INA provisions cited by defendants are designed to create a streamlined procedure allowing for the effective administration of the immigration laws so that the removal of

illegal aliens can proceed with as much alacrity as possible while maintaining a minimum of procedural due process. According to defendants, these provisions apply because Counts 2 and 3 of the complaint, "at their core," challenge Arar's removal order. See, e.g., Ashcroft Mem. at 19. Arar, by contrast, insists that Counts 2 and 3 raise issues collateral to the removal order, directly challenging his detention, transfer and torture in Syria. Thus, the applicability of the three provisions turns on this deep disagreement about the precise nature of Counts 2 and 3.

Defendants' attempt to redefine this action as a simple challenge to circumstances "arising out of" Arar's removal is not persuasive. That Arar's complaint goes beyond his removal is evidenced not least by the fact that he requested removal – to Canada. Thus, this case does not concern why defendants might have chosen to send Arar to Syria; neither does Arar appear to attack the bases for sending him there. Rather, this case concerns whether defendants could legally send Arar to a country where they knew he would be tortured and arbitrarily detained or where they knew there was a strong possibility of such a fate. As Arar argues, this case attacks a policy under which he was sent to a country, either in spite of, or perhaps because of, the likelihood that he would be tortured upon arrival.

But even on defendants' account of the nature of this suit, it remains the case that Arar's only available remedy under the

INA would have been an order seeking his return. That remedy would have had no bearing on his detention and coercive interrogation, which would cease only if, and when, immigration authorities were capable of effecting his release. This case thus raises a serious question whether the procedural system administrating the admission and exclusion of aliens is truly capable of remedying the alleged torture and detention.

Nevertheless, defendants insist that the above-cited provisions of the INA bar Counts 2 and 3. Assuming the applicability of those provisions, they still do not preclude subject-matter jurisdiction for the reasons explained below.

### (i)    8 U.S.C. § 1252(b)(9)

Section 1252(b)(9) provides:

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this chapter shall be available only in judicial review of a final order under this section.

According to defendants, § 1252(b)(9) deprives this court of jurisdiction to consider Counts 2 and 3 because those claims involve actions "arising from" removal proceedings and can therefore only be heard by a court of appeals upon a petition for review of a final order of removal. See, e.g., Ashcroft Mem. at 22 ("the heart of Arar's complaint involves his removal to Syria rather than a country where he alleges he would have been treated more humanely").

Arar claims that § 1252(b)(9) has no application because, in fact, he does not contest the underlying removal order as such. Rather, he alleges a conspiracy by defendants to detain him without formal charges and to render him to Syria for interrogation under torture. As I have already indicated, these allegations are separate from, and collateral to, the underlying removal order under which he was deported.

Moreover, the very citation of this "zipper clause" assumes the availability of certain kinds of relief that were not present here. Most immigration petitioners have the opportunity to challenge their removal at a hearing, with the ability to be represented by counsel, where they can raise legal claims, including those with respect to CAT. These proceedings include, at a minimum, a hearing before an immigration judge, an appeal before the Board of Immigration Appeals and, finally, review in the relevant U.S. court of appeals. In this case, Arar alleges that he was intentionally deprived of the opportunity to obtain adequate review over his CAT claim. Moreover, he alleges he was denied access to counsel while held in the United States and then transported to Syria, against his will, where he was held incommunicado and tortured for ten months. If, as Arar alleges, federal officials actually obstructed him from filing a grievance, there is no basis for defendants' claim that § 1252(b)(9) can be interpreted to effectively bar him from any forum to litigate his claim. Certainly, Arar was not in a

position similar to ordinary deportees who can "wait until their administrative proceedings come to a close and then seek review in a court of appeals."  <u>Reno v. American-Arab Anti-Discrimination Comm.</u>, 525 U.S. 471, 479, 119 S.Ct. 936, 941, 142 L.Ed.2d 940 (1999).  Thus, the "zipper clause" defendants invoke to bar this litigation rings hollow.

Defendants cite <u>Calcano-Martinez v. INS</u>, 232 F.3d 328 (2d Cir. 2000), in which the Second Circuit noted that because § 1252(b)(9) establishes "'exclusive appellate court' jurisdiction over claims 'arising from any action taken or proceeding brought to remove an alien,' all challenges are channeled into one petition."  <u>Id.</u> at 340 (citing 8 U.S.C. § 1252(b)(9); <u>see also</u> <u>Flores-Miramontes v. INS</u>, 212 F.3d 1133, 1140-41 (9th Cir. 2000)).  Noting that "all challenges" must now be brought under one petition for review, defendants assert that the current action is foreclosed in this court.  But this analysis misreads the holding of <u>Calcano-Martinez</u> and mischaracterizes the purpose behind § 1252(b)(9).

<u>Calcano-Martinez</u> held that the jurisdiction-limiting provisions of IIRIRA, including § 1252(b)(9), did not divest district courts of jurisdiction to hear habeas appeals raising legal challenges to removal orders.  232 F.3d at 337, <u>aff'd</u> 533 U.S. 348, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001).  The petitioners, who enjoyed a full administrative process before the agency, were not precluded from raising legal challenges under

habeas.  As the Second Circuit explained in Calcano-Martinez,

§ 1252(b)(9) was intended to resolve certain procedural and

administrative problems presented in immigration proceedings.

"Before [§ 1252(b)(9)], only actions attacking the deportation

order itself were brought in a petition for review while other

challenges could be brought pursuant to a federal court's federal

question subject matter jurisdiction under 28 U.S.C. § 1331."

Id. at 340.  For instance, in Cheng Fan Kwok v. INS, 392 U.S.

206, 212, 88 S.Ct. 1970, 1974, 20 L.Ed.2d 1037 (1968), the

Supreme Court held that the statutory precursor to § 1252(b)(9)

allowed an alien to institute separate proceedings for a

challenge to the denial of a stay of deportation and a challenge

to the underlying deportation order itself.  After Cheng Fan

Kwok, parties could initiate separate court proceedings, at times

in separate courts, for successive filings in matters ultimately

originating out of the same set of circumstances.  See also

Flores-Miramontes, 212 F.3d at 1140-41 (noting that, prior to

§ 1252(b)(9), "while motions to reopen were to be brought in the

courts of appeal . . . challenges to denials of stays of

deportation fell within the jurisdiction of the district courts,

under the general federal question statute").  By consolidating

review of all appeals of the removal order itself in one forum,

Congress solved the problem of successive filings and additional

back-door challenges to removal orders.  Calcano-Martinez, 232

F.3d at 340.  But this action is neither a direct nor back-door

challenge to a removal proceeding.

The inapplicability of § 1252(b)(9) to the facts of this case is further highlighted by recent Supreme Court directives regarding the "zipper clause."  As the Supreme Court explained in St. Cyr, the provision is intended "to consolidate 'judicial review' of immigration proceedings into one action in the court of appeals," not to eliminate judicial review altogether.  533 U.S. at 313, 121 S.Ct. at 2286; see Calcano-Martinez, 232 F.3d at 340.  Recent cases interpreting analogous provisions of IIRIRA comport with this understanding.  See American-Arab Anti-Discrimination Committee, 525 U.S. at 485, 119 S.Ct. at 944 (noting, with respect to § 1252(g), Congress's interest in making sure that "certain immigration decisions, "if . . . reviewable at all . . . at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed.").

In light of the purpose behind its enactment as well as the facts attending Arar's removal, § 1252(b)(9) does not bar Arar's suit.

**(ii)   8 U.S.C. § 1252(g)**

Section 1252(g) reads as follows:

Except as provided in this section and notwithstanding any other provision of law . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

Defendants argue, again, that Counts 2 and 3 are barred because all events "arise from" the execution of Arar's removal order. <u>See</u>, <u>e.g.</u>, Ashcroft Mem. at 24 ("Accepting Arar's allegations, the decision which is the subject of Arar's Second and Third <u>Bivens</u> claims was 'removing Mr. Arar to Syria' ostensibly for the purpose of his detention and torture by Syrian officials.") (citing Cplt. ¶ 48). For the reasons expressed <u>supra</u>, that description of the complaint is neither correct nor fair. In any event, the broad reading defendants insert into § 1252(g) is not borne out by the case law. The <u>American-Arab Anti-Discrimination Committee</u> court specifically rejected the

> unexamined assumption that § 1252(g) covers the universe of deportation claims – that it is a sort of "zipper" clause that says "no judicial review in deportation cases unless this section provides judicial review." In fact, what § 1252(g) says is much narrower. The provision applies only to three discrete actions that the Attorney General may take: her "decision or action" to "<u>commence</u> proceedings, <u>adjudicate</u> cases, or <u>execute</u> removal orders."

525 U.S. at 482, 119 S.Ct. at 943 (emphasis in original). <u>See Calcano-Martinez</u>, 232 F.3d at 339, n.5 (noting that, in <u>American-Arab Anti-Discrimination Committee</u>, "[t]he Supreme Court thus held that [§ 1252(g)] applies in a very narrow class of cases"). As the Fourth Circuit has explained, the Supreme Court "reasoned that these three actions are stages of the deportation process at which the Executive has discretion to go forward or to abandon the endeavor and that § 1252(g) was designed to prevent judicial intervention into these actions outside the streamlined

process Congress had designed." <u>Mapoy v. Carroll</u>, 185 F.3d 224, 228 (4th Cir. 1999).  In other words, § 1252(g), like § 1252(b)(9), was intended to help restore order to the administrative process by preventing multiple lawsuits over claims arising from action involving the removal of an alien – not to foreclose <u>bona</u> <u>fide</u> legal and constitutional questions unrelated to the removal order by barring all federal court review.

Even if Arar were challenging the underlying removal order according to which he was transferred to Syria – as defendants claim – § 1252(g) would still not apply.  Arar challenges, on constitutional grounds, the decision to send him abroad for torture, pursuant to a purported policy of extraordinary rendition for individuals suspected of terrorist involvement. That goes far beyond a mere challenge to the "decision or action" to "commence proceedings, adjudicate cases, or execute removal orders."  As noted in <u>American-Arab Anti-Discrimination Committee</u>, it would be "implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." 525 U.S. at 482, 119 S.Ct. at 943.  <u>See</u> <u>Wong v. INS</u>, 373 F.3d 952, 964 (9th Cir. 2004) (rejecting government's position with respect to § 1252(g) by finding that the provision does not bar "all claims relating in any way to deportation proceedings") (citing <u>Catholic Soc. Servs., Inc. v. INS</u>, 232 F.3d 1139, 1150

(9th Cir. 2000) (en banc)).  Consequently, even accepting

defendants' characterization of the nature of this suit,

§ 1252(g) would not bar Counts 2 and 3.

### (iii)  8 U.S.C. § 1252(a)(2)(B)(ii)

Section 1252(a)(2)(B)(ii), provides in relevant part,

Notwithstanding any other provision of law . . . no court
shall have jurisdiction to review--

(i) any judgment regarding the granting of relief under
section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this
title, or

(ii) any other decision or action of the Attorney General or
the Secretary of Homeland Security the authority for which
is specified under this subchapter to be in the discretion
of the Attorney General or the Secretary of Homeland
Security, other than the granting of relief under section
1158(a) of this title.

"The starting point of the analysis," defendants argue, "is

Arar's status as an arriving alien seeking admission."  Ashcroft

Mem. at 25.  Thus, defendants point out, the Attorney General has

discretion in deciding what to do with aliens suspected of being

involved in terrorism and where to send them – including the

ability to disregard their preferred country of removal.  <u>See</u>

Ashcroft Mem. at 25-27.  Under 8 U.S.C. § 1231(B)(2)(C)(IV), they

point out, the Attorney General "may disregard" an alien's

designation of a country of removal if granting the request would

be prejudicial to the interests of the United States.

However, Arar was <u>not</u> seeking admission to the United

States, and, thus, defendants' argument begins from an incorrect

"starting point."  In any event, § 1252(a)(2)(B)(ii), which

essentially bars judicial review of purely discretionary determinations, is not dispositive.

The Ninth Circuit is the only court of appeals to have thus far analyzed 8 U.S.C. § 1252(a)(2)(B)(ii) in remotely similar circumstances. In <u>Wong</u>, the Ninth Circuit rejected the government's position by ruling that "claims of constitutional violations are not barred by § 1252(a)(2)(B)." 373 F.3d at 963.

Although this circuit has not directly interpreted that provision, a recent case, <u>Sepulveda v. Gonzales</u>, 407 F.3d 59 (2d Cir. 2005), is instructive. In <u>Sepulveda</u>, the Second Circuit interpreted 8 U.S.C. § 1252(a)(2)(B)(i), which bars federal review of judgments regarding the granting of relief of, <u>inter alia</u>, cancellation of removal under 8 U.S.C. § 1229b and adjustment of status under 8 U.S.C. § 1255(i). The Second Circuit held that the jurisdiction-stripping provision would not bar federal review of nondiscretionary or purely legal questions regarding an alien's eligibility for such relief. Rather, 8 U.S.C. § 1252(a)(2)(B)(i) only precludes review of <u>discretionary</u> determinations to grant or deny relief. <u>Id.</u> at 62-64. Because both (i) and (ii) concern varieties of judgments that are otherwise non-justiciable in federal courts, the analysis in <u>Sepulveda</u> would apply to subsection (ii) as well.

<u>Santos-Salazar v. U.S. Dep't of Justice</u>, 400 F.3d 99, 104 (2d Cir. 2005), interpreting a separate jurisdiction-stripping element of the INA, is equally on point. The Second Circuit

noted that, although 8 U.S.C. § 1255(a)(2)(C) bars federal-court
review of final orders of removal based on certain criminal
conduct, "[t]here are, however, aspects of § 1252(a)(2)(C) as to
which judicial review has not been eliminated." Id. at 104.
Section 1252(a)(2)(C) "does not deprive the courts of
jurisdiction to determine whether the section is applicable,
e.g., whether the petitioner is in fact an alien, whether he has
in fact been convicted, and whether his offense is one that is
within the scope of 8 U.S.C. § 1182(a)(2)." Id. (citations
omitted).  The Santos-Salazar court ultimately dismissed the
action for lack of a substantial constitutional question.  Had it
found such a question apparent, its discussion indicates that it
would have ruled differently.

     The maxim that courts retain jurisdiction to consider purely
legal questions holds true in other administrative contexts as
well.  See Johnson v. Robison, 415 U.S. 361, 367, 94 S.Ct. 1160,
1165-66, 39 L.Ed.2d 389 (1974) (provision barring review of
"decisions of the Administrator on any question of law or fact
under any law administered by the Veterans' Administration
providing benefits for veterans" did not bar constitutional
challenge) (internal quotation marks omitted).  Wong and
Sepulveda as well as the Supreme Court cases cited strongly favor
jurisdiction over Arar's claims because he does not challenge
discretionary decision-making by the Attorney General, but rather
constitutional violations incident to his removal to Syria to

face torture.

Defendants cite <u>Doherty v. Meese</u>, 808 F.2d 938, 941 (2d Cir. 1986), for the proposition that such determinations are "essentially unreviewable." <u>Id.</u> at 944; <u>see</u> Ashcroft Mem. at 26. In <u>Doherty</u>, an immigration petitioner attempted to short-circuit the government's appeal of the immigration judge's decision granting the petitioner's request to be deported to the country of his choice. The petitioner attempted to block the appeal in the agency by seeking federal court review in the midst of the administrative process. The actual holding of <u>Doherty</u> is that, absent extraordinary circumstances, the court of appeals cannot "intervene in the administrative process <u>prior</u> to a final order of deportation." 808 F.2d at 942 (emphasis added). Although it is not crystal clear whether the <u>Doherty</u> court would have reached the same conclusion regarding its power to review the Attorney General's determination at the <u>conclusion</u> of the administrative hearings, § 1252(a)(2)(B)(ii) appears to bar jurisdiction in ordinary circumstances where the only aspect of an appeal is the Attorney General's discretion itself. Nevertheless, <u>Doherty</u> is not squarely applicable to the case at bar because Arar does not simply challenge the discretionary determinations of the Attorney General, but rather the legal authority of the Attorney General to send him to a country in violation of CAT.

Defendants further note that the Attorney General's discretion is even more expansive in cases involving the removal

of aliens who pose dangers to national security.  First, Congress established, through FARRA, that regulations implementing the United States' obligations under the CAT, <u>see</u> Pub. L. No. 105-277, § 2242(c), do not apply to aliens who may pose a danger to the security of the United States.  <u>See</u> 8 U.S.C. § 1231(b)(3)(B).  Second, alien terrorists seeking protection under Article 3 of CAT are not entitled to standard administrative proceedings governing their requests for withholding of removal under the CAT.  <u>See</u> 8 U.S.C. § 208.18(d).

To the extent that Arar challenges the Attorney General's discretion in these areas, his claims would be foreclosed.  <u>See</u> <u>Doherty</u>, 808 F.2d at 942.  But, outside a challenge to the <u>merits</u> of the Attorney General's findings, the question is whether, in spite of CAT, the Attorney General had the authority to remove Arar, even if he were a member of al Queda, to a country where he was likely to face torture.  Section 1252(a)(2)(B)(ii), as interpreted under case law, will not erect a bar to that constitutional question, regardless of whether Arar can prevail on the merits of the issue.

"If it were clear that the question of law could be answered in another judicial forum, it might be permissible to accept" defendants' jurisdictional argument.  <u>St. Cyr</u>, 533 U.S. at 314, 121 S.Ct. at 2287.  "But the absence of such a forum," <u>id.</u>, coupled with the serious constitutional questions raised in this case, cautions against foreclosing what is apparently Arar's sole

remaining avenue for legal challenge.

**(iv)    FARRA**

Finally, defendants argue that any claim involving a
violation of the CAT would be foreclosed due to plaintiff's
failure to institute a review of a final order of removal under
FARRA.  Under FARRA, § 2242(d),

> Notwithstanding any other provision of law, and except as
> provided in the regulations described in subsection (b), no
> court shall have jurisdiction to review the regulations
> adopted to implement this section, and nothing in this
> section [this note] shall be construed as providing any
> court jurisdiction to consider or review claims raised under
> the Convention or this section [this note], or any other
> determination made with respect to the application of the
> policy set forth in subsection (a), except as part of the
> review of a final order of removal pursuant to section 242
> of the Immigration and Nationality Act (8 U.S.C. 1252).

Claiming that Counts 2 and 3, "at their core," assert violations
of FARRA, defendants contend that the jurisdiction-limiting
principles of FARRA bar federal question jurisdiction "to
'consider' that determination, whether in the guise of a <u>Bivens</u>
action or otherwise."  Ashcroft Mem. at 30.

As discussed <u>supra</u> at part (4) of this discussion section of
the opinion, the policies enunciated under FARRA do not permit a
private cause of action for damages for a violation of that
provision.  Nevertheless, the jurisdiction-limiting provision of
FARRA, which channels review into one consolidated proceeding in
the court of appeals, is of questionable relevance to claims
(whatever their merit) raised under other statutes and the
constitution in a case in which defendants by their actions

essentially rendered meaningful review an impossibility.  This is the case even if, as defendants argue, Arar's complaint is nothing more than a second chance at challenging "the determination that his removal to Syria complied with the policy [in FARRA]."  Ashcroft Mem. at 30.

To summarize the jurisdictional argument, IIRIRA was intended to create a "streamlined process," in which issues of law and fact in matters concerning the admission and exclusion of aliens "are not subject to separate rounds of litigation," <u>Van Dinh v. Reno</u>, 197 F.3d 427, 433 (10th Cir. 1999) – not to eliminate judicial review altogether.  The jurisdiction-limiting and jurisdiction-stripping provisions of IIRIRA do not preclude a consideration of the merits of Arar's alleged due process violations.

b.    **Substantive Due Process**[9]

Arar argues that the treatment he allegedly suffered

_____

[9] Defendants also raise qualified immunity arguments with respect to Counts 2 and 3 as well as 4, and those arguments will be considered, as necessary, only after the underlying constitutional questions have been addressed.  Although "many courts faced with claims resting on constitutional rights of uncertain scope have dismissed cases based on qualified immunity alone," <u>Harbury v. Deutch</u>, 233 F.3d 596, 601 (D.C. Cir. 2000), <u>rev'd on other grounds sub nom.</u>, <u>Christopher v. Harbury</u>, 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (citing <u>Childress v. Small Bus. Admin.</u>, 825 F.2d 1550, 1552 (11th Cir. 1987)), the Supreme Court has cast doubt on this approach.  <u>See</u> <u>Wilson v. Layne</u>, 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999). Accordingly, the merits of the constitutional argument will be considered before adjudication of the qualified-immunity issue.

unquestionably constitutes a violation of substantive due process.  See Pl. Opp. Mem. at 27.  However, defendants question whether robust Fifth Amendment protections can extend to someone like Arar, who, for juridical purposes, never actually entered the United States.  Moreover, they cite precedent rejecting extraterritorial Fifth Amendment protections to non-U.S. citizens.

While one cannot ignore the "shocks the conscience" test established in Rochin v. California, 342 U.S. 165, 172-73, 72 S.Ct. 205, 209-10, 96 L.Ed. 183 (1952), that case involved the question whether torture could be used to extract evidence for the purpose of prosecuting criminal conduct, a very different question from the one ultimately presented here, to wit, whether substantive due process would erect a per se bar to coercive investigations, including torture, for the purpose of preventing a terrorist attack.  Whether the circumstances here ultimately cry out for immediate application of the Due Process clause, or, put differently, whether torture always violates the Fifth Amendment under established Supreme Court case law prohibiting government action that "shocks the conscience" – a question analytically prior to those taken up in the parties' briefing – remains unresolved from a doctrinal standpoint.[10]  Nevertheless,

_____

[10] In Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980), this circuit noted the "universal condemnation of torture in numerous international agreements[] and the renunciation of torture as an instrument of official policy by virtually all of

because both parties seem (at least implicitly) to have answered

this question in the affirmative, it will be presumed for present

purposes that the Due Process clause would apply to the facts

alleged.

Defendants argue that Arar's claims alleging torture and

---

the nations of the world (in principle if not in practice)" and
found that "an act of torture committed by a state official
against one held in detention violates established norms of the
international law of human rights, and hence the law of nations."
Id. at 880. Filartiga cited, in a footnote, survey data (which
the circuit court did not clearly endorse) indicating that
torture might be prohibited under the Eighth Amendment to the
U.S. Constitution, which bars "cruel and unusual punishments."
See id. at 884, n. 13. But, this dictum does not address the
constitutionality of torture to prevent a terrorist attack.

Although the United States has, in the context of various
international undertakings, made certain treaty commitments
against torture, these obligations, unlike the Due Process
clause, can be repudiated. Notwithstanding the well established
cannon that "an act of Congress ought never to be construed to
violate the law of nations if any other possible construction
remains," Murray v. Schooner Charming Betsy, 2 Cranch 64, 118, 2
L.Ed. 208 (1804), as well as the argument, pressed by some, that
customary international law is always binding on all states, it
is dubious whether that proposition would hold true in the face
of congressional legislation to the contrary. As the Ninth
Circuit has explained, "we are bound by a properly enacted
statute, provided it be constitutional, even if that statute
violates international law." Alvarez-Mendez v. Stock, 941 F.2d
956, 963 (9th Cir. 1991). See United States v. Aguilar, 883 F.2d
662, 679 (9th Cir. 1989) ("In enacting statutes, Congress is not
bound by international law; if it chooses to do so, it may
legislate contrary to the limits posed by international law."),
cert. denied, 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771
(1991). See also Restatement (Third) of International Law
§ 115(1)(a) ("An Act of Congress supercedes an earlier rule of
international law or a provision of an international agreement as
law of the United States if the purpose of the act to supercede
the earlier rule or provision is clear and if the act and the
earlier rule or provision cannot be fairly reconciled.").

unlawful detention in Syria are <u>per</u> <u>se</u> foreclosed under <u>Johnson</u> <u>v. Eisentrager</u>, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), and its progeny.  These cases, they claim, unequivocally establish that non-resident aliens subjected to constitutional violations on non-U.S. soil are prohibited from bringing claims under the Due Process clause.  <u>See</u>, <u>e.g.</u>, U.S. Mem. at 25; Thompson Mem. at 29, 31.

In <u>Eisentrager</u>, the Supreme Court held that a federal district court lacked jurisdiction to issue a writ of habeas corpus to twenty-one German nationals who had been captured in China by U.S. forces, brought to trial and convicted before an American military commission in Nanking and placed in incarceration in occupied Germany.  The Supreme Court ruled that non-U.S. citizens with absolutely no relationship to the United States, captured outside U.S. territory and tried before a military tribunal, could not avail themselves of the right of habeas corpus to prove their innocence before a U.S. court.  The Court held that "in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act."  <u>Id.</u> at 771, 70 S.Ct. at 940. Bereft of any established contacts with the United States, the <u>Eisentrager</u> petitioners could not avail themselves of U.S. courts.

Under <u>Eisentrager</u>, given that "the privilege of litigation

has been extended to aliens, whether friendly or enemy, only because permitting their presence in the country implied protection," id. at 777-78, 70 S.Ct. at 943, aliens outside the United States could not invoke the Constitution on their behalf. Consequently, the "nonresident enemy alien, especially one who has remained in the service of the enemy, does not have even this qualified access to our courts, for he neither has comparable claims upon our institutions nor could his use of them fail to be helpful to the enemy." Id. at 776, 70 S.Ct. at 943.

However, there are obvious distinctions between Eisentrager and the case at bar. The Eisentrager petitioners had a trial pursuant to the laws of war. Although that trial might not have afforded them the panoply of rights provided in the civilian context, one cannot say that the petitioners had no fair process. Moreover, the Eisentrager detainees had "never been or resided in the United States," were "captured outside of our territory and there held in military custody as [] prisoner[s] of war," were "tried by a Military Commission sitting outside the United States" and were "at all times imprisoned outside the United States." Eisentrager, 339 U.S. at 777, 70 S.Ct. at 943. Arar, by contrast, was held virtually incommunicado - moreover, on U.S. soil - and denied access to counsel and process of any kind. Owing to these factual distinctions, Eisentrager is not squarely applicable to the case at bar.

Defendants also cite United States v. Verdugo-Urquidez, 494

U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), in which the

Supreme Court revisited the question of the extraterritoriality

of the U.S. Constitution to non-U.S. citizens.  Verdugo-Urquidez

involved a question regarding the extraterritoriality of the

Fourth Amendment's protection against unreasonable searches and

seizures.  The Court held that a warrantless search and seizure

of an alien's property in Mexico, even though orchestrated within

the United States, did not constitute a Fourth Amendment

violation.  Although the illegal search was ordered by U.S.

officials, it took place "solely in Mexico," Verdugo-Urquidez,

494 U.S. at 264, 110 S.Ct. at 1060, which, the Court held,

amounted to no Fourth Amendment violation.

After foreclosing the possibility of any extraterritorial

application of the Fourth Amendment, the Verdugo-Urquidez court

explored in dicta the same question with regard to the Fifth

Amendment.  Relying on dicta in Eisentrager, the Supreme Court

held that prior case law foreclosed such possibility:

> Indeed, we have rejected the claim that aliens are entitled
> to Fifth Amendment rights outside the sovereign territory of
> the United States.  In Johnson v. Eisentrager . . . the
> Court held that enemy aliens arrested in China and
> imprisoned in Germany after World War II could not obtain
> writs of habeas corpus in our federal courts on the ground
> that their convictions for war crimes had violated the Fifth
> Amendment. . . . The Eisentrager opinion acknowledged that
> in some cases constitutional provisions extend beyond the
> citizenry; "the alien . . . has been accorded a generous and
> ascending scale of rights as he increases his identity with
> our society."  But our rejection of the extraterritorial
> application of the Fifth Amendment was emphatic: "Such
> extraterritorial application of organic law would have been
> so significant an innovation in the practice of governments

> that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. . . . None of the learned commentators on our Constitution has even hinted at it. The practice of every modern government is opposed to it."

494 U.S. at 269, 110 S.Ct. at 1063 (quoting Eisentrager, 339 U.S. at 770, 784-85, 70 S.Ct. at 940, 947).

However, Verdugo-Urquidez, which involved a search and seizure of a home in Mexico, can be distinguished from the case at bar. As Justice Kennedy observed in his concurring opinion, Mexico's different legal regime compounded (and perhaps created) the Fourth Amendment violations. "The absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment's warrant requirement should not apply in Mexico as it does in this country." Verdugo-Urquidez, 494 U.S. at 278, 110 S.Ct. at 1068 (Kennedy, J., concurring).

Verdugo-Urquidez is further distinguishable from the instant case by the fact that the defendant in that case was prosecuted in an Article III court, where "all of the trial proceedings are governed by the Constitution. All would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant." Id. Thus, any anxiety over the lack of Fourth Amendment protection were minimized by the

fact that the trial would ultimately proceed in accordance with
Fifth Amendment guarantees.

After Verdugo-Urquidez, the Court of Appeals for the
District of Columbia Circuit considered a case, more directly
applicable to the facts at issue here, involving a Guatemalan
citizen and high-ranking member of a Guatemalan rebel
organization who was allegedly tortured in Guatemala at the
behest of CIA officials, who had ordered and directed the torture
and then engaged in an eighteen-month cover-up.  Harbury v.
Deutch, 233 F.3d 596 (D.C. Cir. 2000), rev'd on other grounds sub
nom., Christopher v. Harbury, 536 U.S. 403, 122 S.Ct. 2179, 153
L.Ed.2d 413 (2002).  The constitutional violations at issue in
Harbury included torture.  Moreover, the torture was allegedly
planned and orchestrated by U.S. officials acting within the
United States.  Thus, unlike Eisentrager and Verdugo-Urquidez,
the factual background of Harbury is closely related to the case
at bar.

The D.C. Circuit relied heavily on dicta in Verdugo-
Urquidez, particularly its reading of Eisentrager, to ultimately
hold that the decedent's wife (a U.S. citizen) could not bring a
Fifth Amendment claim on his behalf for the torture he suffered
in Guatemala.  The D.C. Circuit noted, first, that Verdugo-
Urquidez did not attach constitutional significance to the fact
"that the search was both planned and ordered from within the
United States.  Instead, it focused on the location of the

primary constitutionally significant conduct at issue: the search and seizure itself." <u>Harbury</u>, 233 F.3d at 603. <u>See</u> <u>id.</u> ("The search was conceived, planned, and ordered in the United States, carried out in part by agents of the United States Drug Enforcement Agency, and conducted for the express purpose of obtaining evidence for use in a United States trial. . . . Still, the Court treated the alleged violation as having 'occurred solely in Mexico.'") (citing <u>Verdugo-Urquidez</u>, 494 U.S. at 264, 110 S.Ct. at 1060). Because of this, the D.C. Circuit found that "the primary constitutionally relevant conduct at issue here – [the deceased's] torture – occurred outside the United States." <u>Id.</u> at 603.

The D.C. circuit further noted that <u>Verdugo-Urquidez</u> read <u>Eisentrager</u> to "emphatically" reject the notion of any extraterritorial application of the Fifth Amendment. That language, although "dicta . . . is firm and considered dicta that binds this court." <u>Harbury</u>, 233 F.3d at 604 (citing <u>United States v. Oakar</u>, 111 F.3d 146, 153 (D.C. Cir. 1997)).[11]

_____

[11] The standard in the Second Circuit regarding the effect of dictum is slightly different. The Second Circuit held in <u>United States v. Bell</u>, 524 F.2d 202, 206 (2d Cir. 1975) that "a distinction should be drawn between 'obiter dictum,' which constitutes an aside or an unnecessary extension of comments, and considered or 'judicial dictum' . . . to guide the future conduct of inferior courts." Under this ruling, Supreme Court dictum is not binding on lower courts within this judicial circuit, but "must be given considerable weight and cannot be ignored in the resolution of the close question." <u>Id.</u> at 206. Such dictum, "while of great significance and entitled to this Court's respect does not preclude . . . this Court from reaching its own decision

Still, the case at bar, unlike Harbury, presents a claim of torture by an alien apprehended at the U.S. border and held here pending removal; furthermore, the fact that Arar's alleged torture began with his removal from the territory of the United States makes this case factually different from Harbury. Nevertheless, by answering the question "whether the Fifth Amendment prohibits torture of non-resident foreign nationals living abroad" in the negative, id. at 602, Harbury appears to have important implications for the case at bar.

However, in Rasul v. Bush, 542 U.S. 466, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004), the Supreme Court issued a ruling potentially favorable to Arar. Rasul considered the statutory habeas claims of two Australian and twelve Kuwaiti citizens captured abroad, who challenged the legality of their detention at the Guantanamo Bay Naval Base. The Supreme Court extended statutory habeas jurisdiction to the detainees, finding that they could challenge their detention in Guantanamo Bay, a territory over which "the United States . . . exercise[s] complete jurisdiction and control." Id. at 471, 124 S.Ct. at 2691 (internal quotation

after independent consideration and study of the question." Id. at 206, n. 4 (citation omitted).
    Under the Second Circuit's approach, the Supreme Court's discussion of the extraterritoriality of the Fifth Amendment, for these purposes, appears to be "of the 'obiter dictum' variety. Even if it were 'judicial dictum,' it would still 'not be binding,' although 'it must be given considerable weight and can not be ignored in the resolution of [a] close question.'" Velazquez v. Legal Services Corp., 349 F. Supp. 2d 566, 582 (E.D.N.Y. 2004) (citing Bell, 542 F.2d at 206).

marks omitted).

Rasul only considered the question "whether the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing." Id. at 485, 124 S.Ct. at 2699. Moreover, the Supreme Court reached its decision by noting that "the United States exercises 'complete jurisdiction and control' over the Guantanamo Bay Naval Base, and may continue to exercise such control permanently if it so chooses." Id. at 480, 124 S.Ct. at 2696.

To be sure, there is no argument that the United States exercises the same control over the Syrian officials alleged to have detained and tortured Arar as it does in the case of Guantanamo Bay. Nevertheless, one might read Rasul as extending habeas jurisdiction to a group of aliens with even less of a connection to the United States than Arar.

Defendants reject that contention, arguing that, in light of the above-cited cases, the substantive due process violations asserted in Arar's complaint "are predicated upon a constitutional protection that has never been extended to arriving aliens, much less aliens whom the executive has determined pursuant to legislative authorization have terrorist connections." Ashcroft Mem. at 7. But Arar – who received none of the procedural and substantive protections afforded the petitioners in Eisentrager – has a connection to the United

States lacking in _Eisentrager_, _Verdugo-Urquidez_, _Harbury_ and _Rasul_. All of Arar's claims against U.S. officials allegedly arise out of actions taken or initiated by them while Arar was on U.S. soil. Moreover, the factual scenario presented in this case makes it more difficult to simply apply the precedents established in the _Eisentrager_ line of cases.

As already noted, the _Eisentrager_ detainees had "never been or resided in the United States," were "captured outside of our territory and there held in military custody as [] prisoner[s] of war, were 'tried by a Military Commission sitting outside the United States' and were "at all times imprisoned outside the United States." _Eisentrager_, 339 U.S. at 777, 70 S.Ct. at 934. Arar, by contrast, was held virtually incommunicado in _this_ country and denied access to counsel and a meaningful process of any kind. Moreover, as the _Rasul_ court noted, the Guantanamo detainees "are not nationals of countries at war with the United States, and they deny that they have engaged in or plotted acts of aggression against the United States; they have never been afforded access to any tribunal, much less charged with and convicted of wrongdoing. . . ." _Id._ at 476, 124 S.Ct. at 2693. _See_ _also_ _id._ at 488, 124 S.Ct. at 2700 (Kennedy, J., concurring in judgment) ("[h]aving already been subject to procedures establishing their status, [the _Eisentrager_ plaintiffs] could not justify 'a limited opening of our courts' to show that they were 'of friendly personal disposition' and not enemy aliens.")

(citing Eisentrager, 339 U.S. at 778).

Another difference between Rasul and the case at bar is that Rasul based its jurisdiction on the statutory habeas provision (28 U.S.C. § 2241), not the U.S. Constitution.[12] Arar, by contrast, alleges substantive constitutional claims not addressed in Rasul. See In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 463 (D.D.C. 2005) (citing language in Rasul as "stand[ing] in sharp contrast to the declaration in Verdugo-Urquidez . . . that the Supreme Court's 'rejection of extraterritorial application of the Fifth Amendment [has been] emphatic'") (citing Verdugo-Urquidez, 494 U.S. at 269, 110 S.Ct. at 1063), appeal docketed, No. 05-8003 (D.C. Cir. March 10, 2005; Khalid v. Bush, 355 F. Supp. 2d 311, 321 (D.D.C. 2005) ("In the final analysis, the lynchpin for extending constitutional protections beyond the citizenry to aliens was and remains 'the alien's presence within its territorial jurisdiction.'") (citing Eisentrager, 339 U.S. at 771, 70 S.Ct. at 940), appeal docketed sub nom. Boumediene v.

---

[12] It should be noted that Arar's counsel (both present and former) never brought a petition for habeas corpus during his detention in the United States or while in Syria. Precisely what, if any, remedy might have been available to Arar via habeas is uncertain. Moreover, without the benefit of hindsight, Arar's former counsel may not have known to bring an emergency petition for stay of removal during Arar's 13-day U.S. detention, especially if counsel was not informed of any final order of removal. And once Arar had been removed from the United States, it is uncertain how a habeas petition would have fared. Because no habeas petition was ever sought, the question whether statutory habeas protection might have been available during the pendency of Arar's detention is, at this point, an academic question.

<u>Bush et al.</u>, No. 05-5062 (D.C. Cir. March 10, 2005).

At this juncture, the question whether the Due Process Clause vests Arar with substantive rights is unresolved. Assuming, without resolving, the existence of some substantive protection, Arar's claims are foreclosed under an exception to the <u>Bivens</u> doctrine.

**c.    Special Factors Counseling Hesitation**

The substantive due process analysis notwithstanding, the Supreme Court's creation of a <u>Bivens</u> remedy for alleged constitutional violations by federal officials is subject to certain prudential limitations and exceptions.  The Supreme Court has "expressly cautioned . . . that such a remedy will not be available when 'special factors counseling hesitation' are present."  <u>Chappell v. Wallace</u>, 462 U.S. 296, 298, 103 S.Ct. 2362, 2365, 76 L.Ed.2d 586 (1983) (quoting <u>Bivens</u>, 403 U.S. at 396, 91 S.Ct. at 2005).  Those factors do not concern "the merits of the particular remedy [being] sought."  <u>Bush v. Lucas</u>, 462 U.S. 367, 380, 103 S.Ct. 2404, 2413, 76 L.Ed.2d 648 (1983). Rather, they involve "the question of who should decide whether such a remedy should be provided."  <u>Id.</u>  For example, a <u>Bivens</u> remedy will not be extended to a plaintiff if "defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective."  <u>Carlson v. Green</u>, 446 U.S. 14, 18-19, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15

(1980). Moreover, courts will refrain from extending a _Bivens_ claim if doing so trammels upon matters best decided by coordinate branches of government. See _Lucas_, 462 U.S. at 378-80, 103 S.Ct. at 2411-13 (discussing case law according to which courts have deferred to coordinate branches).

Defendants argue that both of these exceptions apply to Counts 2 and 3 because, first, the INA provides Arar with an adequate, comprehensive remedy and, second, because the foreign policy and national-security concerns raised here are properly left to the political branches of government. The first argument is unpersuasive; the second is compelling.

**(i)    The Immigration and Nationality Act**

First, defendants argue that the remedial scheme set forth in the INA obviates any need for a _Bivens_ remedy. Having already pursued the argument that the INA bars federal jurisdiction over Arar's claims, they press this contradictory argument. Here, they claim that the INA provides Arar with a "comprehensive statutory scheme" to bring claims incident to his removal order, particularly via statutory provisions channeling review of the immigration-related issues to the federal courts of appeal. See, e.g., Thompson Mem. at 26.

Defendants' invocation of the INA is no more persuasive in the _Bivens_ context than it was in the jurisdictional context. In fact, to argue that the INA precludes federal jurisdiction and, at the same time, affords Arar a "comprehensive scheme" for

68

review has a certain dissonance, even under the most liberal construction of alternative pleading. Arar alleges that his final order of removal was issued moments before his removal to Syria, which suggests that it may have been unforeseeable or impossible to successfully seek a stay, preserving Arar's procedural rights under the INA. See supra at footnote 12 of this opinion. In any event, the INA would not provide any kind of "comprehensive scheme" with respect to his alleged torture by Syrian officials.

Defendants cite Sugrue v. Derwinski, 26 F.3d 8 (2d Cir. 1994), and Van Dinh v. Reno, 197 F.3d 427 (10th Cir. 1999), in support of their contention that the INA is an adequate alternative to Bivens. Neither case supports their position. Sugrue involved, inter alia, a claim against employees of the Veterans Administration based on a disputed disability rating and lost benefits. The court declined to infer a cause of action against the employees in their individual capacities, in light of the "multitiered and carefully crafted administrative process" for addressing disputed benefit ratings. 26 F.3d at 12.

Van Dinh is equally inapposite. That case sought class-wide injunctive relief against the Attorney General's discretionary decision to detain aliens pending their removal. Unlike the case at bar, the jurisdiction-stripping provisions of the INA raised by defendants did apply. See 197 F.3d at 432 (citing 8 U.S.C. § 1252(a)(2)(B)(ii)). Moreover, the alien had a meaningful

alternative remedy as he was entitled to individual relief by
appealing his order of deportation to the Board of Immigration
Appeals, which he bypassed by filing a habeas corpus action in
federal district court instead.  <u>Id.</u> at 429.

Defendants note, however, that Congress has deliberately
refused to provide a private cause of action for monetary damages
within any provision of the INA.  This is perhaps their strongest
argument that Congress did not intend to allow a private party to
pursue a judicial solution to an administrative problem.
Nevertheless, the INA deals overwhelmingly with the admission,
exclusion and removal of aliens – almost all of whom seek to
remain within this country until their claims are fairly
resolved.  That framework does not automatically lead to an
adequate and meaningful remedy for the conduct alleged here.

In short, defendants have failed to demonstrate that
"Congress has provided an alternative remedy [in the form of the
INA]," <u>Carlson</u>, 446 U.S. at 18-19, or to identify an alternative
venue through which Arar could have satisfactorily preserved
"some avenue for judicial relief."  <u>Calcano-Martinez v. INS</u>, 232
F.3d 328, 333 (2d Cir. 2000).

**(ii)    National-Security and Foreign Policy Considerations**

Defendants next argue that this court should decline to
extend a <u>Bivens</u> remedy in light of the national-security concerns
and foreign policy decisions at the heart of this case.  Such
determinations, they claim, are uniquely reserved to the

political branches of government and counsel against the
extension of a damages remedy here.  <u>See</u>, <u>e.g.</u>, Ashcroft Mem. at
33, n.32.

This case undoubtedly presents broad questions touching on
the role of the Executive branch in combating terrorist forces –
namely the prevention of future terrorist attacks within U.S.
borders by capturing or containing members of those groups who
seek to inflict damage on this country and its people.  Success
in these efforts requires coordination between law-enforcement
and foreign-policy officials; complex relationships with foreign
governments are also involved.  In light of these factors, courts
must proceed cautiously in reviewing constitutional and statutory
claims in that arena, especially where they raise policy-making
issues that are the prerogative of coordinate branches of
government.

A number of considerations must be noted here.  First,
Article I, Section 8 of the U.S. Constitution places the
regulation of aliens squarely within the authority of the
Legislative branch.  Congress has yet to take any affirmative
position on federal-court review of renditions; indeed, by
withholding any explicit grant of a private cause of action under
the Torture Victim Protection Act to plaintiffs like Arar, or to
any plaintiff under FARRA, the opposite is the more reasonable
inference.

Second, this case raises crucial national-security and

foreign policy considerations, implicating "the complicated multilateral negotiations concerning efforts to halt international terrorism." <u>Doherty v. Meese</u>, 808 F.2d 938, 943 (2d Cir. 1986). The propriety of these considerations, including supposed agreements between the United States and foreign governments regarding intelligence-gathering in the context of the efforts to combat terrorism, are most appropriately reserved to the Executive and Legislative branches of government. Moreover, the need for much secrecy can hardly be doubted. One need not have much imagination to contemplate the negative effect on our relations with Canada if discovery were to proceed in this case and were it to turn out that certain high Canadian officials had, despite public denials, acquiesced in Arar's removal to Syria. More generally, governments that do not wish to acknowledge publicly that they are assisting us would certainly hesitate to do so if our judicial discovery process could compromise them. Even a ruling sustaining state-secret-based objections to a request for interrogatories, discovery demand or questioning of a witness could be compromising. Depending on the context it could be construed as the equivalent of a public admission that the alleged conduct had occurred in the manner claimed – to the detriment of our relations with foreign countries, whether friendly or not. Hence, extending a <u>Bivens</u> remedy "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national

interest." <u>U.S. v. Verdugo-Urquidez</u>, 494 U.S. 259, 273-74, 110 S.Ct. 1056, 1065, 108 L.Ed.2d 222 (1990). It risks "produc[ing] what the Supreme Court has called in another context 'embarrassment of our government abroad' through 'multifarious pronouncements by various departments on one question.'" <u>Sanchez-Espinoza v. Reagan</u>, 770 F.2d 202, 208 (D.C. Cir. 1985) (Scalia, J.) (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 226, 217, 82 S.Ct. 691, 715, 710, 7 L.Ed.2d 663 (1962)). As the Supreme Court recently noted, "[r]emoval decisions, including the selection of a removed alien's destination, 'may implicate our relations with foreign powers' and require consideration of 'changing political and economic circumstances.'" <u>Jama v. Immigration & Customs Enforcement</u>, 543 U.S. 335, 348, 125 S. Ct. 694, 704, 160 L. Ed. 2d 708 (2005) (quoting <u>Mathews v. Diaz</u>, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)). <u>See also</u> <u>Shaughnessy v. U.S. ex rel. Mezei</u>, 345 U.S. 206, 222, 73 S.Ct. 625, 634, 97 L.Ed. 956 (1953) (Jackson, J., dissenting) ("Close to the maximum of respect is due from the judiciary to the political departments in policies affecting security and alien exclusion.").

The Supreme Court has further noted that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial

inquiry or interference." <u>Harisiades v. Shaughnessy</u>, 342 U.S. 580, 588-89, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952) (footnote omitted); <u>see also</u> <u>Bertrand v. Sava</u>, 684 F.2d 204, 211-12 (2d Cir. 1982).

Third, with respect to these coordinate branch concerns, there is a fundamental difference between courts evaluating the legitimacy of actions taken by federal officials in the domestic arena and evaluating the same conduct when taken in the international realm. In the former situation, as in <u>Elmaghraby v. Ashcroft</u>, No. 04-cv-1409, 2005 WL 2375202 (E.D.N.Y. Sept. 27, 2005), judges have not only the authority vested under the Constitution to evaluate the decision-making of government officials that goes on in the domestic context, whether it be a civil or a criminal matter, but also the experience derived from living in a free and democratic society, which permits them to make sound judgments. In the international realm, however, most, if not all, judges have neither the experience nor the background to adequately and competently define and adjudge the rights of an individual vis-à-vis the needs of officials acting to defend the sovereign interests of the United States, especially in circumstances involving countries that do not accept our nation's values or may be assisting those out to destroy us.

On a related point, despite plaintiff's counsel's contention to the contrary at oral argument, the qualified immunity defense, which works effectively in the domestic sphere to protect

officials in the performance of their duties, is not a sufficient
protection for officials operating in the national-security and
foreign policy contexts.  This is because the ability to define
the line between appropriate and inappropriate conduct, in those
areas, is not, as stated earlier, one in which judges possess any
special competence.  Moreover, it is an area in which the law has
not been developed or specifically spelled out in legislation.
Nor can we ignore the fact that an erroneous decision can have
adverse consequences in the foreign realm not likely to occur in
the domestic context.  For example, a judge who, because of his
or her experience living in the community, rejects a police claim
that a certain demonstration is potentially violent and, as a
result, allows the demonstration to proceed over the objections
of these law-enforcement officials faces a much smaller risk that
this decision will result in serious consequences even if, with
the benefit of hindsight, his or her judgment turns out to be
wrong.  On the other hand, a judge who declares on his or her own
Article III authority that the policy of extraordinary rendition
is under all circumstances unconstitutional must acknowledge that
such a ruling can have the most serious of consequences to our
foreign relations or national security or both.

Accordingly, the task of balancing individual rights against
national-security concerns is one that courts should not
undertake without the guidance or the authority of the coordinate
branches, in whom the Constitution imposes responsibility for our

foreign affairs and national security.  Those branches have the
responsibility to determine whether judicial oversight is
appropriate.  Without explicit legislation, judges should be
hesitant to fill an arena that, until now, has been left
untouched – perhaps deliberately – by the Legislative and
Executive branches.  To do otherwise would threaten "our
customary policy of deference to the President in matters of
foreign affairs."  <u>Jama</u>, 543 U.S. at 348, 125 S.Ct. at 704.  <u>See</u>
<u>Chaser Shipping Corp. v. U.S.</u>, 649 F. Supp. 736, 739 (S.D.N.Y.
1986), <u>aff'd</u>, 819 F.2d 1129 (2d Cir. 1987) (affirming dismissal
by district court of tort claims by foreign shipping company
against United States under covert military operations in
Nicaragua), <u>cert.</u> <u>denied</u>, 484 U.S. 1004, 108 S.Ct. 695, 98
L.Ed.2d 647 (1988), <u>rehrg.</u> <u>denied</u>, 487 U.S. 1243, 108 S.Ct. 2921,
101 L.Ed.2d 952 (1988).  In sum, whether the policy be seeking to
undermine or overthrow foreign governments, or rendition, judges
should not, in the absence of explicit direction by Congress,
hold officials who carry out such policies liable for damages
even if such conduct violates our treaty obligations or customary
international law.

For these reasons, I conclude that a remedy under <u>Bivens</u> for
Arar's alleged rendition to Syria is foreclosed.[13]  Accordingly,

_____

[13] Under the Authorization for Use of Military Force, Pub.L.
107-40, §§ 1-2, 115 Stat. 224 (Sept. 18, 2001) ("AUMF"),
President Bush has been authorized to "use all necessary and
appropriate force against those nations, organizations, or

Counts 2 and 3 of the complaint are dismissed.[14]

**(5)**

**Detention Within the United States**

Count 4 of Arar's complaint challenges his thirteen-day period of detention within the United States, during which time he alleges he was denied access to counsel and subjected to coercive and involuntary custodial interrogation. This included being placed in a cell at JFK Airport with lights remaining on all night, the denial of telephone privileges and adequate food, denial of access to his consulate and verbal attacks by interrogators. Arar's complaint further alleges that he was involuntarily subjected to coercive interrogation "for excessively long periods of time and at odd hours of the day and night" and was "placed in solitary confinement, shackled, chained, strip-searched and deprived of sleep and food for

_____

persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Despite the breadth of this language, the AUMF is not a factor in the above analysis.

[14] Two of the individually named defendants, Larry Thompson and John Ashcroft, also raise a defense under the political-question doctrine. Under that doctrine, courts will not review "those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Japan Whaling Assoc. v. Am. Cetacean Soc'y, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986). Having determined that no Bivens remedy is available here, there is no need to discuss the political-question doctrine.

extended periods of time." Cplt. ¶ 4. The interrogation was "designed to overcome his will and compel incriminating statements from him." Cplt. ¶ 4.

An individual in Arar's shoes, detained at the U.S. border and held pending removal, does not officially effect an "entry into the United States." Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 2500, 150 L.Ed.2d. 653 (2001). Instead, such a person is "'treated,' for constitutional purposes, 'as if stopped at the border.'" Id. (citing Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 215, 73 S.Ct. 625, 629-31, 97 L.Ed. 956 (1953)). See Leng May Ma v. Barber, 357 U.S. 185, 188-90, 78 S.Ct. 1072, 1074-75, 2 L.Ed.2d 1246 (1958) (alien "paroled" into the United States pending admissibility had not effected an "entry"); Kaplan v. Tod, 267 U.S. 228, 230, 45 S.Ct. 257, 257-58, 69 L.Ed. 585 (1925) (despite nine years' presence in the United States, an "excluded" alien "was still in theory of law at the boundary line and had gained no foothold in the United States").

Defendants liken Arar's juridical status to that of the plaintiff in Mezei. Mezei concerned a lawful permanent resident who briefly left the country and, upon return, was refused entry for national security reasons and held on Ellis Island indefinitely while the Government attempted to find another country to accept him. Upon challenging his nearly two-year detention on due process grounds, the Supreme Court held that the plaintiff enjoyed few, if any, procedural due process rights to

challenge his incarceration. With <u>Mezei</u> as the starting point,
defendants argue that Arar, too, is owed little or no due process
protections. <u>See</u>, <u>e.g.</u>, Mueller Mem. at 27 (citing <u>Zadvydas</u> for
proposition that "Arar['s] entitlement to constitutional
protection is at best debatable").

But the precise relationship between <u>Mezei</u> and this case is
unclear. For one thing, <u>Mezei</u> does not address the <u>substantive</u>
due process claims raised here. Moreover, the plaintiff in <u>Mezei</u>
was attempting to effect an entry (or, more precisely, reentry)
into the United States, which potentially raises different
national security questions from an individual like Arar, who was
only "passing through the United States" on his way to Canada.
Thompson Mem. at 15.

With this questionable starting point, defendants launch
into an argument regarding the substantive due process rights of
excludable aliens, a matter about which courts have said
relatively little. The Second Circuit, citing <u>Mezei</u>, has
mentioned, in a footnote, that "[o]ther than protection against
gross physical abuse, the alien seeking initial entry appears to
have little or no constitutional due process protection." <u>Correa
v. Thornburgh</u>, 901 F.2d 1166, 1171, n.5 (2d Cir. 1990).
Defendants cite <u>Correa</u> and <u>Mezei</u> as standing for the proposition
that an individual in Arar's situation enjoys only the most
limited due process protections while in the United States.

Assuming, <u>arguendo</u>, the aptness of <u>Correa</u> and <u>Mezei</u>, Arar's

rights in the U.S. are by no means nonexistent.  Although the federal courts have not fully fleshed out the contours an excludable alien's due process rights, certain developments since <u>Mezei</u> warrant mention.

Preliminarily, the First Circuit has noted that "outside the context of admission and exclusion procedures, excludable aliens do have due process rights." <u>Amanullah v. Nelson</u>, 811 F.2d 1, 9 (1st Cir. 1987).  <u>Amanullah</u> involved a habeas petition by four Afghani men challenging their detention pending final resolution of their exclusion proceedings.  The First Circuit, affirming a lower court denial of the habeas petitions, noted the various constitutional guarantees afforded excludable aliens.  The court noted that excludable aliens "have <u>personal</u> constitutional protections against illegal government action of various kinds; the mere fact that one is an excludable alien would not permit a police officer savagely to beat him, or a court to impose a standardless death penalty as punishment for having committed a criminal offense." <u>Id.</u> at 9 (emphasis in original).

The Fifth Circuit has equally rejected the notion that "excludable aliens possess no constitutional rights." <u>Lynch v. Cannatella</u>, 810 F.2d 1363, 1372, 1374 (5th Cir. 1987).  <u>Lynch</u>, like <u>Amanullah</u>, addressed the question whether excludable aliens – here, stowaways discovered hiding aboard a barge bound for ports on the Mississippi river – could challenge their incarceration pending removal.  Noting that the stowaways did

"not possess a due process right to remain free of incarceration pending their deportation," id. at 1370, the Fifth Circuit, nevertheless, noted that excludable aliens were, at a minimum, "entitled under the due process clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials." Id. at 1374.  The Eleventh Circuit has reached a similar conclusion as well.  See Jean v. Nelson, 727 F.2d 957, 972 (11th Cir. 1984) (en banc) ("Of course, there are certain circumstances under which even excludable aliens are accorded rights under the Constitution."), aff'd, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).  More recently, my colleague has flatly rejected the proposition that continued presence of national security concerns make the treatment of aliens in our custody within the United States unreviewable under Bivens.  Elmaghraby v. Ashcroft, No. 04-cv-1409, 2005 WL 2375202 (E.D.N.Y. Sept. 27, 2005) (Gleeson, J.).

As already noted, Correa and Mezei are of questionable relevance to the case at bar because Arar was not attempting to effect entry to the United States.  Regardless, the deprivations Arar alleges with respect to his treatment while in U.S. custody potentially concern the type of "gross physical abuse" that could trigger a due process violation.  Arar's allegations indicate that he was treated quite differently than the usual illegal alien.  Although plaintiff's allegations – as compared to those in Elmaghraby — are presently borderline as to whether they

constitute a due process violation of "gross physical abuse," an amended complaint might remedy this deficiency.

Arar also alleges that defendants interfered with his access to courts in part by lying to his counsel. In order to successfully bring a denial-of-access claim, Arar must identify "a separate and distinct right to seek judicial relief for some wrong." Christopher v. Harbury, 536 U.S. 403, 414-15, 122 S.Ct. 2179, 2186, 153 L.Ed.2d 413 (2002). This requirement pays tribute to the fact that one's access to court is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." Id. at 415, 122 S.Ct. at 2186-87.

Those defendants taking up the denial-of-access issue argue that the only interference with Arar's access to court involved his ability to file "'a petition for habeas corpus or . . . otherwise challenge his detention.'" Ashcroft Reply Br. at 23 (citing Pl. Opp. at 32). Because they believe that any habeas petition would have been "doomed to fail," id. at 24, Arar's denial-of-access claim must fail, too. Whether any such petition would have been successful, see supra at footnote 12 of this opinion, it is clear that Arar is not asserting any challenge to his removal as such. Thus, any denial-of-access claim must concern more than his removal.

In any event, I have concluded that, given the serious national-security and foreign policy issues at stake, Bivens did

not extend a remedy to Arar for his deportation to Syria and any torture that occurred there. It would, therefore, be circular to conclude that a denial of access to counsel amounted to a violation of the Fifth Amendment when Arar cannot assert a "separate and distinct right to seek judicial relief" against defendants in the first place. Thus, I am inclined to deny any such claim unless plaintiff in repleading Count 4 can articulate more precisely the judicial relief he was denied.

In sum, Count 4, construed most favorably to plaintiff, alleges a possible "gross physical abuse" due process violation and perhaps a limited denial of access to counsel right (apart from the rendition aspect of the claim).[15]

## (6)

### Qualified Immunity

Having dismissed Counts 2 and 3 of the complaint under the special factors precluding <u>Bivens</u> relief, the only remaining question is whether Count 4, if still viable, is subject to a defense under the qualified immunity doctrine. Defendants argue that none of the claimed violations raised in Arar's complaint

---

[15] In a footnote of his opposition brief, <u>see</u> Pl. Mem. at 27, n.9, plaintiff raises a claim under the "state-created danger doctrine," according to which defendants violated the Due Process clause by affirmatively placing Arar in a situation where he was likely to face torture. At oral argument, counsel for Arar pressed this claim, arguing that it applies to Counts 2, 3 and 4. The state-created danger doctrine is but a back-door approach for reaching the claims in Counts 2 and 3 and is, therefore, rejected.

could have been deemed clearly established under law at the time the events took place.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Excluding the rendition aspect of the claim, the alleged "gross physical abuse" in the United States in Count 4 involved deprivations that would appear to violate clearly established rights. Such treatment, if true, may well violate the basic standards for a detainee in any context – civil, criminal, immigration, or otherwise – and possibly constitute conduct that a defendant could reasonably foresee giving rise to liability for damages. See Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

**(7)**

### Personal Involvement and Personal Jurisdiction

Defendants note, however, that the complaint lacks the requisite amount of personal involvement needed to bring a claim against them in their individual capacities or even to establish personal jurisdiction. See, e.g., Ashcroft Mem. at 8. Indeed, at this point, the allegations against the individually named defendants do not adequately detail which defendants directed, ordered and/or supervised the alleged violations of Arar's due

84

process rights, as defined in section (5) of this opinion, or whether any of the defendants were otherwise aware, but failed to take action, while Arar was in U.S. custody.  See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).  Accordingly, all claims against the individual defendants are dismissed without prejudice with leave for plaintiff to replead Count 4.

(8)

**State-Secrets Privilege**

The United States, invoking the state-secrets privilege, has moved for summary judgment under Fed. R. Civ. P. 56, with respect to Counts 1, 2 and 3 of the complaint.  See Memorandum in Support of the United States' Assertion of State Secrets Privilege.  The government has submitted declarations from former Deputy Attorney General James B. Comey and former Secretary of the U.S. Department of Homeland Security Tom Ridge, attesting that foreign affairs considerations are involved in this case.  See Dkt. No. 91.  Certain defendants, noting the invocation of that privilege, argue that it constitutes yet a further reason warranting dismissal of any Bivens claim.  See, e.g., Mueller Reply Mem. at 6.

I determined that before addressing the state-secrets privilege, it would be more appropriate to resolve the motions to dismiss the statutory and constitutional claims because it was not clear how the confidentiality of such information could be maintained without prejudicing my ability to hear and fairly

85

respond to plaintiff's arguments.  Now that those Counts have

been dismissed on other grounds, the issue involving state

secrets is moot.

The United States does not seek to dismiss Count 4 on

grounds of state-secrets privilege.  The individual defendants,

however, have asserted that all counts – including 4 – must be

dismissed against them in light of the invocation of privilege by

the United States.  Because, as this court construes Count 4, the

issue of state secrets is of little or no relevance, the

individually named defendants' assertion that Count 4 must be

dismissed with respect to them in light of the privilege is

denied at this time.  Should an amended complaint alter that

picture, the issue can be addressed at that time.

## Conclusion

1.  Arar lacks standing to bring a claim for declaratory
relief against plaintiffs in their official capacities, and thus
those claims are denied.

2.  With respect to claims under the Torture Victim
Protection Act against defendants in their personal capacities,
plaintiff as a non-citizen is unable to demonstrate that he has a
viable cause of action under that statute or that defendants were
acting under "color of law, of any foreign nation."  Accordingly,
Count 1 is dismissed with prejudice.

3.  With respect to claims alleging that defendants violated
Arar's rights to substantive due process by removing him to Syria
and subjecting him to torture, coercive interrogation and
detention in Syria, the INA does not foreclose jurisdiction over
plaintiff's claims.  Nonetheless, no cause of action under <u>Bivens</u>
can be extended given the national-security and foreign policy
considerations at stake.  Accordingly, Counts 2 and 3 are
dismissed with prejudice.

4.  With respect the claim that Arar was deprived of due
process or other constitutional rights by the defendants during
his period of domestic detention, prior cases holding that
inadmissible aliens deserve little due process protection are
inapplicable because Arar was not attempting to effect an entry
into the United States; in any event, the circumstances and
conditions of confinement to which Arar was subjected while in

U.S. custody may potentially raise <u>Bivens</u> claims.  However, plaintiff must replead those claims without regard to any rendition claim and name those defendants that were personally involved in the alleged unconstitutional treatment; as to the denial of access to counsel claim, he must also identify the specific injury he was prevented from grieving.  Count 4 is therefore, dismissed without prejudice.

5.  Claims against all ten John Doe law enforcement agents named in connection with that Count 4 are dismissed without prejudice as well, with leave to replead.

Dated:     Brooklyn, New York
           February 16, 2006

                              ORDERED:

                              ___/s/_____

                              David G. Trager
                              United States District Judge